

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 0 1 2022

TAMMY H. DOWNS, CLERK
By:_____
PLAINTIFF  DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DAIRY FARMERS OF AMERICA, INC.

v.                        No. 4:22-cv- 501- JM

WES WARD, in his official capacity as Secretary
of the Department of Agriculture; and
FREDERIC SIMON, in his official capacity as
Chairman of the Arkansas Milk Stabilization Board

This case assigned to District Judge _Moody_
and to Magistrate Judge _Ray_
                        DEFENDANTS

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Dairy Farmers of America, Inc. ("DFA"), for its complaint, states:

### PRELIMINARY STATEMENT

1.      For nearly a century, the milk industry in the United States has been heavily regulated by the federal government. This extensive federal regulation takes many forms, but perhaps the most important for purposes of this matter is the extensive regulatory program pursuant to which the minimum prices that dairy producers must receive from dairy handlers are established.

2.      The sale of raw milk in Arkansas has long been governed by this federal program through the operation of Federal Milk Marketing Order No. 7, which covers Arkansas and other southeastern states.[1] 7 C.F.R. 1007.2. This federal program creates a pool of money whereby the processors of raw milk into consumable products (like beverage milk, cheese, and butter) pay money into the pool based on the intended use of the raw milk and the farmers, or their cooperatives, receive proper payment from that pool based on the average of all receipts, which is overseen and audited by the Federal Market Administrator.

_____

[1] *See* USDA Agricultural Marketing Service, *An Overview of the Federal Milk Marketing Order Program* (Oct. 2019), available at
https://www.ams.usda.gov/sites/default/files/media/DairyFMMOBooklet.pdf.

3.      In 2007, Arkansas created the Arkansas Milk Stabilization Board Act to study ways in which to assist Arkansas dairy farmers. ARK. CODE ANN. § 2-10-101 *et seq.* The Milk Board is composed of five gubernatorial appointees:  two Arkansas dairy farmers, one Arkansas consumer, one Arkansas milk processor, and one Arkansas retailer. ARK. CODE ANN. § 2-10-103(a). As originally conceived, the Milk Board had a limited role. It was supposed to research how other states support their dairy farmers, investigate ways to support the dairy industry, and—perhaps foreseeing that regulating the dairy industry in light of a comprehensive federal scheme would have legal ramifications—"[c]reate a plan to assist Arkansas dairy farmers that would be equitable to all parties in the state dairy industry and withstand legal challenges." ARK. CODE ANN. § 2-10-104(a)(2)–(4) (2007 version).

4.      Fourteen years later, in 2021, Arkansas purported to directly regulate Arkansas milk prices for the first time by ordering the Milk Board to require that Arkansas milk producers receive prices above those set by the federal program. *See* Ark. Act 521 of 2021.[2] To implement Act 521's mandate, the Milk Board adopted the Milk Stabilization Rule (the "Rule") this year,[3] which would require milk "dealers"[4] to pay a so-called "over-market premium" to milk producers, and would require "cooperatives," such as DFA, to "pass through" the premium to producers as well as make

---

[2] In 2009, Arkansas enacted a temporary grant program in 2009 to prop up Arkansas milk prices. *See* Act 968 of 2009. That program, though, was not funded by taking money from one private interest and giving it to another private interest. *See* ARK. CODE ANN. § 2-10-203.

[3] The Rule is attached as Exhibit 1 to this Complaint.

[4] "Dealer" is defined in the Rule as "any person, who purchases or receives or handles on consignment or otherwise milk within the State, for processing or manufacture and further sale, within or without the State . . . ." This definition does not line up with the definitions of the federal regulatory system, which would use terms such as "pool plant," "distributing plant," "supply plant," or "handler." 7 C.F.R. §§ 1000.5, 1000.6, 1007.7, 1000.9.  The Rule's "dealer" would nonetheless be encompassed, depending on the specific products being processed at the plant, by one or more of the federal definitions.

the calculations to arrive at the premium. By requiring such a payment, the Rule directly conflicts with the pervasive federal regulation of the raw milk market, which establishes the method of calculation for the minimum price to be paid by the processor (milk dealer) and the rules and procedures for the payment for raw milk. *See* 7 C.F.R. §§ 1000.50 et. seq., 1007.51 et. seq. (available at https://fmmatlanta.com/Misc_Docs/Language_FO7%20May_14.pdf [accessed May 29, 2022]).

5.     The Rule also purports to shield a cooperative's member contracts from interference, providing that "[n]o provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state." Rule at § 5.A. However, to the extent that the Rule requires a cooperative to pay Arkansas dairy farmers in a way that substitutes the State's judgment for the cooperative's judgment in determining what that the cooperative pays other farmers in the region, the Rule does indeed interfere with the cooperative's contracts with its members.

6.     This interference with contract could have severe impacts. To the extent that the State believes that DFA is responsible for making the payments under the Rule to its Arkansas dairy farmer members, DFA may be required to pay those farmers more than DFA would have received for their milk under the federal regulatory program. In all cases, such a situation would require DFA to take money that would otherwise go to its non-Arkansas dairy farmer members in order to pay its Arkansas dairy farmers consistent with the Rule.

7.     DFA therefore seeks a declaration from this Court that Act 521, as implemented by the Rule, is an improper, unconstitutional interference with DFA's contracts with its dairy farmer

members (both in Arkansas and elsewhere). In the alternative, DFA seeks a declaration that the Act 521 and the Rule do not apply to DFA because the Rule makes clear the State's intent not to interfere with a dairy cooperative's contracts with its farmer members, which Act 521 and Rule necessarily would.

8.      In the alternative, DFA seeks a declaration that Act 521 and the Rule are preempted by the federal regulatory program because they undermine the very purposes of the federal rules regarding payment to farmers.

9.      Additionally, in the further alternative, DFA seeks a declaration that Act 521, and the Rule unduly burden interstate commerce and exceed the state's police powers under the Arkansas Constitution by regulating the price to be agreed upon by two contracting parties solely for the benefit of one of those parties.

10.     For these and other reasons, DFA brings this lawsuit seeking the foregoing declarations. DFA further requests an injunction barring enforcement of Act 521 and the Rule.

## PARTIES

11.     Plaintiff Dairy Farmers of America, Inc. ("DFA") is a Kansas cooperative marketing association with its principal place of business in Kansas City, Kansas. DFA is a cooperative owned by over 6,000 family farms across the country, including Arkansas and its six surrounding states. DFA is governed by a 48-member board of directors who are all farmer members elected by other farmer members.

12.     Defendant Wes Ward is the Secretary of the Arkansas Department of Agriculture. In that role, he implements and enforces the challenged legislation and Rule. *See* ARK. CODE ANN. § 25-38-202(b). This suit is brought against him in his official capacity and as the representative of the Arkansas Department of Agriculture.

13.     Defendant Frederic Simon is the Chairman and a member of the Milk Board. In that role, he implements and enforces the challenged legislation and Rule. This suit is brought against him in his official capacity and as the representative of the Milk Board.

## JURISDICTION AND VENUE

14.     DFA's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution, and the Arkansas Constitution. This Court has supplemental jurisdiction over DFA's claim that the Act and the Rule do not apply to it. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

15.     The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a).

16.     This Court has inherent equitable powers to enjoin the actions of state officials if they contradict the federal Constitution or federal law. *Ex parte Young*, 209 U.S. 123, 159–60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

17.     Venue is proper in this district because this action challenges an Arkansas law and regulations passed in and administered from Little Rock, which is within the Central Division of this District. 28 U.S.C. §§ 83(a)(1), 1391(b)(1)–(2).

## BACKGROUND

### A.     The Dairy Supply Chain

18.     The regulation and operation of the dairy industry in the United States is complicated. There are three levels of the supply chain at issue. First, dairy farmers operate farms at which raw milk is produced. Second, those farmers may join together to form a farmer cooperative (consistent with several federal and state laws encouraging such joint action to improve the economic interests of their farmer members) like DFA. The farmers are the owners of

the cooperative and agree, consistent with cooperative principles, to some form of democratic governance and the sharing of economic risks and rewards. Those cooperatives purchase and then market the raw milk produced by their members. Third, processors, some of which may be owned by cooperatives or even by individual farmers, purchase raw milk and process it into consumable form.

19.     There are two prices of raw milk of interest—the prices that processors (milk "dealers") pay for the raw milk they buy and the prices that dairy farmers receive for the raw milk they sell, with a farmer-owned cooperative often in between. The price that processors pay for raw milk is regulated. The federal government sets the price based on certain formulas, and processors pay that price, which usually differs depending on the milk's end use, along with any negotiated service charges intended to at least partially offset certain marketing expenses (also sometimes referred to as "premiums") above that price. *See infra* Paragraph 28, incorporated herein by reference.

20.     The price received for raw milk is generally based on the concept of market-wide pooling. The purpose of such pooling is to create orderly marketing conditions and to allow farmers to benefit from the classified system of pricing without creating a marketing environment that pits farmers against one another to supply any particular type of plant (*i.e.*, fluid v. cheese), which would result in increased costs and a diminution in the overall value of the milk.

21.     The revenue that farmers receive for their raw milk is often called the "mailbox price." For independent farmers (*i.e.,* farmers who are not members of cooperatives), the mailbox price is a regulated price based on the weighted average of all regulated prices (often called the "blend price"), plus any additional premium above that price which is negotiated between the seller

(the farmer) and the buyer (the processor) of the raw milk, but less permitted deductions, such as lab testing or legal fees. *See infra* Paragraph 31, incorporated herein by reference.

22.     For farmers who belong to cooperatives, the determination of the mailbox price involves a different type of calculation unique to each cooperative. It begins with the cooperative's receipt of the blend price from processors on behalf of its farmer members, plus any service charges negotiated by the cooperative that processors pay above that blend price which are intended to at least partially offset certain marketing expenses. This collective negotiation on behalf of a group of farmers is encouraged by the Capper-Volstead Act and other agricultural exemptions, which provide exemptions from the antitrust laws for activities relating to the collective marketing and handling of milk.

23.     The revenues from the sale of a cooperative farmer member's milk and the costs associated with the marketing of the milk are pooled with those of other cooperative members in the region. This means that a particular farmer in a cooperative pooling arrangement will receive a payment that reflects his share of this pool, and this share will depend on the cooperative's methods for allocating the pool. *See infra* Paragraph 32, incorporated herein by reference.

24.     Because farmers own the cooperative, they also receive any profits that the cooperative makes on the sale of finished product or from other operations (this distribution is called a "patronage dividend"). While each cooperative's methods for allocation of both the revenues associated with the sale of raw milk and the profits from operations will differ, the allocation methods are generally determined by decisions made by the cooperative's board of farmers or made by cooperative employees overseen by the elected farmer board.

25.     In DFA's case, DFA is formed as a Kansas cooperative which qualifies under Section 6 of the Clayton Act, 15 U.S.C. § 17, and the Capper-Volstead Act, 7 U.S.C. § 291, for

7

purposes of certain limited antitrust exemptions and for purposes of the federal regulatory program. DFA is divided into seven areas for purposes of the farmer's democratic governance and raw milk marketing.

26.     DFA's farmer-members in Arkansas are part of DFA's Southeast Area. Those farmers elect local farmers to represent them, who in turn elect farmers to represent them on the Southeast Area Council. The Area Council oversees DFA's operations in the Southeast. At the same time, the Southeast Area is a pool within DFA whereby the revenues from the sale of raw milk by all farmers in the Southeast are put together, expenses of the Southeast operations are deducted, and then the net proceeds are shared and paid back to the farmers. DFA's Southeast Area farmer members also receive, as a separate payment, a patronage dividend that is established by DFA's farmer Board of Directors based on the profits that DFA, which is owned in its totality by all the family farms who are its member owners, may have made on its own processing and other operations.

**B.     The Pervasive Federal Regulation of Dairy**

27.     In 1937, Congress enacted the Agricultural Marketing Agreement Act, which authorized the Secretary of Agriculture to regulate minimum prices paid to producers of milk via marketing orders for particular geographic areas. *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 188–90 (1994) (citing 7 U.S.C. § 601 *et seq.*); *see also Ark. Dairy Coop. Ass'n v. U.S. Dept. of Agriculture*, 573 F.3d 815, 817–18 (D.C. Cir. 2009).

28.     To that end, the Secretary of Agriculture has issued milk marketing orders setting minimum producer prices for various regions of the country. *See* 7 U.S.C. § 608c. Arkansas is in the Southeast Marketing Area, 7 C.F.R. § 1007.2, and is governed by Federal Milk Market Order No. 7.

29.     For the purpose of setting prices under marketing orders, milk is divided into four classes, depending on what end product the milk is used to produce. 7 C.F.R. §§ 1007.40, 1000.40. Class I milk, for example, is milk disposed of in the form of fluid milk products. 7 C.F.R. §§ 1007.40, 1000.40(a). Each class of milk receives a different price. 7 C.F.R. §§ 1007.40, 1000.40; *see also Ark. Dairy Coop. Ass'n*, 573 F.3d at 818.

30.     As set forth above, the persons who process the raw milk into consumable products (*see* 7 C.F.R. §§ 1000.5, 1000.6, 1007.7) pay a class-based price according to the way the milk is used, 7 C.F.R. §§ 1007.60, 1007.71. Class I milk typically fetches a higher price than other classes of milk. This price is not dependent in which state the plant is located; rather it is a question of whether the plant is regulated by a particular milk marketing order. There are three plants in Arkansas at which fluid milk is processed and all three plants are regulated under Federal Order 7.

31.     As set forth above, raw milk "producers," *i.e.*, dairy farmers, 7 C.F.R. § 1007.12, ultimately receive a blended price based on the weighted average price of all the classes of milk sold, *West Lynn Creamery*, 512 U.S. at 189 n.1. *See also Ark. Dairy Coop. Ass'n*, 573 F.3d at 818 (explaining concept of payment pooling).

32.     If the dairy farmer belongs to a cooperative, the cooperative is paid the blend price for the raw milk shipped to a particular processor. Yet, the federal regulations do not require the cooperative to pay the farmer the blend price. Rather, the cooperative is explicitly permitted to take those proceeds and combine those proceeds with that of other farmers, net out expenses, and then distribute the net to the farmers under its membership and marketing agreements with its member. 7 U.S.C. § 608c(5)(F).[5]

---

[5]     That Section states: "Nothing contained in this subsection (5) is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions of the Act

C.      **DFA's Membership and Marketing Agreements**

33.     Each dairy farmer member of DFA has entered into an agreement with DFA that governs that farmer's membership in and the marketing of their milk by DFA.

34.     The current form of DFA's Membership and Marketing Agreement provides in pertinent part that—

> DFA agrees to purchase all Milk from Member, and thereafter market or utilize such Milk in a form and manner as DFA deems best for the advantage and benefit of all Members. DFA is authorized to adopt or enter into any marketing plan or plans for pooling of Milk or dairy products, or proceeds from the sale of Milk or dairy products. DFA is authorized to blend the proceeds of Milk with the proceeds derived from raw grade "A" milk sold by other Members.

A true and correct copy of the current Membership and Marketing Agreement is attached hereto as Exhibit 2 and is incorporated by reference herein.

35.     The Membership and Marketing Agreement provides that after title to the milk passes to DFA, which occurs at the member–producer's farm when the milk is "transferred onto the hauler's trailer past the trailer's valve," "DFA has the exclusive responsibility and right to perform or to direct the handling and all other aspects of the marketing or utilization of Milk, including the right to commingle Milk with other producers' milk." Exhibit 2 at ¶ 2(B) and (C).

36.     Some farmers members of DFA have entered into prior versions of the Membership and Marketing Agreement. Nonetheless, each such Agreement provides that "Member agrees to

---

of Congress of February 18, 1922, as amended, known as the "Capper-Volstead Act" [7 U.S.C. §§ 291, 292], engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers: Provided, That it shall not sell milk or its products to any handler for use or consumption in any market at prices less than the prices fixed pursuant to paragraph (A) of this subsection (5) for such milk."

abide by and observe the rules, regulations, policies and Bylaws of DFA which are incorporated into this Agreement by reference. Member agrees that the rules, regulations, policies and Bylaws of DFA supersede and control over any conflicting provisions stated, or implied, in this Agreement." Exhibit 2 at ¶ 1(E).  It is DFA policy to take title to the member's milk, notwithstanding the specific terms of the Membership and Marketing Agreement, once the raw milk is transferred to the hauler's trailer (consistent with the current Membership and Marketing Agreement set forth in Exhibit 2).

37.     Regarding distributions of proceeds to DFA's members, the Membership and Marketing Agreement provides that DFA first pays "ordinary and necessary expenses incurred in the marketing or utilization of Milk or dairy products" and any other deductions and offsets authorized by law, its rules, regulations, policies, Bylaws, or other agreements between DFA and the member. Exhibit 2 at ¶ 3(A).

38.     In addition to this payment, DFA members receive an allocation of net earnings "upon the basis of patronage pursuant to its Bylaws." Exhibit 2 at ¶ 3(B).

39.     Although there have been numerous versions of this Membership and Marketing Agreement over the years, DFA's broad authority to market the milk, to blend the revenues received, to subtract expenses, and then to distribute the proceeds[6] (as well as to allocate net earnings pursuant to its bylaws), taking into consideration the interests of all of its farmer members has been consistent.

---

[6]     This is sometimes referred to as "reblending" because the cooperative first receives the federal blend price for the raw milk that it delivers to a regulated processor and combines it with the proceeds from sales to other processors and then deducts expenses, leading to a new calculation of the value of the pool from which distributions will be made to the farmers. See note 5, above.

### D.    Act 521 - Arkansas Imposes Additional Price Controls on Milk

40.    In 2021, Arkansas passed Act 521, which purported to give the Milk Board jurisdiction over the "base milk price paid to an Arkansas milk producer," and which ordered the Milk Board to "[r]equire that an Arkansas milk producer receive Class 1 prices for milk utilized or sold as fluid milk in this state." Act 521 of 2021, § 1 (codified at ARK. CODE ANN. § 2-10-104(d)(1)). The Act further directed the Milk Board to "[m]ake, modify, and enforce rules that the board deems necessary to effectively carry out this subsection." Act 521 of 2021, § 1 (codified at ARK. CODE ANN. § 2-10-104(d)(2)(b)). The Act expressly ties the "Class 1" price to Federal Milk Marketing Order No. 7. Act 521 of 2021, § 2 (codified at ARK. CODE ANN. § 2-10-104(e)(2)).

41.    Over the course of several months, the Milk Board attempted to formulate a rule that would implement Act 521's unfunded mandate. As the Milk Board began those proceedings under the Arkansas Administrative Procedure Act, it held public meetings where input was provided. In one of the first meetings, lawyers for the Arkansas Department of Agriculture arranged for the appearance of dairy-law experts on the faculty of the Penn State University Center for Agricultural and Shale Law.  The two law professors provided a PowerPoint presentation to the Board explaining the basics of the Federal Milk Marketing Order system and highlighted a price-control law from Pennsylvania. Significantly, the Pennsylvania law included establishing minimum pricing at the wholesale and retail level and chose to define a cooperative as a milk producer similar to the Federal Milk Marketing Order system. The law professors contrasted Act 521 and highlighted their concerns with the Act, including the interplay with the Federal Milk Marketing Order system and the application of the United States Constitution's dormant commerce clause, indicating that there is always a question of whether a state law that discriminates against out-of-state producers violates the commerce clause. In addition, the professors raised practical issues including application of the Act 521 to milk shipped to and processed out of state and,

significant to this case, application to milk produced by members of a cooperative.[7] The professors indicated that the state's authority to audit and mandate how a cooperative's money was paid out to its members was questionable and indicated that when a producer decides to become a member of a cooperative, that contractual relationship is controlling and cannot be interfered with.

42.    In March 2022, the Milk Board adopted the Milk Stabilization Rule, and the Rule was filed with the Arkansas Secretary of State on May 23, 2022.

43.    The Rule requires that milk "dealers" (typically the processor) pay what is termed an "Over-Market Premium" (hereinafter sometimes referred to as "Premium") to Arkansas milk producers. Rule at §§ 2–3. The Premium reflects an effort to require Arkansas milk producers be paid the federal Class I price for all their milk that is ultimately sold as fluid milk in Arkansas. Rule at § 3.B. This is in direct conflict with the federal regulatory program, which requires that an Arkansas milk producer shipping to a federally regulated plant receive the blend price under Federal Milk Marketing Order No. 7.

44.    The Rule requires that the dealer either pay the Premium to the producer directly, or else remit the Premium to the cooperative (such as DFA), in which case the cooperative must pass the Premium through, "in whole," to the producer. Rule at §§ 3.B, 5.C. If the dealer pays the Premium to the cooperative, then the cooperative must perform the calculation necessary to determine the Premium, even though the Premium is calculated based on information possessed by the dealer. Rule at § 3.B.

---

[7] DFA understands that the State has disclaimed any intention to regulate the prices paid by out-of-state milk dealers even if such dealers purchase raw milk from Arkansas dairy farmers and sell fluid milk in Arkansas. Should DFA's understanding be incorrect, it would have an additional commerce clause claim regarding the unconstitutionality of Act 521 and the Rule.

45.     The Rule purports to insulate DFA's contracts with its members (as well as with dealers) from interference by Act 521. *See* Rule at § 5.A–B. As counsel for the Department of Agriculture explained to the Milk Board at one of its meetings, Section 5 was put in the Rule to avoid "getting in the middle" of the contracts between the DFA and its members.

46.     While the text of the Rule appears to require dealers to fund the Over-Market Premium and shield cooperatives' relationship with their producer–members from interference, the majority of the members of the Milk Board clearly indicated throughout the process that they wanted the Premium to be paid by DFA, regardless of whether funds were paid by the processor, and apparently without regard to the interests of DFA's non-Arkansas dairy farmer members in the sharing of any proceeds by farmers in Federal Order 7 among all farmer members in the Order.

47.     After the draft rule was placed for public comment, the chairman of the Milk Board wrote a letter to Arkansas Governor Asa Hutchinson suggesting that neither end consumers nor dealers would bear the brunt of the legislature's payment mandate, but rather that DFA would bear it. According to the letter, "[t]he acclamation [*sic*] here that Act 521 is a 'Tax' going into effect costing Arkansans \$.20 per gallon of milk and that Hiland Dairy will have to administer the paperwork of the program immortalizes the Milk Board's work! Act 521 is not a tax and the cooperative side of Dairy Farmers of America will be distributing the monies, not Hiland Dairy processing directly." In addition, one member of the legislature who was a proponent of Act 521 and aggressively pushed the Milk Board to adopt these rules wrote to the Governor, stating that "[t]he funds from which this payment would come is from DFA, not a tax, and would affect only about 5% of the milk processed by Arkansas farmers."

48.     In an unsigned February 4, 2022, memorandum letter, the Department of Agriculture has stated that the Rule "[r]equires the cooperative to pay an over-market premium to

14

producers in Arkansas if the local utilization exceeds the [Federal Milk Marketing Order No. 7] utilization."

49.     It is a violation of the Rule for a cooperative such as DFA to fail to pass through the premium to a producer. Rule at § 6.B. The Rule also purports to create a civil cause of action in circuit court for a producer to recover an unpaid over-market premium.[8]

50.     The Rule goes into effect on June 2, 2022. *See* ARK. CODE ANN. § 25-15-204(g)(1)(A) ("Each rule adopted by an agency is effective ten (10) days after filing of the final rule with the Secretary of State unless a later date is specified by law or in the rule itself.").

51.     In light of the impending effective date of the Rule, statements made by government officials about the applicability of the Act and the Rule to DFA, and the uncertainty caused thereby, there is a case or controversy subject to the Federal Declaratory Judgment Act. 28 U.S.C. § 2201(a).

## CLAIMS FOR RELIEF

### CLAIM I
### (Declaratory/Injunctive Relief—Contracts Clause/Non-interference with Contract under the Rule)

52.     DFA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

53.     By requiring DFA to pay the Over-Market Premium to its Arkansas members, the Act and the Rule violate the United States and Arkansas Constitution by unlawfully interfering with DFA's contracts with its members.

---

[8] While not directly at issue in this lawsuit, this attempt by an executive agency to create a private right of action where the legislature has not done so is invalid and unconstitutional.

54.     The Contract Clause forbids states from interfering with contractual obligations. U.S. Const. art. I, §10, cl. 1.

55.     Similarly, the Arkansas Constitution provides that "No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall ever be passed . . .." Ark. Const. art. 2, § 17.

56.     A state law impermissibly interferes with a contract when (1) it substantially impairs a contractual relationship, and (2) it is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022).

57.     Act 521 and the Rule impair various terms within the pre-existing Membership and Marketing Agreements, many of which constitute crucial contractual rights in the cooperative structure. The Act and the Rule's price-fixing regime for Arkansas dairy farmer members completely impair DFA's ability to market and/or utilize members' milk "best for the advantage and benefit of all Members." Further, it impairs DFA's method of distribution of marketing proceeds to its members in the Southeast Area, which requires DFA to distribute the net proceeds from the sale of raw milk in a fair and equitable manner. Act 521 and the Rule impair the very nature of DFA's cooperative structure and a member's basic expectation that revenue will be pooled and shared, as it has always been distributed pursuant to the Membership and Marketing Agreement. This interference therefore creates a basis for dispute with DFA's members in other states.

58.     The Act's purpose—furthered by the Rule—is to directly adjust the rights and responsibilities of cooperative associations to their members, not to advance a broad social interest.

16

59.     For these reasons, Act 521 and the Rule impair the obligations of DFA's contracts with its members and should be deemed unconstitutional and void as applied to pre-existing agreements.

60.     DFA therefore seeks a declaration that Act 521 and the Rule violate the United States and Arkansas Constitution by unlawfully interfering with DFA's contracts with its members.

61.     DFA has a Membership and Marketing Agreement with each farmer member in the southeastern U.S., and DFA is a milk cooperative agricultural association organized under the laws of Kansas.

62.     The Rule specifically declares:

> No provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state.

Rule at § 5.A.

63.     Accordingly, in the alternative, DFA seeks a declaration that Act 521 and the Rule do not apply to it since Act 521 and the Rule would interfere with DFA's agreements with its farmer (producer) members.

## CLAIM II
### (Declaratory/Injunctive Relief—Federal Preemption)

64.     DFA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

65.     Pursuant to the Agricultural Marketing Agreement Act, 7 U.S.C. § 601 *et seq.*, and its implementing regulations, Congress has undertaken to regulate the field of the pricing of raw

milk to processors and the permissible payments therefor by the processor and cooperatives to the dairy farmers who produced the raw milk.

66.    Federal law specifically permits qualified cooperatives, such as DFA, to distribute the proceeds from the sale of the raw milk of its members consistent with its contracts with those members. 7 U.S.C. § 608c(5)(F).

67.    The federal government regulates all of the plants in Arkansas that produce fluid (beverage) milk under the Southeast Marketing Area, Federal Milk Marketing Order No. 7. Thus, the federal government has established the minimum regulated price that such plants must pay to producers or to their cooperatives. The federal government has also established that qualified cooperatives are entitled to reblend the proceeds from the sales of raw milk to those regulated plants with its proceeds from other sales of raw milk and net out its expenses before distribution to the cooperatives' producer members.

68.    A key purpose of the federal regulatory system is to create orderly marketing conditions by allowing all farmers to benefit from the classified pricing system.

69.    The Supremacy Clause provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme law of the land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  State laws that conflict with federal law are therefore considered "without effect." *Altria Group v. Good,* 555 U.S. 70 (2008), quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

70.    By singling out Arkansas dairy farmers for special payments associated with the supply of raw milk to federally regulated plants, the Act and the Rule are in direct conflict with the purposes of the pooling provisions of the federal regulatory system for raw milk.

71.     By attempting to set forth the price that any person must pay for raw milk from Arkansas dairy farmers and that DFA must pay to its Arkansas farmer members for their raw milk in contradiction to the AMAA, Law 521 and the Rule violate the Supremacy Clause.

72.     DFA therefore seeks a declaration that Act 521 and the Rule violate the United States Constitution by attempting to regulate raw milk pricing and payments to farmers in contradiction to federal law and regulation.

### CLAIM III
### (Declaratory/Injunctive Relief—Dormant Commerce Clause)

73.     DFA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

74.     The Commerce Clause provides that "Congress shall have power . . . [t]o regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3.

75.     Although framed as an affirmative grant to Congress, the Constitution prohibits states from regulating such commerce, the Supreme Court has "long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). This "negative" form of the Commerce Clause—known as the "dormant" Commerce Clause—"prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Id.* (quoting *New Energy Co. of Ind. V. Limbach*, 486 U.S. 269, 273 (1988)).

76.     Under Supreme Court case law, "if a state law discriminates against out-of-state goods or economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advance a legitimate local purpose.'" *Tenn. Wine & Spirits Ass'n*, 139 S. Ct. at 2461 (quoting *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008). This so-called "heightened scrutiny" applies when "the state regulation at issue discriminates against interstate commerce 'either on its

19

face or in practical effect.'" *Cloverland-Green Spring Dairies, Inc. v. Penn. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002) (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). "Discrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the [State] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at 210–11 (quoting *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)).

77.     The Act and the Rule discriminate against out-of-state interests, both facially and in practical effect. Under the Act and the Rule, a non-Arkansas producer who sells in Arkansas is not entitled to the same higher price guaranteed to Arkansas producers who sell in Arkansas. And in terms of practical effect, the Act and the Rule force non-Arkansans in a multi-state cooperative (such as DFA) to subsidize the mandatory higher prices being paid to Arkansas members. This discrimination in favor of Arkansas member producers to the detriment of non-Arkansas members creates a basis for dispute with DFA's members in other states and is in contravention of the dormant Commerce Clause.

78.     For these reasons, Act 521 and the Rule are per se invalid under the dormant Commerce Clause.

79.     DFA seeks a declaration that the Act and the Rule violate the United States Constitution by unlawfully interfering with interstate commerce.

### CLAIM IV
### (Declaratory/Injunctive Relief—Invalid Exercise of Police Power)

80.     DFA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

81.     A state may not interfere with private-property or contract rights unless the public interest requires the interference, and the means are reasonably necessary for the accomplishment

of the purpose and not unduly oppressive upon individuals. Legislation must, in other words, be enacted for a public, rather than a private, purpose. *Hand v. H&R Block, Inc.*, 528 S.W.2d 916, 920, 921 (Ark. 1975). The police power of the state may not be used to regulate the price to be agreed upon by the contracting parties solely for the benefit of one of the parties. *Id.* at 921. Nor is the purpose declared by the legislature conclusive, especially if the declared purpose has no substantial connection to the real purpose of the legislation. *Id.* at 923.

82.     The Act and Rule were enacted and promulgated for the private purpose of benefiting Arkansas milk producers at the expense of milk dealers, cooperatives, and the out-of-state members of cooperatives.

83.     The Act itself does not cite any purpose for its mandatory redistribution of funds among participants in the milk supply chain. The Rule recites various statements of purpose, but none of them indicate that the Arkansas dairy industry will stand or fall on the issue whether Arkansas producers received a blended price under Federal Milk Marketing Order No. 7 or a mandatory Class I price. The Rule merely states, without evidence, that cooperatives "often negotiate" with dealers for prices exceeding the federal minimum, and that those negotiated prices should be nullified and the benefits re-allocated to producers.

84.     For these reasons, Act 521 and the Rule are unconstitutional exercises of Arkansas's police power under state law.

85.     DFA seeks a declaration that the Act and the Rule violate the Arkansas Constitution as an unlawful price control.

### CLAIM V
### (Declaratory Relief—Non-Application to DFA)

86.     DFA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

87.     By its terms, Act 521's implementing Rule requires the milk dealer, not cooperatives such as DFA, to fund the over-market premium. DFA's role is limited to "passing through" the premium to the producer, and, arguably, calculating the premium, although it's not clear whether DFA would possess the information to make a calculation that is based on a dealer's data. Moreover, the Rule shields a cooperative's member contracts from interference, providing that "[n]o provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state." Rule at § 5.A.

88.     The Board's Chairman, however, has stated that cooperatives—and in particular DFA—will fund the premium. And in an unsigned February 4, 2022, memorandum letter, the Department of Agriculture has stated that the Rule "[r]equires the cooperative to pay an over-market premium to producers in Arkansas if the local utilization exceeds the [Federal Milk Marketing Order No. 7] utilization."

89.     DFA therefore seeks a declaration that DFA is not required to fund the premium under Act 521 and the Rule.

## PRAYER FOR RELIEF

DFA respectfully prays that this Court:

a.      issue an order and judgment declaring that Arkansas Act 521 of 2021, as codified, and the Milk Stabilization Board's Milk Stabilization Rule, is an unconstitutional interference with DFA's contracts with its members, or in the alternative, that the Act and Rule does not apply to DFA under the terms of the Rule;

      b.     in the alternative, issue an order and judgment declaring that Arkansas Act 521 of 2021, as codified, and the Milk Stabilization Board's Milk Stabilization Rule, are preempted by federal law and regulation;

      c.     in the alternative, issue an order and judgment declaring that Arkansas Act 521 of 2021, as codified, and the Milk Stabilization Board's Milk Stabilization Rule, are unconstitutional attempts to regulate interstate commerce and exceed the police power of the state;

      d.     enjoin the implementation and enforcement of Act 521 and the Rule against DFA;

      e.     award DFA costs and reasonable attorneys' fees, as appropriate; and

      f.     grant any other relief the Court finds just and appropriate.

*Respectfully submitted,*

Kevin A. Crass (AR Bar #84029)
Friday, Eldredge & Clark, LLP
400 W. Capitol Ave., Ste. 2000
Little Rock, Ark. 72201
501.376.2011 – *phone*
501.376.2147 – *fax*
*crass@fridayfirm.com*

*Counsel for Plaintiff*

Agency No. 209-10
Clean Copy

**MILK STABILIZATION RULES**

**I. Purpose**

1. The purpose of these rules is to:
   a. Implement Act 521 of 2021, codified at Ark. Code Ann. § 2-10-104; and
   b. Ensure that Arkansas milk producers receive Class 1 prices for milk utilized or sold as fluid milk in this state.

2. It is the understanding of the Arkansas Milk Stabilization Board that:
   a. Prices for milk produced and sold in Arkansas are currently only regulated at the Federal level, pursuant to the state of Arkansas's inclusion in Federal Milk Marketing Order Number 7;
   b. The Federal regulations set the minimum prices of milk paid to producers based on the average utilization of milk within the entire marketing order region, which includes several southeastern states;
   c. Traditionally, the utilization of milk produced and sold in the state of Arkansas as fluid milk is much higher than the average utilization of milk as fluid milk in the Federal Milk Marketing Order Number 7;
   d. As a result, Arkansas milk producers are often underpaid for the milk they produce, making it necessary for the state to require a premium to fairly compensate milk producers;
   e. The overwhelming majority of milk producers in Arkansas are members of cooperative associations;
   f. Due to various economic reasons, the cooperative associations often negotiate with milk dealers to reach agreements for price premiums that exceed the Federal Marketing Order's established monthly minimum milk price;
   g. However, milk producers remain underpaid for the milk they produce as the premiums paid to cooperatives are not sufficiently passed on to producers;
   h. It is therefore necessary to establish clear circumstances that cause Arkansas milk producers to be underpaid for milk, and to require that premium payments are fairly passed through to producers in those circumstances.

**II. DEFINITIONS AND CONTEXT**

The following terms shall be construed in this rule to have the following meanings, except in those instances where the context clearly indicates otherwise:

"**BOARD**" means the Arkansas Milk Stabilization Board.

"**BOOKS AND RECORDS**" or "**BOOKS OR RECORDS**" shall include all pertinent books, ledgers, journals, records, papers, memoranda, correspondence, vouchers, bills, receipts, cancelled checks, accounts, exhibits, photographs and other documents.

"**CONSUMER**" means any person other than a milk dealer who purchases milk for consumption or use by him or herself or others.

"**COOPERATIVE**" means a cooperative agricultural association or corporation of producers organized under the laws of this State or of any other state and engaged in making collective sales or in the marketing of milk for producers under contract with it.

EXHIBIT 1

"**DEALER**" means any person, who purchases or receives or handles on consignment or otherwise milk within the State, for processing or manufacture and further sale, within or without the State, whether on behalf of himself or others, or both. A producer who delivers milk to a milk dealer only shall not be deemed a milk dealer.

"**DEPARTMENT**" means the Arkansas Department of Agriculture.

"**HANDLE**" to handle means the doing of any one or several or all of the following acts, to buy, sell, barter, acquire, store, process, consign, receive, transport, control as owner, buyer, seller, consignee, consignor, bailee, bailor, broker, or factor.

"**MARKET**" includes any county, city, borough, incorporated town, or township in the State, or any two or more such counties, cities, boroughs, incorporated towns, or townships, or any portions thereof, or any other land within the territorial limits of the State designated by the Board as a marketing area.

"**MILK**" includes fluid milk and cream, fresh, sour or storage, skimmed milk, low-fat milk, flavored milk or milk drink, buttermilk, ice cream mix, and condensed or concentrated whole or skimmed milk except when contained in hermetically sealed cans.

"**OVER-MARKET PREMIUM**" means the payment required to be paid to producers pursuant to Act 521 of 2021, and further provided for in this rule.

"**PERSON**" includes an individual, corporation, association, partnership, limited partnership, or other unincorporated enterprise owned or conducted by or on behalf of two or more individuals or other persons.

"**PRICE**" includes the amount paid or to be paid and the proceeds returned or to be returned, whether the transaction be one of purchase, sale, consignment, sale or return, accounting, or otherwise.

"**PRODUCER**" means a person producing milk in Arkansas.

"**SOLD**" means a producer's sale of milk to a dealer, either directly or indirectly through a cooperative or other agent.

"**STORE**" includes a grocery store, hotel, restaurant, soda fountain, dairy products store, or any similar mercantile establishment which sells or distributes milk.

Any reference in this rule to quantity of milk shall be construed to include its whole milk equivalent.

### III. PRICES OF MILK
### A. Calculations of Milk Prices
Milk class prices shall be calculated using the regulations set in 7 C.F.R. Part 1000. By the 17th of every month, a dealer shall determine the utilization of its milk that was both produced in and sold as fluid milk within Arkansas for the preceding month. If the dealer's percentage of utilization of milk that was produced in and sold as fluid milk within Arkansas exceeds the percentage of utilization of milk as Class I milk in Federal Milk Marketing Order (FMMO) Number 7, the producer shall be paid an Over-Market Premium, as calculated in Section III, Paragraph B.

2

**B. Over-Market Premium**
When an Over-Market Premium is owed to a producer, the premium shall be paid to the producer, or to the producer's cooperative, by the dealer pursuant to the rules for payments to producers set forth below. If the Dealer pays the premium to the cooperative, the cooperative shall make the calculations. The premium shall be calculated as follows:

1. Calculate the Dealer's Class I Utilization Price by multiplying the percentage of its milk produced in and sold in Arkansas as fluid milk by the Class I Price as determined under the FMMO 7 (Dealer's Class I Utilization % x Class I Price);
2. Calculate the FMMO Class I Utilization Price by multiplying the percentage of milk utilized as Class I milk within the FMMO 7 by the Class I Price as determined under the FMMO 7 (FMMO 7 Utilization % x Class I Price); and
3. Subtract the FMMO 7 Class I Utilization Price from the Dealer's Class I Utilization Price (Dealer's Class I Utilization Price – FMMO Class I Utilization Price).

The figure that results from the calculation above is the Over-Market Premium that is owed to producers for every hundredweight of milk produced in and sold as fluid milk within Arkansas.

**C. Terms of Payment**
**1.** Producers shall be paid as follows:
> (a) Payment to producers, cooperatives and producer settlement funds shall be made under the Federal milk marketing order.
> (b) A final settlement payment for all milk and cream purchased shall be made not later than the 17th day of the following month. The final settlement shall include any balances due to the producer, including any Over-Market Premium owed, if applicable, and shall be accompanied by a statement to each producer setting forth the information required under Section III, paragraph D.
> (c) If a date required for payment falls on a Saturday, Sunday or State or National Holiday, the payment is due on the following business day.

**2.** This section may not be interpreted as prohibiting a dealer from paying its producers on a weekly basis; however, when a dealer pays on this basis, it shall also provide its producers with a monthly statement as prescribed by Section III, paragraph D. All advance payments on the weekly basis shall be at least at the lowest announced class price for the previous month for the number of pounds purchased or received during the week in question. The final settlement shall include any balances due for the initial weeks during the month and shall be accompanied by a statement to each producer setting forth the information required under Section III, paragraph D.

**D. Monthly Statement to Producers**
Dealers purchasing milk or cream from producers shall furnish producers, in addition to any reports to producers that may be required by the FMMO, with statements containing each of the following items at the time of the monthly final settlement payment. Producers receiving their statements through electronic media shall have an agreement to do so on file with the purchasing dealer.

1. The name and address of the dealer issuing statement.
2. The date of statement.
3. The period for which statement is rendered.

3

4. The name and either the address or the producer number of the producer for whom the statement is intended.
5. The total pounds of milk purchased from the producer.
6. The gross amount paid for milk.
7. The dealer's utilization percentage for milk produced in and sold as fluid milk in Arkansas.
8. The utilization percentage for class I milk in FMMO 7.
7. Itemization of the pounds of milk subject to Over-Market Premiums and additional amounts paid as premiums, bonuses, or similar payments.
8. The gross amount due after addition of premiums, bonuses, or similar payment.
9. Itemization of advance payments and authorized deductions.
10. The total deductions.
11. The net amount due and paid.
12. A listing of the amount of milk picked up each day.

## IV. RECORDS, REPORTS, AND INFORMATION
### A. Records
Milk dealers shall keep within the State the following records:

1. All records as may be required to be kept or produced under the FMMO.
2. Any records used to determine the dealer's liabilities for Over-Market Premiums under these rules.
3. All reports filed with the Board as required under these rules.
4. Such other records and information as the Board may deem necessary.

The records herein required shall be kept in the possession of the milk dealer for a period not less than two years unless the Board otherwise provides.

### B. Reports
By the 20th of every month, each milk dealer shall submit to the Board a report for the preceding month stating whether the percentage of its milk produced in and sold as fluid milk within Arkansas is greater or less than the percentage of milk utilized as Class I milk in FMMO 7. The report shall list in detail the total amount of the dealer's milk produced in and sold within Arkansas and the total amount of the dealer's milk produced in and sold as fluid milk within Arkansas. If an Over-Market Premium is owed for the preceding month, the following additional information shall be included in the monthly report:

1. The Over-Market Premium price per hundredweight, as calculated under Section III Paragraph B.
2. An accounting of how much milk was subject to the Over-Market Premium.
3. Identification of producers owed an Over-Market Premium, including the names and addresses of the producers.
4. A copy of the statement provided to each producer upon final settlement payment, as required under Section III, Paragraph D.

## V. COOPERATIVES
**A.** No provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state.

4

**B.** Nothing herein contained shall prevent any milk dealer from contracting for his milk with such cooperative agricultural association or corporation.

**C.** Dealer payments of Over-Market Premiums made to cooperatives shall be passed through, in whole, to producers for the premium owed to the producer under this rule.

## VI. VIOLATIONS
**A.** It shall be a violation of these rules for a milk dealer to fail to pay an Over-Market Premium as required under these rules.

**B.** It shall be a violation of these rules for a cooperative to fail to pass through Over-Market Premium payments in whole as required in Section V(C).

**C.** A producer who is not paid an Over-Market Premium as required under these rules may file an action in a circuit court with proper jurisdiction to recover the Over-Market Premium and any other applicable damages under Arkansas law or rule.



**Dairy Farmers of America**

## MEMBERSHIP AND MARKETING AGREEMENT
### Grade "A"

This MEMBERSHIP AND MARKETING AGREEMENT ("Agreement") is entered into between Dairy Farmers of America, Inc. ("DFA"), and the producer of milk described below:

<table>
<tr><td colspan="2" align="center"><b>Member Information</b></td></tr>
<tr><td>Membership Name ("Member"):</td><td></td></tr>
<tr><td>Member's Soc. Sec. No. or Federal Tax I.D. No.:</td><td></td></tr>
<tr><td colspan="2">Member is doing business as (check one):</td></tr>
<tr><td></td><td>_____ Sole Proprietorship    _____ Partnership<br>_____ Corporation    _____ Limited Liability Company<br>_____ Joint Venture Account    _____ Other: _____</td></tr>
<tr><td>Dairy Farm Address ("Farm"):</td><td>Member's Mailing Address (if different than Farm address):</td></tr>
<tr><td>Telephone:</td><td>Facsimile:</td></tr>
<tr><td>E-mail:</td><td></td></tr>
<tr><td colspan="2">The name of the authorized representative of Member is: _____ ("Authorized Representative"), who is the sole individual authorized to act on behalf of Member under this Agreement, as described in Section 1.G. below.</td></tr>
</table>

In consideration of the performance of the obligations of the parties to each other and the rights and obligations between producers signing similar agreements, it is mutually agreed:

**1.    Member Responsibilities.**

**A.** Member is engaged in the production of raw grade "A" milk on the Farm (hereinafter referred to as "Milk") and agrees to produce Milk of the quality set forth herein. Except for Milk produced by Member solely for home consumption by Member and for no commercial purpose, Member agrees to sell to DFA all Milk produced by Member or otherwise under the control of Member. All Milk shall be free and clear of all liens and encumbrances. Member may grant a security interest in the proceeds due to Member by DFA, (as described in Section 3.A. below), but Member shall not grant a security interest in the Milk itself.

**B.** Member agrees to sell unadulterated Milk that meets the quality conditions and standards specified by DFA and the applicable federal, state and local regulations or ordinances. Member assumes all risks and is solely responsible for any and all loss, damage, or expense incurred by DFA, directly or indirectly, as a result of Milk not meeting such requirements. If Member has knowledge that Milk fails to meet such quality conditions and standards, Member must immediately notify DFA of such failure and Member must not sell such Milk or permit it to be commingled with milk produced by other members or with any other milk. Upon receipt of such notification from Member, DFA will use reasonable efforts to assist Member in selling or disposing of Milk in a lawful manner.

**C.** Member agrees that DFA shall have full control over the means and method of the hauling of Milk.

**D.** Member has designated the member(s) and voting member(s) for the Farm on the Member Designation and Voting Member Designation Form attached as Exhibit "A" ("Designation Form"). The

**EXHIBIT 2**

Authorized Representative of Member may execute and submit to DFA a replacement Designation Form from time to time.

**E.** Member agrees to abide by and observe the rules, regulations, policies and Bylaws of DFA which are incorporated into this Agreement by reference. Member agrees that the rules, regulations, policies and Bylaws of DFA supersede and control over any conflicting provisions stated, or implied, in this Agreement.

**F.** Member agrees that written notices of allocation, capital retains, capital accounts, capital account balances and patronage are not subject to realization or anticipation and cannot be pledged, made the subject of a security interest of any kind or otherwise encumbered, transferred or assigned to anyone, other than DFA, its subsidiaries and other entities controlled by DFA, or otherwise disposed of unless authorized in writing by DFA. Member agrees that DFA, its subsidiaries and other entities controlled by DFA have the right of offset against the allocation, capital retains, capital accounts, capital account balances and patronage for all obligations owed by Member to DFA, its subsidiaries or other entities controlled by DFA.

**G.** Member agrees that the Authorized Representative is the sole individual authorized to act on behalf of Member under this Agreement and shall be responsible for all instructions to DFA on behalf of Member regarding membership matters.  The Authorized Representative may be changed only through a written request to DFA executed by the existing Authorized Representative.

2. **DFA Responsibilities.**

**A.** DFA agrees to purchase all Milk from Member, and thereafter market or utilize such Milk in a form and manner as DFA deems best for the advantage and benefit of all Members. DFA is authorized to adopt or enter into any marketing plan or plans for pooling of Milk or dairy products, or proceeds from the sale of Milk or dairy products. DFA is authorized to blend the proceeds of Milk with the proceeds derived from raw grade "A" milk sold by other Members.

**B.** DFA agrees to pick up, or arrange for the pick-up of, Milk from Member on the Farm. The milk hauler shall be designated by or through DFA. Title to Milk shall transfer to DFA on the Farm as it is transferred onto the hauler's trailer past the trailer's valve. Such transfer of title does not limit in any way the responsibilities of Member to DFA for any and all loss, damage, or expense incurred by DFA, directly or indirectly, resulting from Member breaching the terms of this Agreement.

**C.** After title to Milk passes to DFA, DFA has the exclusive responsibility and right to perform or to direct the handling and all other aspects of the marketing or utilization of Milk, including the right to commingle Milk with other producers' milk.

3. **Distribution of Proceeds.**

**A.** In order to determine the proceeds to be paid to Member for Milk, DFA will first pay, or make provisions for the payment of (i) all ordinary and necessary expenses incurred in the marketing or utilization of Milk or dairy products including, but not limited to, the cost of manufacturing, processing, preparing for market, handling, hauling, associated research, advertising and distribution, service of debt and payment to third-party creditors, and (ii) any other deductions or offsets authorized by law, its rules, regulations, policies, Bylaws or other agreements between DFA and Member.

**B.** DFA will allocate net earnings and may allocate net losses upon the basis of patronage pursuant to its Bylaws. Member consents and agrees that the amount of any distributions with respect to Member's patronage which are made in written notices of allocation or per-unit retain certificates, which are received by Member from DFA, will be taken into account at their stated dollar amounts in the manner provided in DFA's Bylaws.

**C.** DFA may retain, as equity capital, proceeds received from the sale of Milk or dairy products produced by Member as provided in its Bylaws.

**D.** Unless otherwise directed in writing by the Authorized Representative of Member in a form acceptable to DFA, all payments of proceeds for Milk will be paid in the name of Member.

4. **Breach and Conduct.** If Member breaches or threatens to breach the terms of this Agreement, fails to act in good faith in connection with this Agreement, or otherwise takes any action injurious to DFA, then (i) DFA may terminate this Agreement consistent with DFA's Bylaws, and (ii) DFA shall be entitled to exercise all other remedies at law or equity to which DFA is entitled, including those remedies contained in its Bylaws.

5. **Controlling Agreement.** This Agreement supersedes any membership agreement previously in effect between Member and DFA relating to the Farm. Any reference in this Agreement to the rules, regulations, policies or Bylaws of DFA also includes all future amendments to those documents. This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas.

6. **No Assignment.** Member cannot assign or transfer any right, title, interest or obligation arising out of this Agreement for any purpose without the prior written consent of DFA.

7. **Duration and Termination.** This Agreement shall become effective on the date Milk is first picked up by DFA from Member ("Anniversary Date"). Unless otherwise terminated as provided by the Bylaws of DFA or by the terms of this Agreement, this Agreement will continue in full force and effect for a term of one (1) year from the Anniversary Date, and will be automatically extended from year to year thereafter. However, this Agreement may be terminated by either party giving written notice to the other party at least thirty (30) days before the Anniversary Date. The termination will be effective on the Anniversary Date.

8. **Modifications.** Except for any replacement Designation Form(s) hereafter submitted by Member to DFA, this Agreement cannot be amended except by a written instrument signed by the Authorized Representative of Member and DFA.

Read, considered, and signed on behalf of Member this ____ day of _____, _____.


By: _____
    (Signature of Authorized Representative named on page one)

---

**FOR DFA USE ONLY**

Date Area Council Approved: _____

Membership Number: _____ Anniversary Date: _____

Field Representative: _____ District Number: _____

County: _____ Township: _____

DFA Authorized Signature: _____

    Printed Name: _____

    Title: _____

---

### Exhibit "A"
### Member Designation and Voting Member Designation Form

| | |
|---|---|
| Date of Exhibit A | |
| ("Execution Date"): | _____ |
| Member: | _____ |
| Producer Number: | _____ |
| Address of Farm: | _____ |

**This Exhibit A is:**
☐ **Original**
☐ **Replacement of Existing Exhibit A for Farm**

**I.      Member Designation.** The DFA Bylaws allow for multiple memberships per farm. Member may designate individuals on the Farm as members of DFA, provided each person(s) designated for membership must own or operate a dairy farm, or otherwise be engaged in the production of dairy products. The members for the Farm may include the lessees and tenants of lands used for the production of dairy products and any lessor and landlords who are at risk with respect to the volume or value of dairy products produced on leased premises. By listing an individual below, Member designates such individual on the Farm for membership in DFA and represents to DFA that such individual qualifies for membership in DFA under the DFA Bylaws. If Member desires to designate additional members for the Farm, please indicate below and submit with this Exhibit the information below for each additional member.

**II.      Voting Member Designation.** The DFA Bylaws also permit, subject to the rules, policies and procedures adopted by an Area Council, that each farm within that Area may cast a number of votes (not to exceed three) equal to the number of members affiliated with such farm. By checking the box below next to an individual's name (up to three), Member also designates such individual as a voting member for the Farm.

| **Member(s) for Farm** | **Check for Voting Member(s) (Up to Three)** |
|---|---|
| Name: _____ | ☐ |
| (Authorized Representative of Member) | |
| Address: _____ | |
| City, State, Zip: _____ | |
| Phone Number: _____ | |
| | |
| Name: _____ | ☐ |
| Address: _____ | |
| City, State, Zip: _____ | |
| Phone Number: _____ | |
| | |
| Name: _____ | ☐ |
| Address: _____ | |
| City, State, Zip: _____ | |
| Phone Number: _____ | |
| | |
| Name: _____ | ☐ |
| Address: _____ | |
| City, State, Zip: _____ | |
| Phone Number: _____ | |

Yes: ☐ No ☐    Additional member(s) designated on separate pages.

Designated by Member as of the Execution Date.
By its Authorized Representative: _____

Printed Name of Authorized Representative: _____