IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DAIRY FARMERS OF AMERICA, INC.                                    PLAINTIFF

v.                              CASE NO. 4:22-cv-501-JM-JTR

WES WARD, IN HIS OFFICIAL                                          DEFENDANTS
CAPACITY AS SECRETARY OF THE
DEPARTMENT OF AGRICULTURE;
AND  FREDERIC SIMON, IN HIS
OFFICIAL CAPACITY AS CHAIRMAN
OF THE ARKANSAS MILK
STABILIZATION BOARD

## DEFENDANTS MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Milk is unique among farm commodities.  **SUMF 1.**  Milk is highly perishable, produced, and "harvested" on a daily basis, and moved from farm to market every other day, if not every day.  **SUMF 2.**  Traditionally, milk has been a staple in the diet of Arkansans, especially the young. **SUMF 3.**   Throughout history, dairy farming has been vital to the development of rural communities in Arkansas.  **SUMF 4.**

In 1990, there were 849 licensed Grade A dairy-producing farms in Arkansas.  **SUMF 17.** As of August 1, 2023, only 25 of the 849 licensed Grade A dairy farms remain.  **SUMF 24.**  This is a 97.06% reduction in just over 30 years.  **SUMF 25.**  Our dairy farmers need our help.

The Federal Milk Marketing Orders ("**FMMOs**") were first established under the authority of the Agricultural Marketing Agreement Act of 1937.  **SUMF 5.**  A FMMO is a regulation issued by the U.S. Secretary of Agriculture.  Its purpose is to stabilize markets by placing certain requirements on the handling of milk in the area it covers.  **SUMF 6.**  A FMMO requires milk handlers in a marketing area to pay not less than certain minimum class prices established

according to how the milk us utilized.  **SUMF 7.**  A milk order, including the pricing provisions and all other provisions, becomes effective only after approval by dairy farmers.  **SUMF 8.**  It requires that payments for milk be pooled and paid to individual farmers or cooperative associations of farmers on the basis of a uniform or average price.  **SUMF 9.**

There are eleven (11) FMMOs in effect.  **SUMF 10.**  Arkansas, and other southeastern states, are under FMMO No. 7.  **SUMF 11.**  FMMOs establish certain provisions under which dairy processors purchase fresh milk from dairy farmers supplying a marketing area.  **SUMF 12.**  Each milk marketing order includes a classified price plan, a system of *minimum* prices, terms of the order, and provisions for administering the order.  **SUMF 13.**

Federal deregulation of the milk industry in 2000 decreased the relative price of milk in Arkansas and the southeastern states compared to major milk-producing areas in the Midwest.  **SUMF 14.**  The decreased price of milk led to further declines in milk production and the number of dairy farms.  **SUMF 15.**

In 2007, the Arkansas Legislature voted to establish the Arkansas Milk Stabilization Board.  **SUMF 32.**  The purpose of establishing the Board was to:  (a) assure the continued viability of dairy farming in the state; (b) assure consumers of an adequate supply of pure and wholesome milk; and (c) to encourage increased production to meet the state's need for quality milk.  *Id.*  Its purpose was not to displace the federal order system nor to encourage the merging of federal orders.  **SUMF 33.**

On March 15, 2021, Arkansas House Bill ("**HB**") 1729 was filed.  **SUMF 35.**  HB 1729 sought to amend the Arkansas Milk Stabilization Board Act; to amend the powers and duties of the Arkansas Milk Stabilization Board; and to set the price to be paid for milk produced and sold in Arkansas.  **SUMF 36.**  On April 1, 2021, HB 1729 became Act 521 of 2021.  **SUMF 39.**

Pursuant to Act 521 of 2021, the Arkansas Milk Stabilization Board proposed Milk Stabilization Rules to ensure that Arkansas milk producers received Class 1 prices for milk produced and sold as fluid milk within Arkansas. **SUMF 41.**

Dairy Farmers of America, Inc. ("**Plaintiff**" or "**DFA**" interchangeably) is a Kansas cooperative marketing association, whose principal place of business is in Kansas City, Kansas, and is owned by more than 6,000 family farms ("**Member-Farmers**") across the United States of America. *Doc. 1, p. 4.* Plaintiff conducts business in the Great State of Arkansas, including its six neighboring states: Louisiana, Mississippi, Missouri, Oklahoma, Tennessee, and Texas. *Id.*

Plaintiff filed its Complaint on June 1, 2022, in the United States District Court for the Eastern District of Arkansas's Central Division alleging that Arkansas Act 521 of 2021 (codified at ARK. CODE ANN. § 2-10-104) ("**Act 521**") and the resulting Milk Stabilization Rule (the "**Rule**"), which was adopted to implement Act 521's mandate, violated numerous federal and state laws. *Doc. 1 at 2, 12, and 13.*

Specifically, Plaintiff alleges that Act 521 and the Rule both: **(A)** violate the United States Constitution and Arkansas Constitution by unlawfully interfering with the Plaintiff's contracts and thus violate both "Contract Clauses"; **(B)** contradict the Agricultural Marketing Agreement Act (codified at 7 U.S.C. § 601 *et seq.*) ("**AMAA**"), and thus violate the "Supremacy Clause"; **(C)** are *per se* invalid under the United States Congress's "Dormant Commerce Clause"; **(D)** are unconstitutional exercises of Arkansas's police power under state law; **and (E)** simply do not apply to the Plaintiff. *Doc. 1, pp. 15, 17, 19, 20, and 21.* Furthermore, Plaintiff alleges that **(F)** Frederic Simon—at the time of initiating this action— in his official capacity as Chairman of the Arkansas Milk Stabilization Board (the "**Board**"), sought to implement and enforce Act 521 and the Rule. *Doc. 1 at 21-22.*

Act 521 requires that an Arkansas milk producer (or "farmer" interchangeably) receive Class 1 prices for milk both produced in and sold as fluid milk in Arkansas. Act 521 also states that the Board may revise the payment of Class 1 prices *if* Arkansas is no longer considered a milk-deficit state. The Board is also authorized to make, modify, and enforce rules that the Board deems necessary. The goal of Act 521 is to keep Arkansas milk in Arkansas, while fairly compensating Arkansas dairy farmers. ARK. CODE ANN. § 2-10-104.

Defendants assert that the Plaintiff will be unable to show that neither Act 521 nor the Rule violated the "Contract Clauses" of the United States nor the Arkansas Constitutions. Furthermore, that neither Act 521 nor the Rule conflicts with nor frustrates the AMAA as its central, legislative purpose is not usurped whatsoever. Additionally, that the Plaintiff cannot make a showing that Act 521 nor the Rule are per se invalid under the United States Congress's Dormant Commerce Power nor that they are unconstitutional exercises under Arkansas's state police power. Moreover, that Act 521 and the Rule wholly apply to the Plaintiff as a cooperative conducting business in the State of Arkansas. And lastly, that Plaintiff's notion of justiciability against Defendant Frederic Simon lacks standing as the Arkansas Milk Stabilization Board nor the Chairman position exists, effective July 1, 2023.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the facts, and inferences to be drawn from said facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

4

The moving party is entitled to summary judgment if the non-moving party has failed to make a showing sufficient to establish the existence of an element *essential* to that party's case. *Celotex*, 477 U.S. at 322-23.  The United States Court of Appeals for the Eighth Circuit has held that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III.  STATEMENT OF FACTS

Defendants incorporate by reference, as if stated word-for-word herein, the Statement of Undisputed Material Facts ("**SUMF**") and the supporting exhibits filed in support of their Motion for Summary Judgment.  Each reference to exhibits made herein will be to exhibits sequentially attached to the SUMF.

### IV.  ARGUMENT

Off-the-bat, Defendants will rely on supporting case law from the United States Supreme Court, the United States Court of Appeals for the Eighth Circuit, peer United States Courts of Appeals, and United States District Courts to defend their arguments.  A portion of the Plaintiff's claims will be "first impression" upon this Court and Defendants will rely on a portion of binding and persuasive law to support their Motion for Summary Judgment in these relevant matters.

**A.    Plaintiff Failed to Show that Neither Act 521 nor the Rule Interfere with its Existing Member-Farmer Contracts and thus Does Not Violate the "Contract Clauses" of the United States or Arkansas Constitutions.**

**1.    Federal Contract Clause Analysis.**

One of the United States' "express limitations on state power" is that "[n]o State shall pass any Law impairing the Obligation of Contracts."  *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 14 (1977); U.S. CONST. art. 1, § 10, cl. 1 (cleaned up).  Simply put, this Federal "Contract

Clause" ensures that state governments—such as the Arkansas General Assembly—cannot interfere with existing contracts absent a compelling justification. *American Fed'n of State, Cnty. & Mun. Emps. v. Benton*, 513 F.3d 874, 879 (8th Cir. 2008).

To that end, the Eighth Circuit established a three-prong test to determine whether Arkansas law violates the Federal Contract Clause. *Id.* **(a)** The Court must determine if the Plaintiff answered the threshold question of whether or not Act 521 and the Rule have "operated as a substantial impairment on [a] pre-existing contractual relationship[]." *Id.* **(b)** If the Court determines that a substantial impairment existed, the Court must then determine whether Arkansas proffers a "significant and legitimate public purpose behind" Act 521 and the Rule. *Id.* If no such significant and legitimate public purpose exists, Act 521 and the Rule are deemed unconstitutional for violating the Federal Contract Clause. **(c)** However, if Arkansas is able to identify a legitimate public purpose, the Court must then consider whether or not the adjustment of the contracting parties' rights are "based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.*

An analysis of the caselaw presented will establish that Arkansas law does not violate the Federal Contract Clause. As such, Defendants are entitled to summary judgment on this claim.

> **a.** **Whether or Not Act 521 and the Rule Operated as a Substantial Impairment on Pre-Existing Contractual Relationships.**

This first prong poses a three-part inquiry. First, the Plaintiff must show that itself and its Member-Farmers were engaged in a contractual relationship. *American Fed'n*, 513 F.3d at 879. Second, the Plaintiff must show that Act 521 and the Rule impairs said contractual relationship. *Id.* And lastly, the Plaintiff must show that the impairment on said relationship is substantial. *Id.*

For the first inquiry, Plaintiff provided a copy of their boilerplate, template Membership and Marketing Agreement ("**Agreement**") attached to its Complaint. *Doc. 1, Ex. 2.* For all intents

and purposes, Defendants understand that this Agreement constitutes a written tool that Plaintiff may use to bind itself and its Member-Farmers in a contractual relationship. However, Defendants have requested, but have not received, any copies or proof of any such existing contractual relationships in the state of Arkansas nor with any alleged Arkansas Member-Farmers.

For the second inquiry, the Plaintiff must prove the threshold determination that Act 521 and the Rule have the detrimental effect of impairing its existing contractual obligations with its Member-Farmers. *U.S. Trust Co.*, 431 U.S. at 17; *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). To do so, the Plaintiff must show that Act 521 and the rule undermined their contractual bargain, interferes with their reasonable expectations, and prevents them from safeguarding or reinstating their rights. *Sveen v. Melin*, 201 L. Ed. 2d 180, 138 S. Ct. 1815, 1821 (2018). As stated, nothing in the Membership and Marketing Agreement or the Rules support Plaintiff's claim.

A reading of the Agreement illustrates that DFA agrees to: (a) purchase all milk from the Member (i.e., the dairy farmer); (b) pick up or arrange for the milk to be picked up from the Member's farm; (c) distribute proceeds to the Member after DFA pays for the ordinary and necessary expenses incurred, such as manufacturing, processing, handling, hauling, advertising, etc. and any other deductions or offsets authorized by law. *Doc. 1 at 30.* The Agreement sets a *minimum* for what is to be paid to the Member, not a maximum.

The Milk Stabilization Rules promulgated by the Board, state that milk class prices are to be calculated using the regulations set forth in the Milk Marketing Order No. 7. If the dealer's (i.e., Hiland Dairy) percentage of utilization of milk that was produced in and sold as fluid milk within Arkansas exceeds the percentage of utilization of milk as Class 1 milk in the FMMO No. 7, the producer (dairy farmer) shall be paid an Over-Market Premium. *Doc. 1 at 25.* When an Over-

Market Premium is owed to a producer, the premium is to be paid to the producer, or to the producer's cooperative, by the dealer pursuant to the rules for payments to producers. There is nothing in the Agreement that suggests a higher amount cannot, will not, or should not be paid. The language of the Agreement and the Milk Stabilization Rules do not conflict with one another. As such, Act 521 nor the Rule impair the Plaintiff's contractual relationships with its Member-Farmers.

For the third and final inquiry of the first prong, the Plaintiff must show that the impairment on its contractual relationships with its Member-Farmers is substantial. *America Fed'n*, 513 F.3d at 879. Considering the Defendants argument in the second inquiry, it would be hard to make a non-existing impairment substantial. But if this Court determines that an impairment exists, Defendants offer that it is not "substantial."

As of August 1, 2023, there are 25 dairy farms in Arkansas. That is it. Only 25. Plaintiff, on the other hand, has a membership of approximately 6,000 dairy farms. Arkansas dairy farms would account for 0.46% of their gross memberships. In 2020, the Plaintiff's net income, excluding non-recurring items, was $170.6 million. In 2021, the Plaintiff's net income, excluding significant non-recurring items, was $199 million. And for 2022, it had a reported net income of $107.9 million, with net sales totaling $24.5 **billion** (versus the $11 million Arkansas milk sales dairy farms generate annually). It is incredulous to say that any alleged payment to an Arkansas Member could be a substantial burden on Plaintiff.

While the Plaintiff may be able to satisfy the first prong of the three-prong inquiry, it cannot be disputed that it would fail on the second and third prongs.

**b.      Whether or Not a Significant and Legitimate Public Purpose Exists.**

Once the threshold of determining if an impairment actually exists, which it does not in this case, the Court must turn to determine whether "that impairment violated the Contract Clause." *U.S. Trust Co.*, 431 U.S. at 17.  However, the United States Supreme Court notes in *El Paso v. Simmons*, that "it is not every modification of a contractual promise that impairs the obligation of contract under federal law."  379 U.S. 497, 506-07 (1965).  Meaning, that while some might see this constitutional provision as "unambiguously absolute," it simply is not "the Draconian provision that its word seems to imply."  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934) (further proving that the Contract Clause "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.").

Therefore, we must see if such an impairment of the Contract Clause is an "essential attribute[] of sovereign power."  *U.S. Trust Co.*, 431 U.S. at 21.  Arkansas has a "sovereign right to protect the general welfare of [its] people" and that the Court *must respect* a state legislature's "wide discretion on their part in determining what is and what is not necessary."  *El Paso*, 379 U.S. at 508-09 (cleaned up) (emphasis added).  While it has been long established that the Contract Clause "limits the power of the State . . . to regulate [contracts] between private parties[,]" it does not outright prohibit the State from "repealing or amending statutes generally, or from enacting legislation with retroactive [contractual] effects."  *U.S. Trust Co.*, 431 U.S. at 17.

Such a literalism "would make it destructive of the public interest by depriving the State of its prerogative of self-protection."  *Spannaus*, 438 U.S. at 240.  Such an exercise of police power by the State is "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort, and general welfare of the people," and most importantly "is paramount to *any*

*rights* under contracts between" parties.  *Id.* at 241.  More simply, Act 521 and the Rule "must serve a legitimate public purpose."  *U.S. Trust Co.*, 431 U.S. at 22 (quoting *Home Bldg. & Loan Ass'n v. Blaisedell*, 290 U.S. 398, 444-45 (1934)).  Furthermore, legislation such as Act 521 and its resultant Rule, which will adjust the rights and responsibility of Plaintiff must be upon "reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.*

In *Spannaus*, the Court established four standards from previous cases in measuring whether or not a state law affects contractual relationships:  (1) covered a generalized economic or social problem; (2) operated in an area already subject to state regulation when the contracts were entered into; (3) simply effected a temporary alteration of the contractual relationship; and (4) operated upon a broad class of affected individuals or concern.  438 U.S. at 244-51.

In 1990, Arkansas had 849 Grade A dairy-producing farms across the state.  As of today, only 25 remain.  This is an overall decrease of 97.06% in Arkansas Grade A dairy-producing farms over said 33-year period.  The size of the Grade A dairy farming industry in Arkansas makes it the 46th largest milk-producing state in the United States.  Dairy farmers have faced a variety of challenges that have led to a decline in dairy operations in Arkansas.  Arkansas parents not having enough milk to provide their family with, or a school district not having enough milk to provide for their students every day are the concerns of every Arkansan, including Arkansas dairy farmers.  Their job is to provide all the milk they can to Arkansas citizens.  It is undisputed that a lack of milk in Arkansas is and could continue to be a sizeable economic concern.

For years, the Plaintiff has entered contracts with its 6,000+ Member-Farmers to provide services for hauling and processing milk.  According to the Complaint, some of those Member-Farmers are, or have been, Arkansas dairy farmers.  Initiating a Rule that provides for Arkansas

farmers to receive an amount above the minimum contract price makes perfect sense in this state. The evidence available establishes that neither the Act nor the Rule interfere with any of the Plaintiff's contractual relationships.

> **c.    Whether or Not the Adjustment of the Rights and Responsibilities of the Contracting Parties is Reasonable and Appropriate to the Public Purpose to Justify the Adoption of Act 521 and the Rule.**

On March 15, 2021, Arkansas HB 1729 was filed.  HB 1729 sought to amend the Arkansas Milk Stabilization Board Act; to amend the powers and duties of the Arkansas Milk Stabilization Board; and to set the price to be paid for milk produced and sold in Arkansas.  This need was based on the dramatically dwindling number of Arkansas Grade A dairy farmers, and the public interested of supporting local growth in milk production for the families of Arkansas.  The need for the legislation could not be seen as anything other than reasonable and appropriate, given the dramatically falling number of Grade A dairy farms.

The evidence, arguments, and case law presented above clearly establishes that the Defendants have not violated the Federal Contract Clause.

> **2.    State Contract Clause Analysis.**

Furthermore, in a mirror-like fashion to the U.S. Constitution, one of Arkansas's primary tenants is that "[n]o . . . law impairing the obligation of contracts shall ever be passed . . . ."  ARK. CONST. art. 2, § 17.  However, this is a state law matter and state law matters should be left for state courts to decide.  If Plaintiff wishes to complain about violations of *state* constitutional law via an enactment of a *state* statute or Act, then the Plaintiff should be well aware that such claims should be presented to a state court for proper resolution.

Furthermore, under *Palade v. Board of Trustees of Univ. of Ark. Sys.*, the plaintiff filed an action alleging violations of the Federal Contract Clause and asserted state claims of violating the

Arkansas Contract Clause. 2022 Ark. 119, at 2-3, 645 S.W.3d 1, 3 . In *Palade*, the defendant Board of Trustees filed a motion to dismiss plaintiff's state-law claims arguing that they "were barred by the Eleventh Amendment and sovereign immunity . . . ." *Id.* The Defendants in the Plaintiff's present action assert the same argument. For these reasons, any claim brought under the Arkansas Constitution should be dismissed.

**B.    Plaintiff Failed to Show that Neither Act 521 nor the Rule Contradicts the Legislative Purpose of the AMAA and thus Does Not Violate the United States Constitution's "Supremacy Clause."**

Federal laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Furthermore, "Congressional intent is the touchstone of preemption analysis." *Grant's Dairy*, 232 F.3d at 14 (quoting *Cippolone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992); *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990). Moreover, while conducting such analyses, courts must "start with the assumption that the historic police powers of the states [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.* at 14-15 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

To begin this analysis, the Court must recognize that preemption is split between two distinct camps. "Express preemption" occurs when the face of a federal statute expressly states that Federal law is *exclusive* in a field (*i.e.*, preempting state law, defining the extent of said preemption, and leaving no room for contradictory or supplementary state or local laws). *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990). In the Plaintiff's present action, the facts present no such case or reason for an analyzation of express preemption.

In the second camp we have "implied preemption." Implied preemption occurs when a federal statute does *not* expressly state that Federal law is exclusive in a field, but federal preemption of state or local law is nonetheless implied from congressional intent. *Hillsborough*, 471 U.S. at 713. Implied preemption can occur in three unique, but similar, paths. The Plaintiff's present action calls for the analyzation of all three forms of implied preemption, and the Defendants believe the Plaintiff fails on all three arguments.

### 1. Implied Preemption Analysis.

As stated above, three types of implied preemption exist. First, courts routinely recognize "conflicts preemption," which is where Federal and state law are mutually exclusive, meaning that compliance with both Federal and state regulations is a physical impossibility. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Second, courts recognize "field preemption," which is where a scheme of Federal law is "so pervasive as to make reasonable the inference that Congress has left no room for the States to supplement it." *Id.* Lastly, courts recognize "frustration preemption," which pseudo-arises out of conflicts preemption, but is distinct enough to analyze as a separate type of implied preemption. *Id.* Frustration preemption exists when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the United States Congress. *Id.* Simply put, frustration preemption exists where state law impedes the overall goals of Federal law.

To begin an analysis of implied preemption regarding the AMAA, Defendants find it prudent to follow the model argument provided in *Grant's Dairy*. In *Grant's Dairy*, the First Circuit considered the innate objectives of federal milk price regulation. *Grant's Dairy*, 232 F.3d at 15. The chief among those objectives were to achieve "parity for producers" and ensure the "orderly supply of agricultural commodities." *Id.* Further, the First Circuit opined that the AMAA

routinely "insured a sufficient quantity of pure and wholesome milk," assured "a level of farm income adequate to maintain productive capacity to meet future needs," and reflects current economic factors.  *Id.*

Ultimately, the First Circuit's analysis mirrored that of the D.C. Circuit's logical and sound reasoning.  *Id.*  That the "objectives of federal milk price regulation, generally, are 'to guarantee producers parity prices, to protect the health and purses of consumers, to establish and safeguard orderly marketing conditions, and to assure to each area of the country a sufficient quantity of pure and wholesome milk.'"  *Id.* (quoting *Schepps Dairy, Inc. v. Bergland*, 628 F.2d 11, 19 (D.C. Cir. 1979)).

Here, Defendants align with the opinion of the First Circuit in *Grant's Dairy*.  In that case, the First Circuit held that "Maine's pricing scheme conflicts with neither the AMAA's overarching purposes . . . nor the goals of federal milk price regulation."  *Grant's Dairy*, 232 F.3d at 16.  Like the Maine law in *Grant's Dairy*, Act 521 and the Rule achieve the same purpose.  Act 521 and the Rule promote price equality for Arkansas dairy farmers without in any way damaging the federal milk market's orderliness.  *Id.*  Most importantly, Act 521 and the Rule contribute "to the promotion of an adequate supply of milk by assuring [Arkansas dairy farmers] a steady, predictable income stream[,]" which will in turn encourage production and bolster dairy farming in the Natural State.  *Id.*

To further bolster the Defendants' reasoning, it is prudent to rely upon the United States Supreme Court's decision in *West Lynn Creamery, Inc. v. Healy*.  512 U.S. 186 (1994).  The Court in *West Lynn* plainly states that "[t]he federal order *does not* prohibit the payment of prices higher than the established minima."  *Id.* at 190, n.1 (emphasis added).  Moreover, that the AMAA has only authorized the "Secretary of Agriculture to *regulate the minimum prices paid to producers*"

for their raw milk.  *Id.* at 189 (emphasis added).  Therefore, just like the First Circuit's reasoning in *Grant's Dairy* and the Supreme Court's reasoning in *West Lynn*, these cases provide an avenue for this Court to recognize that "prices higher than the federal minima are *not fundamentally incompatible with the objectives of the federal regulatory scheme*."  *Grant's Dairy*, 232 F.3d at 17 (emphasis added).

Lastly, there exists a great "phalanx" of cases which arise out of the United States District Courts of Louisiana, Maine, Oregon, and Pennsylvania—two of which were affirmed by the United States Supreme Court—that support the Defendant's claim that Arkansas's regulation of milk prices *higher than the federal minima* is not preempted by the AMAA.  *Grant's Dairy*, 232 F.3d at 18; *Crane v. Commissioner of Dep't of Agric., Food & Rural Res.*, 602 F.Supp. 280, 292 (D. Me. 1985) (holding that the AMAA does not exist to set a ceiling on the price a dealer may pay a farmer nor does the AMAA authorize the setting of maximum prices at all, and that farmers are free to bargain for prices higher than the federal minima); *Schwegmann Bros. Giant Super Mkts. V. Louisiana Milk Comm'n*, 365 F.Supp. 1144, 1156-58 (M.D. La. 1973), *aff'd*, 416 U.S. 922 (1974) (holding that Congress has not preempted "either the field of price competition in interstate commerce . . . , nor the field of milk marketing" through the AMAA); *United Dairy Farmers Coop. Ass'n v. Milk Control Comm'n*, 335 F.Supp 1008, 1014-15 (M.D. Pa. 1971), *aff'd*, 404 U.S. 930 (1971) (holding that the minimum prices set by Pennsylvania's Milk Marketing Board are higher than the minimum set by the federal order; therefore, there is "no impossibility of compliance" with both the federal order and the Pennsylvania minimum and that each may operate without conflict.  Further, that there is zero "indication that Congress has intended to preempt this field . . . ."); *Medo-Bel Creamery, Inc. v. Oregon*, 65 Or. App. 614, 625, 673 P.2d 537, 544 (1983) (holding that nothing in the AMAA bars states from "setting minimum prices that

are higher than those set under the federal statute[,]" and that there is "no impossibility of dual compliance with [both] the federal and state regulatory bodies.").

**C.    Plaintiff Failed to Show that Neither Act 521 nor the Rule Interfere with Interstate Commerce and thus Are Not Per Se Invalid under the United States Congress's Dormant Commerce Power.**

The United States Constitution grants Congress the power "[t]o regulate Commerce . . . among the several states." U.S. CONST. art. 1, § 8. cl. 3. This power has an adverse aspect, which is commonly referred to as the Dormant Commerce Power, which implies that "states may not enact laws that discriminate against or unduly burden interstate commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003). For an Arkansas law—such as Act 521—that is challenged for violating the Dormant Commerce Clause, we look "to a two-tiered analysis." *Id.* at 593.

First, we must determine if discrimination exists. *Id.* Discrimination in this respect "refers to 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* Therefore, if Act 521 is indeed discriminatory, it would then be considered per se invalid. However, the Defendants believe they can proffer "under rigorous scrutiny, that [they have] no other means to advance a legitimate local interest." *Id.* This showing a legitimate local interest then forces us to the second tier of the analytical framework. *Hazeltine*, 340 F.3d at 593. This second analytical framework provides "that the law will be struck down only if the burden it imposes on interstate commerce 'is clearly *excessive* in relation to its putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

**1.    Tier 1 of the D.C.C. Analytical Framework.**

The Supreme court has recognized three indicators of discrimination against out-of-state interests. *Id.* These indicators include a "discriminatory purpose[,]" whether a law could "facially

16

discriminate against out-of-state interests[,]" and if a law has a "discriminatory effect." *Id.* (quoting *Bacchus Imports, Ltd. V. Dias*, 468 U.S. 263, 270 (1984); *Chem. Waste Mgmt. v. Hunt*, 504 U.S. 334, 342 (1992); *Maine v. Taylor*, 477 U.S. 131, 148 n.19 (1986)).

The Plaintiffs are burdened with the task of "proving [the Defendant's] discriminatory purposes." *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). In their present action, the Plaintiffs have made allegations of a discriminatory effect, "both facially and in practical effect." *Doc. 1, p. 20*. However, they have proffered no "direct evidence that the drafters of [Act 521] . . . intended to discriminate against out-of-state business." *Hazeltine*, 340 F.3d at 593. (More reasonings). Further, "the bare fact that milk is federally regulated is simply not enough to render concurrent state regulation of some of its milk unconstitutional." *Grant's Dairy*, 232 F.3d at 19-20. However, even if this Court determines that Act 521 contains discriminatory purpose, facially discriminates against out-of-staters, and/or has a discriminatory effect, the Defendants have proffered a legitimate local interest to supplant the burden of Tier 1's outcome.

## 2.    Tier 2 of the D.C.C. Analytical Framework.

If this Court concludes that Act 521 was motivated by a discriminatory purpose, is facially discriminatory against out-of-staters, and/or has a discriminatory effect, the Court must utilize the strict scrutiny balancing test. *Hazeltine*, 340 F.3d at 596-97 (stating that the United States Supreme Court held this as one their tests with the "strictest scrutiny."). In *MSM Farms, Inc. v. Spire*, the Eighth Circuit found that promoting local, family farms is a legitimate state interest. 927 F.2d 330, 333 (8th Cir. 1991). Paired with the strength of this legitimate local interest, however, we must shift the Court's focus to the real crux of this analysis: whether reasonable non-discriminatory alternatives exist to advance said interests. *Hazeltine*, 340 F.3d at 597. The

Defendants bear this burden of demonstrating that no such alternative(s) exists. *Id.* (quoting *Oregon Waste Sys.*, 511 U.S. 93, 100-01 (1994).

For the last 33 years, Grade A dairy farming has decreased in Arkansas by 97.06%. Those Grade A farmers that are left are working their farms, caring for their dairy cows, and are trying to ensure Arkansas receives all the milk it can. The dairy farmers are contracting with who they can, and as any businessperson would, they are seeking the highest price for their fluid milk.

There are three milk processing plants in Arkansas: Hiland Dairy in Fort Smith, Hiland Dairy in Fayetteville, and Hiland Dairy in Little Rock. As of June 2, 2022, Hiland Dairy, at the direction of, or at a minimum, in conjunction with Plaintiff, announced Hiland Dairy would no longer accept milk from Arkansas farmers. As a result, Arkansas dairy farmers are now forced to arrange for their milk to be driven across state lines in order to be processed. Oftentimes, the tanker trucks carrying Arkansas milk must pass by the Hiland Dairy processing plants on their way to unload their milk in neighboring states.

### 3.    The "Market Participant" Exception to the D.C.C. Analytical Framework.

Even when a state law violates the Dormant Commerce Clause and its two-tier analysis, courts routinely carve out a last "hail mary" exception. Meaning, when a state government acts as a "'market participant' rather than a market regulator, however, its conduct is outside the reach of the Commerce Clause." *Red River Serv. Corp. v. Minot*, 146 F.3d 583, 586 (8th Cir. 1998) (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809-10 (1976)). Furthermore, if the state government is a "market participant in a business, it may pursue its own economic interest free from the constraints imposed by the [Dormant] Commerce Clause within the market in which it is a participant." *Id.* at 586-87. In short, the Dormant Commerce Clause is not intended to "limit the liability of the States themselves to operate freely in the free market." *Id.* at 587.

The State of Arkansas is a market participant in the federal milk market. It cannot set regulations for the entire field of milk marketing and compensation. But it can, as a participant, engage in the free market and set prices for its Arkansas dairy products and the prices that its farmers are paid.

**D.      Plaintiff Failed to Show that Act 521 nor the Rule are Unconstitutional Exercises of Arkansas's Police Power and thus Is Not Considered "Unlawful Price Control" In Violation of the Arkansas Constitution.**

States are sovereign. The "police power" is an attribute of that sovereignty. *Marrs v. City of Oxford*, 32 F.2d 134, 138 (8th Cir. 1929). This attribute is to be "exercised for the public welfare" and such welfare can be defined as the "possession and enjoyment of all rights that are subject to reasonable condition as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community." *Id.* (cleaned up) (quoting *Crowley v. Christensen*, 137 U.S. 86, 89 (1890). But this power does not stop there. No, it may extend to "the promotion of the common convenience, prosperity, and welfare. *Id.* at 139.

Furthermore, there is "but one limitation" on the right of Arkansas to enact a statute that accomplishes all the aforementioned. *Harlow v. Ryland*, 78 F.Supp. 488, 493 (E.D. Ark. 1948). That in accomplishing the limitations above, that the Arkansas General Assembly must "reasonably tend to correct some evil and promote some interest of the state, and not violate any direct or positive mandate of the constitution." *Id.* The Arkansas General Assembly in exercising its policy power is "vested with a large discretion to determine what the public interest demands and what measures are necessary to secure and promote such interest." *Id.*

Moreover, in making the determination on whether a law comes within the police power of the state, "it is not incumbent upon the court to find the actual existence of facts which would justify the legislation." *Id.* No. If the court can justify that the State's facts can be reasonably

conceived to exist, the court *must* presume that it did exist and that the law was passed for that purpose. *Id.*; *Marrs*, 32 F.2d at 139 (holding that the "presumption is in favor of a law or ordinance passed in the exercise of the power, until the contrary is shown.").

Plaintiff relies on *Hand v. H&R Block, Inc.* for its authority regarding this matter. 258 Ark. 774, 528 S.W.2d 916 (1975). This case plainly states that "[a]s a general rule, it is well settled that the state may regulate private property rights or contract rights through a valid exercise of its police power, including the regulation of prices." *Id.* 258 Ark. at 781, 528 S.W.2d at 920. This case further points to *State v. Hurlock*, another Arkansas Supreme Court case, that states, "[i]t is true that the police power can only be exercised to suppress, restrain, or regulate the liberty of individual action, when such action is injurious to the public welfare." 185 Ark. 807, 49 S.W.2d 611, 612 (1932). Furthermore, *Hand* draws language from yet another Arkansas Supreme Court case that states "[t]he police power of the state is one founded in public necessity and this necessity must exist in order to justify its exercise." *Beaty v. Humphrey*, 195 Ark. 1008, 115 S.W.2d 559, 561 (1938).

Plaintiff's support from *Hand* is wholly misguided. The Arkansas Supreme court states that

> [n]o case has been cited to us, and our own research has revealed none, wherein the police power of a state has been used to regulate the price to be agreed upon by contracting parties solely for the benefit of one of the parties. In every instance of such regulation under the police powers, it *appears justified* only because some *broad public interest required it*.

*Hand*, 258 Ark. At 783, 528 S.W.2d at 921 (emphasis added). Further, and almost paradoxical to the Plaintiff's argument, they rely on *Hand* when it points to *Nebbia v. New York,* a United States Supreme Court case that "held a state price 'fixing' law [of dairy sales was] not in violation of due process." *Id.* In *Nebbia v. New York*, the Supreme Court held that New York's execution of its

20

police power was permitted because of the "significance of the industry to the public health, welfare and interest involved[.]"  *Id.*

For the reasons stated, Plaintiff will be unable to establish a prima facie case on this claim. Defendants are entitled to judgment in their favor.

**E.    Plaintiff Failed to Show that Act 521 nor the Rule are Inapplicable to the DFA as An Entity and thus Is Required to Fund the Premium Payable to Arkansas Dairy Farmers Under Arkansas Law.**

Plaintiff alleges that the plain language of Act 521 requires the milk dealers, not cooperatives such as itself, to fund the "over-market premium." *Doc. 1 at 22.*  However, no such language exists whatsoever in Arkansas Act 521 of 2021.  The only language present in the Act itself regarding pricing is as follows:

> . . . (B)(i) Require that an Arkansas milk producer [(farmer)] receive Class 1 prices for milk utilized or sold as fluid milk in this state. . . .

H.B. 1729, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) (Act 521 of 2021) (codified at ARK. CODE ANN. § 2-10-104 *et seq.*).  The only other powers Act 521 grants the Arkansas Milk Stabilization Board is the power to "revise the payment of Class 1 prices" if Arkansas is "no longer considered a milk-deficit state" and to "make, modify, and enforce rules" to carry out the Act.  *Id.*

Regarding that last delineation of power, the Plaintiff alleges that the Rule, which exists to enforce Act 521, "shields a cooperative's member contracts from interference." *Doc. 1 at 22.*  The Plaintiff states that the Rule contains the language:

> No provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state.

*Doc. 1, Ex. 1, p. 4, § V(A).*  Further, the Plaintiff points to the language in the Rule that states, "[d]ealer payments of Over-Market Premiums made to cooperatives shall be passed through, in whole, to producers for the premium owed to the producer under this rule." *Id. at p. 5, § V(C).*

The Plaintiff fails to recognize the triumvirate of the "dairy deal."  The Plaintiff operates as a middleman.  The Plaintiff serves as the "brokers of deals" between dairy farmers and dairy dealers.  Yes, the money passes through the Plaintiff's cooperative from a dealer to a farmer, but the Plaintiff encumbers itself with the burden of commingling those monies and determining how much gets paid out to the Arkansas dairy farmers.  Thus, having nested itself in the crucial position of brokering all dairy deals with Arkansas dairy farmers, it is by in large the payor in all of these transactions.  Thus, the applicability of Act 521 and the Rule solely rests with the Plaintiff as the primary dairy cooperative in the United States of America.

**F.    Plaintiff Failed to Show that Defendant Frederic Simon, in His Official Capacity as Chairman of the Arkansas Milk Stabilization Board, Sought to Implement and Enforce Act 521 and the Rule as Such Position and Board Ceased to Exist on July 1, 2023, and thus Should Dismissed as a Party to this Action.**

"Justiciability," simply put, determines the types of cases and controversies that United States District Courts may hear.  The U.S. Constitution provides the basis for the notion of "justiciability," which consists of a series of doctrines that established when a Federal Court may hear and resolve a case.  U.S. CONST. art. III, § 2.  Meaning, before a Federal Court can resolve a claim, it must determine that there is an actual dispute between the parties that is capable of judicial resolution.  In *Lujan v. Defenders of Wildlife*, the United States Supreme Court established a three-part test to determine whether a part has standing to sue:  (1) whether the Plaintiff suffered an "injury-in-fact"; (2) whether causation exists between the injury and the conduct brought before the court; and (3) it must be likely, rather than speculative, that a favorable decision by the court will fix the injury.  504 U.S. 555 (1992).

The Plaintiff fails on all three tests regarding Defendant Simon.  First, the Plaintiff has suffered no such injury at the time of filing suit.  The Plaintiff instructed, or at a minimum agreed with, the decision to refuse to accept milk from Arkansas dairy farmers.  As such, neither Plaintiff, nor Hiland Dairy have paid out one cent to Arkansas Farmers under the Board's Rule.  Second, the injury the Plaintiff has not yet suffered was not caused by Mr. Simon in his position as Chairman of the Arkansas Milk Stabilization Board.  The position of Board Chairman no longer exists nor does the Arkansas Milk Stabilization Board effective July 1, 2023.  Lastly, a favorable decision by this Court will have no authority to hold Mr. Simon accountable as he is no longer serving in his capacity as the state official that the Plaintiff is suing him over.

## V.      CONCLUSION

Plaintiff will be unable to establish a *prima facie* case establishing that:  **(A)** the Defendants violated the United States Constitution and Arkansas Constitution by unlawfully interfering with the Plaintiff's contracts and thus have violated both "Contract Clauses"; **(B)** Act 521 and the Rule contradict the Agricultural Marketing Agreement Act (codified at 7 U.S.C. § 601 *et seq.*) ("**AMAA**"), and thus have violated the "Supremacy Clause"; **(C)** Act 521 and the Rule are *per se* invalid under the United States Congress's "Dormant Commerce Clause"; **(D)** Act 521 and the Rule are unconstitutional exercises of Arkansas's police power under state law; **and (E)** Act 521 and the Rule simply do not apply to the Plaintiff.  *Doc. 1, pp. 15, 17, 19, 20, and 21.*  Furthermore, Plaintiff can no longer proceed on his claims against Defendant Frederic Simon, as of July 1, 2023, as the Arkansas Milk Stabilization Board, as well as the position of Chairman of the Board, were abolished.

For the reasons state above, Defendants are entitled to the dismissal of all claims against them and judgment in their favor.  Defendants respectfully request this Court grant their motion and dismiss the Complaint with prejudice.

Respectfully submitted,

**TIM GRIFFIN**
*Attorney General*,
State of Arkansas

By:    /s/      *Christine A. Cryer*
Christine A. Cryer
Ark Bar No.:  2001082
*Senior Assistant Attorney General*,
State of Arkansas
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 683-0958
Fax:  (501) 682-2591
Email:  Christine.cryer@arkansasag.gov

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I, Christine A. Cryer, hereby certify that on August 2, 2023, I electronically filed the foregoing Brief-in-Support of Defendant's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will automatically send notice to all participants and parties.

By:    /s/      *Christine A. Cryer*
Christine A. Cryer
*Senior Assistant Attorney General*,
State of Arkansas