IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DAIRY FARMERS OF AMERICA, INC.                                        PLAINTIFF

VS.                              CASE NO. 4:22-cv-501-JM-JTR

WES WARD, in his Official Capacity as
Secretary of the Department of Agriculture,
AND FREDERIC SIMON, in his Official
Capacity as Chairman of the Arkansas Milk
Stabilization Board                                                   DEFENDANTS


## DAIRY FARMERS OF AMERICA, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

Table of Authorities......................................................................................... ii

I.     Introduction......................................................................................1

II.    Statement of Relevant Facts and Background Information .................................1

       A. Cooperatives.................................................................................1

       B. The Sale of Raw Milk ......................................................................4

       C. The Arkansas Law and Rule...............................................................8

III.   Summary Judgement Standard ...............................................................14

IV.    Argument ........................................................................................14

       A. The Act and the Rule Unconstitutionally Impair DFA's Contracts with its
          Farm-Owners ...............................................................................14

       B. The Act and the Rule Conflict with Federal Law and are Unconstitutional
          under the Supremacy Clause..............................................................24

       C. The Act and Rule are Unconstitutional under the Dormant Commerce Clause...........29

V.     Conclusion .....................................................................................31

i

## **TABLE OF AUTHORITIES**

**Cases**

*Allied Structural Steel Co. v. Spannaus,*
    438 U.S. 234 (1978)...........................................................................22, 24

*Altria Grp. v. Good,*
    555 U.S. 70 (2008)...................................................................................24

*Ark. Dairy Coop., Inc. v. USDA,*
    576 F. Supp. 2d 147 (D.D.C. 2008) ........................................................5

*Ass'n of Equip. Mfrs. v. Burgum,*
    932 F.3d 727 (8th Cir. 2019) .................................................................16

*Beaumont v. Faubus,*
    239 Ark. 801, 394 S.W.2d 478 (1965)..................................................14

*Blue Circle Cement v. Bd. of Cnty. Comm'rs,*
    27 F.3d 1499 (10th Cir. 1994) ...............................................................25

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.,*
    462 F.3d 249 (3d Cir. 2006).....................................................................5

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co,*
    459 U.S. 400 (1983)............................................................................ 15-16

*Equip. Mfrs. Inst. v. Janklow,*
    300 F.3d 842 (8th Cir. 2002) ...................................15-16, 22-23, 24

*Ezekiel v. Alman,*
    No. 1:19-cv-00023 JM-PSH, 2020 U.S. Dist. LEXIS 29458 ...........14

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992)..................................................................................25

*Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.,*
    232 F.3d 8 (1st Cir. 2000)................................................................ 24-25, 29

*Heights Apartments, LLC v. Walz,*
    30 F.4th 720 (8th Cir. 2022) .................................................................15

*Hitt v. Harsco Corp.,*
    356 F.3d 920 (8th Cir. 2004) .................................................................14

*Lisdahl v. Mayo Found.,*
  633 F.3d 712 (8th Cir. 2011) ...................................................14

*Mahurin v. Oaklawn Jockey Club,*
  299 Ark. 13, 771 S.W.2d 19 (1989)...........................................14

*Maryland v. Louisiana,*
  451 U.S. 725 (1981)...................................................................24

*McCauley v. Ark. Rice Growers' Co-op. Ass'n,*
  171 Ark. 1155, 287 S.W. 419 (1926).........................................17

*Nat'l Broiler Mktg. Ass'n v. United States,*
  436 U.S. 816 (1978).....................................................................1

*Nat'l Pork Producers Council v. Ross,*
  143 S. Ct. 1142 (2023)...............................................................29

*Pierce v. Freeman*
  238 F. Supp. 947 (E.D. La. 1965)..............................................30

*Smyser v. Block,*
  760 F.2d 514 (3d Cir. 1985)..........................................7-8, 26, 27

*Sveen v. Melin,*
  138 S. Ct. 1815 (2018)...............................................................15

*W. Lynn Creamery, Inc. v. Healy*
  512 U.S. 186 (1994)...................................................................30

*Wis. Pub. Intervenor v. Mortier,*
  501 U.S. 597 (1991)...................................................................24

*Zuber v. Allen,*
  396 U.S. 168 (1969)........................................................ *passim*

**Statutes and Rules**

7 C.F.R. § 1007.2 (2023)..................................................................5

7 U.S.C. §§ 601-26 ..........................................................................5

7 U.S.C. § 602.............................................................................25-26

7 U.S.C. § 608c(5)(F) ....................................................................28

7 USCS §§ 291, 292.................................................................................................29

26 U.S.C.S. § 521.................................................................................................17

Act 691 of 2023 ..................................................................................................10

Act 754 of 2007 ...................................................................................................8

Arkansas Act 521 of 2021 (the "Act").............................................................1, 10

Ark. Code Ann. § 2-10-103(a), *repealed by* Act 691 of 2023 ............................9

Ark. Code Ann. § 2-10-104(a)(2)–(4), *amended by* Act 691 of 2023 ...............9

Ark. Code Ann. § 2-10-104(d)(1).......................................................................10

Ark. Code Ann. § 2-10-104(d)(2)(b)...................................................................10

Ark. Code Ann. § 2-10-104(e)(2)........................................................................10

Ark. Code Ann. § 2-10-203, *repealed by* Act 691 of 2023 ...............................10

Ark. Const. art. 2, § 17.......................................................................................14

Fed. R. Civ. P. 56................................................................................................13

Milk Stabilization Rule, 238-00-22 Ark. Code R. § 3 (the "Rule").........1, 11, 12, 13

U.S. Const. art. I, §8, cl. 3..................................................................................29

U.S. Const. art. I, §10, cl. 1................................................................................14

U.S. Const. art. VI, cl. 2......................................................................................24

**Other Authorities**

Agenda of the Administrative Rules Subcommittee of the Arkansas Legislative
    Council, May 18, 2022.......................................................... 19, 21-22

An Act to Create the Arkansas Milk Stabilization Act; to Protect the Arkansas Dairy
    Industry; and For Other Purposes, H.B.1419, 86th Gen. Assemb. (Ark. 2007).................9

Op. Ark. Att'y Gen. No. 36 (2007), 2007 Ark. AG LEXIS 36. ........................... *passim*

U.S.D.A., Agricultural Marketing Service, *An Overview of the Federal Milk Marketing
    Order Program* (2019)..........................................................................5

U.S.D.A., Agricultural Marketing Service, *Federal Milk Marketing Orders* ............................4, 5

U.S.D.A., Agricultural Marketing Service, *Information on Pooling Provisions for
    Federal Orders 5 and 7*....................................................................................................7

U.S.D.A., Rural Development, *Co-ops 101: An Introduction to Cooperatives* 26 (2012)....1, 2, 17

# I. <u>INTRODUCTION</u>

Notwithstanding strong cautions from: (1) experts testifying before the Arkansas Milk Stabilization Board ("Milk Board") and the Arkansas Department of Agriculture; and (2) an Arkansas Attorney General opinion determining a similar proposal was likely unconstitutional, the Arkansas legislature and the Milk Board proceeded to enact and implement Arkansas Act 521 of 2021 (the "Act") and the Milk Stabilization Rule, 238-00-22 Ark. Code R. § 3 (the "Rule"). The Act and the Rule directly interfere with preexisting contractual rights, seek to place the Arkansas law and regulation above federal law and regulations in violation of the Supremacy Clause of the United States Constitution, and further violate the United States Constitution by discriminating against out-of-state suppliers of raw milk in order to benefit in-state interests. As there are no material facts in dispute with regard to this matter, Dairy Farmers of America, Inc. ("DFA") seeks summary judgment declaring the Act and the Rule unconstitutional and unenforceable.

# II. <u>STATEMENT OF RELEVANT FACTS AND BACKGROUND INFORMATION</u>

The basic facts for the Court are not subject to dispute and are set forth in the attached Statement of Undisputed Material Facts ("SUMF"). The following is a brief summary of those facts and the legal landscape in which DFA operates.

## A. Cooperatives

Starting in the early 1900s, the legislative landscape has been designed by Congress to encourage farmers to join together in cooperative form to share the risks and rewards of their joint marketing efforts and to put the farmers in a better position to negotiate with non-cooperative processing companies. *See Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822-26 (1978); *see also* U.S.D.A., Rural Development, *Co-ops 101: An Introduction to Cooperatives* 26 (2012), https://www.rd.usda.gov/files/cir55.pdf ("[m]arketing on a cooperative basis, like

purchasing supplies and services, permits members to combine their strength while maintaining their status as independent business people").  One of the critical cooperative principles, and a characteristic that distinguishes cooperatives from other types of business entities, relates to the distribution of any moneys earned from the marketing and processing of the farmers' agricultural products, the administering of services, or other operations of the cooperative.  Because an agricultural cooperative is owned by farmers, its farmer-owners benefit from any net income that the cooperative may achieve.  *See id.* at 9 ("[m]embers also benefit by sharing the earnings on business conducted on a cooperative basis. When cooperatives generate margins from efficient operations and add value to products, these earnings are returned to members in proportion to their use of the cooperative. Without the cooperative, these funds would go to other middlemen or processors."); *see also* SUMF at ¶ 3.

DFA is such a cooperative:  it is an association without capital stock organized under the Kansas Cooperative Marketing Act.  SUMF at ¶ 1.  It is currently owned by over 6,000 family farms across the country, including family farms in Arkansas and its six surrounding states.  SUMF at ¶ 2.  DFA is governed by a 48-member board of directors who are all DFA farmer-owners, elected by other DFA farmer-owners.  Bachelor Decl., ¶ 3.  DFA is divided into seven geographic areas for purposes of the farmers' grassroots governance and raw milk marketing.  SUMF at ¶ 4.  DFA's farmer-owners in Arkansas are part of DFA's Southeast Area.  SUMF at ¶ 5.  Those farmers elect DFA farmer-owners from within the area to represent them on the Southeast Area Council.  SUMF at ¶ 6.  That Area Council oversees certain of DFA's operations in the Southeast relating to the marketing of raw milk and membership.  SUMF at ¶ 7.

To join DFA, a dairy farmer must execute a "Membership and Marketing Agreement" ("Membership and Marketing Agreement") and have its application for membership approved by

the farmer-owner Board of Directors or relevant Area Council (as it relates to Arkansas dairy farmers, the Southeast Area Council). SUMF at ¶ 8; *see also* Bachelor Decl., Ex. 1.

As pertinent to this Motion, the current form of DFA's Membership and Marketing Agreement provides:

> DFA agrees to purchase all Milk from Member, and thereafter market or utilize such Milk in a form and manner as DFA deems best for the advantage and benefit of all Members. DFA is authorized to adopt or enter into any marketing plan or plans for pooling of Milk or dairy products, or proceeds from the sale of Milk or dairy products. DFA is authorized to blend the proceeds of Milk with the proceeds derived from raw grade "A" milk sold by other Members.

SUMF at ¶ 10. Although there have been different versions of the Membership and Marketing Agreement over the years, DFA's broad authority to market its farmer-owners' milk, to blend the revenues received, to deduct expenses, and then to distribute the proceeds, taking into consideration the interests of all of its farmer-owners, has been included in all of DFA's form agreements. SUMF at ¶ 11. Changes to DFA's policies are incorporated into the Membership and Marketing Agreement and are applicable to all farmer-owners, regardless of the version of the Membership and Marketing Agreement executed by any individual farmer-owner. SUMF at ¶ 12; Bachelor Decl., Ex. 1, at ¶ 1(E).

Regarding distributions of proceeds from the sale of raw milk to DFA's farmer-owners, the Membership and Marketing Agreement provides:

> In order to determine the proceeds to be paid to Member for Milk, DFA will first pay, or make provisions for the payment of (i) all ordinary and necessary expenses incurred in the marketing or utilization of Milk or dairy products including, but not limited to, the cost of manufacturing, processing, preparing for market, handling, hauling, associated research, advertising and distribution, service of debt and payment to third-party creditors, and (ii) any other deductions or offsets authorized by law, its rules, regulations, policies, Bylaws or other agreements between DFA and Member.

SUMF at ¶ 13; Bachelor Decl., Ex. 1, at 3.A.

DFA's Bylaws confirm that DFA is permitted to first deduct cooperative expenses before the proceeds from raw milk marketing will be distributed to DFA's farmer-owners:

> Marketing proceeds to be distributed to members for milk delivered to the Association for marketing will be determined after provision for payment of expenses and matured liabilities of the Association, including marketing and operating expenses, debt service, payments on the Association's capital securities, and all amounts then due and payable (including declared dividends and liquidation amounts) in respect of the Association's preferred equity capital.

SUMF at ¶ 14; Bachelor Decl., Ex. 2.  DFA's Bylaws also provide for the distribution of DFA's net income; such distributions are known as "patronage dividends."  SUMF at ¶ 15.

### B.  The Sale of Raw Milk

There are two separate prices for raw milk that are relevant here: (1) prices that processors pay for the raw milk that they purchase; and (2) prices that dairy farmers receive for the raw milk they sell.  Generally, and as discussed further below, the price that processors in the Southeast pay for raw milk is regulated.[1]  The federal government sets the price for raw milk based on certain formulas, and processors must pay at least that price, which can differ depending on the milk's end use, along with any negotiated service charges above that price (also sometimes referred to as "premiums") which, for DFA, are intended to at least partially offset certain marketing expenses.[2] *See* SUMF at ¶ 24.  The price required to be paid by processors using raw milk for Class I products (e.g., gallon jugs of milk) is generally higher than the prices for other classes of milk.  *See* SUMF at ¶ 26.  The money that farmers receive for their raw milk is not the same as the price paid by the processor, particularly in areas regulated by the federal government and when the farmers belong

---

[1]  *See* U.S.D.A., Agricultural Marketing Service, *Federal Milk Marketing Orders*, https://www.ams.usda.gov/rules-regulations/moa/dairy (last visited July 19, 2023) (describing how milk prices are calculated under the federal system); *see also* Compl. ¶¶ 85-91 (same).

[2]  *Id.*

to a cooperative.  *See* SUMF at ¶ 18.  To understand how this works, an understanding of the regulatory landscape for raw milk is required.

Since the 1930s, the federal government has been involved in regulating the pricing of raw milk.  The most important aspect of regulation for purposes of this matter is the Federal Milk Marketing Order ("FMMO") program[3] pursuant to which (1) the minimum prices that regulated dairy processors must pay for raw milk are set and (2) those funds are distributed back to dairy farmers or dairy farmer cooperatives.[4]  Under the FMMO program, USDA has established various federal milk marketing orders over the years.  AG Op., at *11 (quoting *Cloverland-Green Spring,* 462 F.3d at 254)); *see also* U.S.D.A., Agricultural Marketing Service, *Federal Milk Marketing Orders,* https://www.ams.usda.gov/rules-regulations/moa/dairy (last visited July 19, 2023)*.*  In 2000, following USDA's revision to its then-existing FMMO structure, Arkansas became part of Federal Milk Marketing Order No. 7 ("Order 7"), which covers Arkansas and several states in the Southeastern United States.[5]  7 C.F.R. § 1007.2 (2023); *see also* AG Op., at *14; SUMF at ¶ 23.

---

[3] This regulation has been undertaken under the auspices of the Agricultural Marketing Agreement Act of 1937 ("AMAA"), as amended, 7 U.S.C. §§ 601-26, which permits the United States Department of Agriculture ("USDA") to establish "marketing orders" to set the terms and conditions of the sale of agricultural commodities, including raw milk.

[4] For a general overview of the federal regulation of raw milk and the purposes of the AMAA, *see*  Op. Ark. Att'y Gen. No. 36 (2007), 2007 Ark. AG LEXIS 36, *10-15 (Ark. AG 2007) (quoting *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249 (3d Cir. 2006)) (hereinafter, "AG Op.")*; see also Zuber v. Allen*, 396 U.S. 168, 179 (1969) (providing history of AMAA and noting that "[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area, subject only to specifically enumerated adjustments."); *Ark. Dairy Coop., Inc. v. USDA*, 576 F. Supp. 2d 147, 151 (D.D.C. 2008) (providing background on AMAA).

[5] *See* U.S.D.A., Agricultural Marketing Service, *An Overview of the Federal Milk Marketing Order Program* (2019), https://www.ams.usda.gov/sites/default/files/media/DairyFMMOBooklet.pdf.

Since at least the year 2000, all federal orders contemplate what is called "market-wide" pooling. Under this program, each respective FMMO Market Administrator, including the Market Administrator for Order 7, manages a pool of money whereby the regulated entities that process raw milk into consumable products (like beverage milk, yogurt, cheese, and butter) pay into or receive money from the pool based on the intended use of the raw milk, and establishes the minimum payment that the farmers or farmer cooperatives must receive from the processor. SUMF at ¶ 25.

For purposes of this action, there are several important concepts relating to USDA's regulation of Order 7: the uniform price (often called "the blend price"), Class I utilization, and diversions.

- The federal blend price is the result of the market-wide averaging for the sale of all raw milk across all uses at regulated processing plants. SUMF at ¶ 30. The blend price, subject to a few adjustments under USDA regulations that are not relevant here, is what must be paid by a regulated processor to a qualified dairy farmer or to a farmer's cooperative if that farmer is a member of a cooperative. SUMF at ¶ 30. As USDA has explained, "[m]arket-wide pooling is how dairy farmers share in the benefits arising from the classified pricing of milk." SUMF at ¶ 28; *see also* AG Op., at *11-12.

- Class I utilization in a FMMO is a statistic that USDA (and others) track and is the percentage of milk in the FMMO that is included in the pool that is used for beverage milk purposes. SUMF at ¶ 33. It will vary from month to month. SUMF at ¶ 33. Pooled raw milk not utilized for Class I purposes is utilized for Class II purposes (fresh and cultured dairy products such as ice cream, yogurt, and sour cream), Class III purposes (cheeses), or Class IV purposes (butter and milk powder), each with a regulated minimum price. SUMF at ¶ 34. Raw milk used for

6

Classes II, III, and IV generally has a lower minimum price than raw milk used for Class I. SUMF at ¶ 35.

- Because Class I plants do not take raw milk every day of the week, or the same amount of raw milk every day, and face other changes in raw milk needs, farmers and farmer cooperatives that supply a Class I processing plant must have somewhere to ship highly perishable raw milk on the days that some or all of the raw milk is not needed by the Class I processing plant. SUMF at ¶ 37. Shipments by those suppliers to other plants are called "diversions." SUMF at ¶ 38. Diversions are a critical part of managing the supply of raw milk to Class I plants, and accounting for them is an important aspect of analyzing the supply of raw milk to the Class I processors. *See* SUMF at ¶¶ 37-40. USDA has included diversions in the pooling of revenues because of the "need for a greater supply than the market's fluid milk demand due to the daily and seasonal variations in the supply and demand and balancing needs of the [Class I] market" and "to attract an adequate milk supply to meet Class I needs." U.S.D.A., Agricultural Marketing Service, *Information on Pooling Provisions for Federal Orders 5 and 7* at 3, https://www.ams.usda.gov/sites/default/files/media/InformationonPoolingProvisionsforFeder alOrders5and7.pdf (last visited July 19, 2023); *see also* SUMF at ¶ 39. "Diversions facilitate the orderly and efficient disposition of milk when the milk is not needed at a [Class I] plant." *Id*.; SUMF at ¶ 40.

Market-wide pooling is believed to be beneficial for dairy farmers subject to such pooling.

As the Third Circuit has explained:

> In an unregulated market "cutthroat" competition for the more profitable fluid milk sales can lead to an overall decline in prices. . . . The regulatory scheme authorized by the Act is designed to prevent such strife by having all producers in a regional market share equally in the burden created by surplus milk. This is generally accomplished . . . through the marketwide pooling of milk under "orders" issued by the Secretary.

*Smyser v. Block*, 760 F.2d 514, 516 (3d Cir. 1985); *see also* AG Op. (opinion that proposed Arkansas law requiring processor to pay Class I prices for all milk purchased regardless of use was likely unconstitutional).

The net result of market-wide pooling is that individual farmers or farmer cooperatives receive the uniform price for the milk that they sell to a regulated plant. SUMF at ¶ 30. Indeed, the payment of a uniform price is at the heart of the purposes of the AMAA and USDA regulation. *See Zuber,* 396 U.S. at 179 ("[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area"). But for farmers who belong to cooperatives, generally speaking, the cooperative first receives the federal uniform price for the raw milk that it delivers to a regulated processor, combines it with the proceeds from sales to other processors, and then deducts expenses relating to, among other things, hauling, marketing, and balancing excess milk, leading to the calculation of the value of the cooperative pool from which distributions will be made to the cooperative's farmer-owners. *See* SUMF at ¶ 20.

Because farmer-owners own the cooperative, they are also entitled receive any net income that the cooperative makes on the sale of finished product or from other operations based on their patronage of the cooperative (i.e., their volume of milk marketed through the cooperative in relation to the total farmer-own milk marketed through the cooperative). SUMF at ¶ 15; Bachelor Decl., ¶ 15. Any such payments are called "patronage dividends." SUMF at ¶ 15; Bachelor Decl., ¶ 15. At DFA, the farmer-owner Board of Directors determines the total amount of the patronage dividend. *Id.*

### C. The Arkansas Law and Rule

In 2007, Arkansas created the Arkansas Milk Stabilization Board to study ways to assist Arkansas dairy farmers. Act 754 of 2007. The Milk Board is composed of five gubernatorial

appointees:  two Arkansas dairy farmers, one Arkansas consumer, one Arkansas milk processor, and one Arkansas retailer. Ark. Code Ann. § 2-10-103(a), *repealed by* Act 691 of 2023, §12;[6] SUMF at ¶ 42. As originally conceived, the Milk Board had a limited role. It was supposed to research how other states support their dairy farmers, investigate ways to support the dairy industry, and—perhaps foreseeing that regulating the dairy industry in light of a comprehensive federal scheme would have legal ramifications—"[c]reate a plan to assist Arkansas dairy farmers that would be equitable to all parties in the state dairy industry and withstand legal challenges." Ark. Code Ann. § 2-10-104(a)(2)–(4), *amended by* Act 691 of 2023, § 13; *see also* SUMF at ¶ 43.

In the same year, a bill was presented in the Arkansas Legislature proposing a law stating that, *inter alia*, for "a dairy cooperative that transports milk from farm to processor and distributes milk-sales dollars back to the dairy farmer and any other entity that markets milk directly from a dairy farmer . . . . All milk produced under Grade A regulations and that the processor's requirements for Class 1 Milk shall be priced in the Class 1 Value for milk as stated by the Federal Milk Market administrator on January 1, 2007, for orders that affect Arkansas produced milk . . ."[7] In response to that bill, the Arkansas Attorney General issued an opinion that the bill was "in all likelihood unconstitutional under the Supremacy Clause."  AG Op., at *36, *20.  The bill was not passed.

Fourteen years later, the Arkansas Legislature purported to directly regulate Arkansas milk prices for the first time by ordering the Milk Board to require that Arkansas milk producers receive

---

[6] *See infra* note 9 discussing the change of the relevant entity.

[7] An Act to Create the Arkansas Milk Stabilization Act; to Protect the Arkansas Dairy Industry; and For Other Purposes, H.B.1419, 86th Gen. Assemb. (Ark. 2007), https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FBills%2F2007%2FPublic%2FHB 1419.pdf.

prices above those set by the federal regulatory system. *See* Act 521 of 2021; SUMF at ¶ 44.[8]  The Act purported to give the Milk Board[9] jurisdiction over the "base milk price paid to an Arkansas milk producer," and ordered the Milk Board to "[r]equire that an Arkansas milk producer receive Class 1 prices for milk utilized or sold as fluid milk in this state." Act 521 of 2021, § 1 (codified at Ark. Code Ann. § 2-10-104(d)(1)).  This is strikingly similar to the bill declared "in all likelihood unconstitutional" by the Arkansas Attorney General in 2007.  AG Op., at *4, *20.  The Act further directed the Milk Board to "[m]ake, modify, and enforce rules that the board deems necessary to effectively carry out this subsection."  Act 521 of 2021, § 1 (codified at Ark. Code Ann. § 2-10-104(d)(2)(b)).  The Act expressly requires the use of the "Class 1" price in Order 7.  Act 521 of 2021, § 2 (codified at Ark. Code Ann. § 2-10-104(e)(2)).

Over the course of several months, the Milk Board attempted to formulate a rule.  As the Milk Board began those proceedings under the Arkansas Administrative Procedure Act, it held public meetings where input was provided.  SUMF at ¶ 47.  In one meeting, dairy-law experts on the faculty of the Penn State University Center for Agricultural and Shale Law gave a presentation. *See* AGRIC0014-AGRIC0026, attached hereto as Exhibit A.  The presentation explained the basics of the FMMO system and highlighted a dairy price-control law from Pennsylvania that included establishing minimum pricing at the wholesale and retail level.  *See id.*  The Penn State law professors highlighted legal concerns with the Act, including the state's lack of authority to audit and mandate how a cooperative's money was paid out to its farmer-owners, the interplay with the

---

[8] In 2009, Arkansas enacted a temporary grant program to prop up Arkansas milk prices. *See* Act 968 of 2009. That program, though, was not funded by taking money from one private interest and giving it to another private interest. *See* Ark. Code Ann. § 2-10-203, *repealed by* Act 691 of 2023, §16.

[9] Act 691 of 2023 abolished the Milk Board effective July 1, 2023 and amended Act 521 of 2021 to change the relevant entity to the Arkansas Livestock and Poultry Commission.

FMMO system, and the application of the United States Constitution's dormant Commerce Clause. *See id.* Concerns about interference with contract were also raised by one of the drafters of the rule, who stated that "any solution to the problem" of DFA distributing an over-market premium to its Arkansas and non-Arkansas members alike "would mean interfering with the cooperative/member contract." AGRIC0089, attached hereto as Exhibit B.

The Rule's text requires that milk "dealers" (typically the processor) pay what is termed an "Over-Market Premium" (hereinafter sometimes referred to as "Premium") to Arkansas dairy farmers (called "producers" in the Rule). Rule at §§ 2–3. The text of the Rule appears to require that the dealer/processor either pay the Premium to the dairy farmer directly, or else remit the Premium to the cooperative (such as DFA), in which case the cooperative must pass the Premium through, "in whole," to its Arkansas farmer-owners.[10] Rule at §§ 3.B, 5.C. If the dealer pays the Premium to the cooperative, then the cooperative must perform the calculation necessary to determine the Premium. Rule at § 3.B. Other documents reveal that the Milk Board did not anticipate that dealers would make additional payments to cooperatives to comply with the Rule—instead, the Board assumed that service charges and other amounts already negotiated between cooperatives and processors would cover the Premium required by the Rule, and cooperatives would need to change their current uses of those amounts to pay Class I prices (or more) to their Arkansas farmer-owners. *See* SUMF at ¶ 50.

Table 1 shows how the Over-Market Premium for a hypothetical, but realistic, Arkansas dairy farmer would be calculated under the Rule. The assumptions are derived from the statements

---

[10] It is a violation of the Rule for a cooperative such as DFA to fail to pass through the Premium to its farmer-owner. Rule at § 6.B. The Rule purports to create a civil cause of action in circuit court for a dairy farmer to recover an unpaid Premium. While not directly at issue in this lawsuit, this attempt by an executive agency to create a private right of action where the legislature has not done so is itself invalid and unconstitutional.

of the Milk Board in establishing the Rule or, in the case of the Class I price, from the publicly

announced Order 7 price for July 2023.

**Table 1: Calculating the Over-Market Premium Under the Rule (238-00-22 Ark. Code R. § 3(III)(B))**

| Assumptions for Example |
|---|
| • Farmer Brown is an Arkansas farmer whose milk is transported to an Arkansas fluid milk processing facility with 94%* Class I utilization in the relevant month<br>• Order 7's Class I utilization is 65%* in the relevant month<br>• The announced Class I price for Order 7 for the month is $21.12/cwt**, *** |

| Calculation of Over-Market Premium under Paragraph (III)(B) of the Rule | |
|---|---|
| Under Paragraph (III)(B)(1):<br>"Calculate the Dealer's Class I Utilization Price by multiplying the percentage of its milk produced in and sold in Arkansas as fluid milk by the Class I Price as determined under the FMMO 7 (Dealer's Class I Utilization % x Class I Price)" | 0.94 (Arkansas Class I Utilization)<br>x $21.12/cwt (Class I Price)<br>= $19.85 |
| Under Paragraph (III)(B)(2):<br>"Calculate the FMMO Class I Utilization Price by multiplying the percentage of milk utilized as Class I milk within the FMMO 7 by the Class I Price as determined under the FMMO 7 (FMMO 7 Utilization % x Class I price)" | 0.65 (Order 7 Class I Utilization)<br>x $21.12/cwt (Class I Price)<br>= $13.73/cwt |
| Under Paragraph (III)(B)(3):<br>"Subtract the FMMO 7 Class I Utilization Price from the Dealer's Class I Utilization Price (Dealer's Class I Utilization Price - FMMO Class I Utilization Price)" | $19.85<br>- $13.73<br>= $6.12/cwt<br>This is the Rule's "Over-Market Premium" that is "owed to [dairy farmers] for every hundredweight of milk produced in and sold as fluid milk within Arkansas." |

*The Milk Board stated that "From discussion held at Board meetings, it has been determined that the percentage of producers' milk in Arkansas used as Class I is approximately 94%, while the regional market average use is approximately 65%."

**This is the announced Class I price for Order 7 in July of 2023.  Under the FMMO program, this is the price that the processor pays for the raw milk it purchases, but it is not the price the farmer (or, if the farmer belongs to a cooperative, the cooperative) receives for that raw milk.  Instead, the farmer (or cooperative) receives the Order 7 Uniform (Blend) Price plus any negotiated premiums.

*** The abbreviation "cwt" is used for a hundredweight of milk, which is equal to 100 pounds.  *See* U.S.D.A., Economic Research Service, Agricultural Handbook Number 697, *Weights, Measures, and Conversion Factors for Agricultural Commodities and their Products,* 5 (June 1992), https://www.ers.usda.gov/webdocs/publications/41880/33132_ah697_002.pdf.

Thus, as illustrated by using the percentages considered by the Milk Board, and the July 2023 Class I price, the Premium that must be "passed through" to Farmer Brown – in addition to the dairy cooperative's standard payment for raw milk – would be $6.12/cwt.

After the draft rule was placed for public comment, the chairman of the Milk Board wrote a letter to Arkansas Governor Asa Hutchinson suggesting that neither end consumers nor dealers would bear the brunt of the legislature's payment mandate, but rather that DFA would bear it. SUMF at ¶ 51. According to the letter, "[t]he acclamation [*sic*] here that Act 521 is a 'Tax' going into effect costing Arkansans $.20 per gallon of milk and that Hiland Dairy will have to administer the paperwork of the program immortalizes the Milk Board's work! Act 521 is not a tax and the cooperative side of Dairy Farmers of America will be distributing the monies, not Hiland Dairy processing directly." SUMF at ¶ 51. Other comments consistently asserted that the payment would come from DFA, without requiring any additional payment to DFA by the milk processor. *See* SUMF at ¶¶ 52–54.

The Rule purports to shield a cooperative's contracts with its farmer-owners from interference, providing that "[n]o provision of this rule shall prevent or interfere with, and no provision contained herein shall be deemed or construed to prevent or interfere with, any agreement between producers and milk cooperative agricultural association or corporation organized under the laws of this State, or a similar association or corporation organized under the laws of this or any other state." Rule at § 5.A.

In March 2022, the Milk Board adopted the Rule, which was filed with the Arkansas Secretary of State on May 23, 2022. SUMF at ¶ 55.

### III. <u>SUMMARY JUDGMENT STANDARD</u>

This Court should grant summary judgment to DFA because the evidence demonstrates that there is no genuine dispute as to any material fact, and that DFA is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Ezekiel v. Alman*, No. 1:19-cv-00023 JM-PSH, 2020 U.S. Dist. LEXIS 29458, at *4 (E.D. Ark. Jan. 28, 2020). "Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment." *Id.*

While courts should draw all reasonable inference in favor of the non-moving party, they should do so "without resort to speculation." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 720 (8th Cir. 2011). For claims to survive a motion for summary judgment, "the non-moving party may not rest upon mere allegations or denials of the moving party's pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir. 2004); *see also Ezekiel,* 2020 U.S. Dist. LEXIS 29458, at *3 ("The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.").

### IV. <u>ARGUMENT</u>

#### A. **The Act and the Rule Unconstitutionally Impair DFA's Contracts with its Farmer-Owners**

The Contract Clause of the United States Constitution prohibits states from impermissibly interfering with contractual obligations of parties. U.S. Const. art. I, §10, cl. 1. ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility). The Arkansas Constitution has a similar prohibition—"No . . . law impairing the obligation of contracts shall ever be passed . . . ." Ark. Const. art. 2, § 17. Arkansas's

prohibition has generally been construed as parallel to the United States' Constitution's prohibition. *See Mahurin v. Oaklawn Jockey Club*, 299 Ark. 13, 16, 771 S.W.2d 19, 21 (1989) (looking to U.S. Supreme Court precedent on U.S. Constitution's contracts clause in construing Ark. Const. art. 2, § 17); *Beaumont v. Faubus*, 239 Ark. 801, 804-05, 394 S.W.2d 478, 481 (1965) (same).

The Eighth Circuit Court of Appeals applies a two-prong test when considering whether a state law impermissibly interferes with a contract. A state law impermissibly interferes when it (1) substantially impairs a contractual relationship, considering "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights," and (2) is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022) (internal quotation marks omitted); *see also Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018).

Under the first prong, "[a] state's interference with a minor contractual provision is not a substantial impairment under the Contract Clause. In contrast, interference with a crucial contractual right may constitute a substantial impairment." *Heights Apartments, LLC*, 30 F.4th at 728 (internal citations omitted). Courts "will consider the extent to which the parties' reasonable contract expectations have been disrupted to determine whether the impairment is substantial." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 854 (8th Cir. 2002) (cleaned up). "The impairment does not need to be total, but the more severe the impairment, the closer scrutiny the statute will receive." *Id.*

Courts also consider whether impairment is substantial by considering "whether the industry the complaining party has entered has been regulated in the past" such that the contracting

parties should have reasonably foreseen the current regulation. *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.,* 459 U.S. 400, 411 (1983); *see also Equip. Mfrs. Inst. v. Janklow*, 300 F.3d at 857-59. However, prior regulation by the state does not make the challenged regulation reasonably foreseeable where "the previous state regulation . . . was not sufficiently pervasive so as to destroy all reasonable contractual expectations . . . ." *Id.* at 859.

The second prong of the Eighth Circuit's test, whether the state regulation is appropriately and reasonably crafted for a "significant and legitimate public purpose," requires delving beyond the statute's stated purpose. *See Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019) ("[a] state must do more than mouth the vocabulary of the public weal in order to reach safe harbor" (internal citations omitted)). "The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." *Id.* at 730. A regulation will fall short when "the suspect purpose of the legislation at issue is to directly adjust the rights and responsibilities of [the contracting parties] under the pre-existing . . . agreements, not to advance a broad social interest." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d at 861. Similarly, a regulation does not pass muster where the law "primarily benefits a particular economic actor in the farm economy." *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d at 733.

　　1.　The Act and the Rule Substantially Impair the Contractual Relationship between DFA and its Farmer-Owners.

It is undisputed that DFA has preexisting Membership and Marketing Agreements with hundreds of its farmer-owners in DFA's Southeast Area, which includes Arkansas. *See* SUMF at ¶¶ 8–9, Bachelor Decl., Ex. 1. Those Membership and Marketing Agreements permit DFA "to blend the proceeds of [the sale of a farmer-owner's raw] Milk with the proceeds derived from raw grade 'A' milk sold by other Members." *Id.* at 2.A. Those agreements also permit DFA to deduct

16

the expenses, among other things, associated with the "marketing or utilization of [the farmer-owner's] Milk."  *Id.*

The Membership and Marketing Agreements incorporate DFA's Bylaws, rules, regulations, and policies by reference.  *Id.* at 1.E.  DFA's Articles of Incorporation provide that one of its primary purposes is "[t]o distribute on a uniform basis the marketing proceeds after paying the expenses and matured liabilities of the Association."  SUMF at ¶ 16.  The Bylaws make clear that DFA will deduct cooperative expenses before the remaining raw milk marketing proceeds are distributed to DFA's farmer-owners.  SUMF at ¶ 14.

DFA's Membership and Marketing Agreements, Articles of Incorporation, and Bylaws are consistent with fundamental cooperative principles that form the basis for DFA's existence.  *See* SUMF at ¶¶ 8-17.  As the USDA has explained, "[i]n general, a cooperative is a business owned and democratically controlled by the people who use its services and whose benefits are derived and distributed equitably on the basis of use."[11]  United States laws assume that cooperatives operate on this basis,[12] and the Arkansas Supreme Court recognized nearly a century ago that "such associations, wisely and economically administered, tend to work to the advantage of the producers, and . . . the pooling arrangement tends to stabilize prices . . ."  *McCauley v. Ark. Rice Growers' Co-op. Ass'n*, 171 Ark. 1155, 1164, 287 S.W. 419, 422 (1926).

The Act and Rule substantially impair DFA's ability to fulfill its obligations to all of its farmer-owners under the Membership and Marketing Agreements, which impairment greatly

---

[11] See U.S.D.A., Rural Development, *Co-ops 101: An Introduction to Cooperatives* 1 (2012), https://www.rd.usda.gov/files/cir55.pdf.

[12] For instance, a federal tax exemption for cooperatives applies to "associations organized and operated on a cooperative basis . . . for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them."  26 U.S.C.S. § 521.

disrupts the expectations of both DFA and its farmer-owners. Under the Rule, DFA is required to ignore the agreement that it has reached with all of its farmer-owners to combine the revenues generated by the sale of each farmer-owners' raw milk with the expenses relating to the marketing of that milk prior to the distribution of the net income to the farmer-owners. Per the Rule, DFA is also required to violate DFA's fundamental purpose of equitable treatment of all farmer-owners and of distributing marketing proceeds on a uniform basis. In short, DFA's Arkansas farmer-owners are to be treated differently under the Rule than any other dairy farmer shipping raw milk to regulated plants in Order 7. Indeed, the Rule demands that DFA's Arkansas farmer-owners be paid the Class I price or more instead of the farmer's share of the net earnings that DFA achieves from its Southeast Area raw milk sales.

At the same time DFA is required to pay its Arkansas farmer-owners more for raw milk when that milk is shipped to a Class I plant, the Rule requires DFA to pay less to its non-Arkansas farmers. Under the Rule, instead of distributing proceeds in the manner that is in the best interests of its all its Southeast Area farmer-owners, DFA is required to first use the service charges it receives from Arkansas Class I customers to pay a higher rate to its Arkansas farmer-owners – and only once those farmer-owners are paid would the remaining net proceeds be divided and distributed among DFA's Southeast Area farmer-owners, with the overall pool of money disproportionately smaller due to the initial higher payments to Arkansas farmer-owners. Viewed differently, because DFA is a cooperative, a rule that requires DFA to pay some farmers more necessarily means that DFA must pay other farmers less. This result violates DFA's agreements with its farmer-owners and foundational cooperative principles.

An example is illustrative. Table 2 demonstrates how the Rule's Over-Market Premium would impact the payments a cooperative would make to its farmer-owners using a few realistic

assumptions.  For simplicity, we assume that there are 10 Arkansas farmer-owners and 40 non-Arkansas farmer-owners.  Each farmer produces 1,000 cwt of raw milk per month.  We also use the same Class I utilizations and Class I price as used in Table 1.  These assumptions resulted in an Over-Market Premium of $6.12/cwt.  We also assume that all Arkansas milk goes to an Arkansas Class I plant (and is used for fluid milk sold in Arkansas, requiring the Over-Market Premium to be paid on all raw milk produced by the Arkansas farmers).[13]  We set forth other assumptions on prices in the Table below, but importantly and consistent with the assumptions of the Arkansas legislature and the Milk Board, we assume that the cooperative will not receive any additional money from its customers in order to pay the Over-Market Premium.[14]

---

[13] Under traditional cooperative principles, and consistent with the purposes of market-wide pooling, the destination of the non-Arkansas raw milk does not impact the analysis, but it is known that a large percentage of the milk needed by Arkansas processing plants comes from outside of Arkansas.  *See* SUMF at ¶ 33.

[14] Agenda of the Administrative Rules Subcommittee of the Arkansas Legislative Council, May 18, 2022, at 4.

**Table 2: Effect of the Rule on Cooperative Distributions to Farmer-Owners**

| Assumptions for Example |
|---|
| • Dairy Cooperative A has 10 Arkansas farmer-owners and 40 non-Arkansas farmer-owners<br>• Each farmer-owner produces 1,000 cwt of raw milk per month<br>• The same Class I Price and utilizations, and therefore the same Over-Market Premium, apply as in Table 1, making the Over-Market Premium $6.12/cwt<br>• All Arkansas farmer-owners' milk goes to supply an Arkansas fluid milk plant<br>• The Order 7 Uniform (Blend) Price for the month received by Dairy Cooperative A based on the Order 7 pool is $19/cwt<br>• Dairy Cooperative A receives service charges and other premiums from Class I customers, but after deducting expenses, the total amount available for distribution back to farmer-owners for the month is $18/cwt |

| Monthly Distribution Before the Rule | | |
|---|---|---|
| Net earnings available for distribution to all farmer-owners | $18/cwt (net earnings)<br>x 50 farms<br>x 1,000 cwt per farmer-owner | $900,000 |
| Amount received by each Arkansas farmer-owner | $18 (net earnings) x 1,000 cwt | $18,000 |
| Amount received by each non-Arkansas farmer-owner | $18 (net earnings) x 1,000 cwt | $18,000 |

| Monthly Distribution After the Rule's Effective Date | | |
|---|---|---|
| Net earnings available for distribution to all farmer-owners before application of the Rule | $18/cwt (net earnings)<br>x 50 farms<br>x 1,000 cwt per farmer-owner | $900,000 |
| Funds needed to pay the Over-Market Premium to Arkansas farmer-owners | $6.12/cwt (from Table 1)<br>x 10 farms<br>x 1,000 cwt per farmer-owner | $61,200 |
| Remaining funds available to pay all farmer-owners | $900,000 (total net earnings)<br>- $61,200 (total funds needed to pay the Premium) | $838,800 |
| Amount received by each farmer-owner (since all are assumed to be the same size, we can just divide the amount available by the number of farms).<br>**This is the total amount received by each non-Arkansas farmer-owner** | $838,800 (remaining funds to distribute)<br>÷ 50 (number of farms) | **$16,776** |
| **Total amount received by each Arkansas farmer-owner** | $16,776 (amount each and every farmer-owner receives)<br>+ $6,120 (Arkansas's Over-Market Premium per farm) | **$22,896** |

As demonstrated by Table 2, the Rule will force cooperatives such as DFA to redistribute the revenues collected from customers in order to pay the Over-Market Premium to the Arkansas farmer-owners, thereby reducing the payment to non-Arkansas farmer-owners. Indeed, in the example, the 10 Arkansas farmers would be paid $22,896 ($22.90/cwt) each, an amount exceeding the Class I price of $21.12/cwt, while the 40 non-Arkansas farmer-owners would be paid $16,776 ($16.78/cwt). Table 2 illustrates how the Act's regulatory mandate that DFA rob Peter to pay Paul precludes DFA from fulfilling its contractual obligations to all farmer-owners in its Southeast Area.

This regulation is at odds with not just the language of DFA's Agreements and Bylaws, but with the spirit of cooperatives and the reasonable expectations of DFA's farmer-owners. Farmers do not join agricultural cooperatives for the purpose of subsidizing higher payments to a small subset of the cooperatives' farmer-owners; they join with the intent of sharing equitably in the risks and rewards of collective marketing. SUMF at ¶ 17. Farmer-owners also make, and have already made, choices about how to run their businesses based on their expectation of receiving a base price that is a blend of the proceeds of all farmer-owners in their areas. SUMF at ¶ 22. The Act and the Rule deprive DFA's farmer-owners, and DFA itself, of the benefits of their bargain that were reasonably anticipated and relied upon when entering into a Membership and Marketing Agreement.

The impairment of DFA and its farmer-owners' contracts is heightened by Arkansas's limited history of regulating prices paid to dairy producers and cooperatives, an area that has been almost exclusively the domain of the federal government in the Southeastern United States. As the State previously acknowledged, "[p]rior to the enactment of Act 521, Arkansas milk transactions were only governed by the Federal Milk Marketing Order 7 . . . for the Southeast

Region, which covers all of Arkansas and parts or all of eight other states." Agenda of the Administrative Rules Subcommittee of the Arkansas Legislative Council, May 18, 2022, at 2. The FMMO system operates on a system where processors' payments are essentially pooled, with the same price then paid to farmers regardless of how their milk was utilized.[15]

In light of the extensive and long-standing price regulation of the FMMO system, and Arkansas's dearth of previous milk pricing regulation (as well as a 2007 proposal for doing so having never passed after the Arkansas Attorney General opined it was likely unconstitutional), DFA and its farmer-owners would have no reason to anticipate when entering into Membership and Marketing Agreements that Arkansas would begin regulating milk prices in ways that would dictate changes to the fundamental terms of those Agreements. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978) (state regulation violated contracts clause where, *inter alia*, it "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken").

    2. The State Cannot Meet its Burden of Demonstrating that the Act and the Rule advance a significant and legitimate public purpose.

The Act and the Rule are not saved by appropriate crafting or a legitimate public purpose. Instead, irrefutable facts show an impermissible purpose to "directly adjust the rights and

---

[15] *See* Agenda of the Administrative Rules Subcommittee of the Arkansas Legislative Council, May 18, 2022, at 3, https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FAssembly%2FMeeting+Attachments%2F040%2F5095%2FA.+Summary+Agenda+-+May+18+2022.pdf. ("The FMMO considers the overall use of the milk and assigns the price to be paid to producers based on the percentage of utilization as a whole within the regional market. So, if 75% of milk for the month was used as Class I fluid milk, 75% of all milk in the region would be worth the Class I price, and the remaining 25% of the milk produced would be paid at the rate for the utilization of that milk as Class II, III, or IV. All producers in the region would be paid as if 75% of the milk they produced was used as Class I milk, and 25% was used as Class II, III, or IV milk.").

responsibilities of [the contracting parties] under the pre-existing . . . agreements." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d at 861.

In an Agenda for a meeting of the Administrative Rules Subcommittee of the Arkansas Legislative Counsel held after the Milk Board had already adopted the proposed Rule, the Rule was presented by Defendant Simon, Chairman of the Milk Board, as well as two others, and described as follows:

> In Arkansas, nearly all milk producers are members of cooperatives, the most prevalent being Dairy Farmers of America ("DFA"), a national cooperative association. The proposed rule will require the cooperative to pay Class I prices to its Arkansas members for milk utilized and sold as fluid milk in Arkansas. . . . The proposed rule provides that the premium to be paid to the producers is the premium that is already negotiated between the processor and the cooperative, and the cooperative is required to pass that money through to the producers in an amount that would ensure that the producers receive Class I prices.

SUMF at ¶ 54. This and the other statements about the funding of the Premium are critical since they essentially constitute admissions that the State was aware that DFA would have to take money away from non-Arkansas farmers in order to pay the Premium to Arkansas farmers. In other words, the explicit purpose of the Rule was to change the terms of DFA's distribution of marketing proceeds to its farmer-owners under their Membership and Marketing Agreements. And while the Rule itself contains a clause purporting to disclaim any interference with a cooperative's agreements with its farmer-owners (Rule § 5.A), the history of the Rule and the statements by the drafters in support demonstrate that this clause was a thinly veiled attempt to shield the Rule from the very Constitutional problem the drafters knew they were creating. As a matter of law, the Rule fails to satisfy the second prong of the contracts clause test. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d at 861.

Even if that were not the case, the State can present no credible evidence (and certainly not enough to create a disputed material fact) regarding the State's burden to show that the law "protects a broad societal interest rather than a narrow class." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d at 859 (internal quotation marks omitted).  The State has no credible evidence of any broad societal interest necessitating changing the terms of dairy cooperatives' voluntary agreements with their farmer-owners.  For example, it lacks any findings suggesting that the FMMO system is causing broad harm to Arkansas's citizens.  Instead, the legislation forces dairy cooperatives to undermine the purpose of the FMMO system and privilege their Arkansas farmer-owners at the expense of their other farmer-owners – the epitome of special interest legislation.  This type of legislation cannot survive a contracts clause challenge.  *See Allied Structural Steel Co.*, 438 U.S. at 248-49 (legislation was unconstitutional under the contracts clause because, *inter alia*, it was enacted to protect a "narrow class" rather than a "to protect a broad societal interest.").

## B. The Act and the Rule Conflict with Federal Law and are Unconstitutional under the Supremacy Clause

The Supremacy Clause of the United States Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme law of the land . . ." U.S. Const. art. VI, cl. 2.   Thus, where there is federal legislation, "all conflicting state provisions [are] without effect" due to preemption.  *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)*; see also* AG Op., at *14 (citing *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991)).  To determine whether there is a conflict between state and federal law, the courts look to Congressional intent, and preemption may be express or implied.  *Altria Grp. v. Good,* 555 U.S. 70, 76-77 (2008); AG Op., at *14 (citing *Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.,* 232 F.3d 8 (1st Cir. 2000)).

24

Here, the AMAA stands supreme to the Act and Rule.  While the State has previously found that there is no express preemption in the AMAA, the analysis of whether preemption should be implied has been well laid out by the State in the Attorney General's Opinion finding very similar legislation attempting to favor Arkansas dairy farmers over other suppliers of raw milk likely to be unconstitutional.  AG Op., *infra.*  The State concluded that "the extant federal regime" of regulation of raw milk pricing does not preempt state regulation by virtue of an inference that "Congress did not intend the states to supplement" the federal regulation (AG Op., at *15-16), but also recognized that state law may be preempted should it "'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  AG Op. at *16 (citations omitted); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (conflict pre-emption may occur "where 'compliance with both federal and state regulations is a physical impossibility,' . . . , or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . .'." (citations omitted))*; Blue Circle Cement v. Bd. of Cnty. Comm'rs*, 27 F.3d 1499, 1504 (10th Cir. 1994) (same).  This is precisely what the State found was likely with regard to the 2007 attempt to favor Arkansas dairy farmers through legislation and regulation, and it is precisely what the Act and Rule does today: Arkansas's attempted regulation of the payments to dairy farmers either directly conflicts with or at least stands as an obstacle to the achievement of the full objectives of the AMAA.

The AMAA has as a critical purpose: the uniformity of pricing paid to the producers or their cooperatives for raw milk regardless of the use for which the raw milk will be put.  *See Zuber*, 396 U.S. at 179 ("[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area") and discussion at pp. 7-8, *supra*; *see also Grant's Dairy-Maine*, 232 F.3d at 15 ("The AMAA makes clear that achieving price parity for producers, 7 U.S.C. §

602(1), and ensuring the orderly supply of agricultural commodities (thereby promoting the mutual interests of producers and consumers), id. § 602(4), are among the relevant goals of the legislation.").  The uniform price policy reflects the federal government's desire to eliminate competition among agricultural producers subject to a federal marketing order from competing to supply a particular type of processing plant in order to achieve higher prices. *See, e.g., Smyser*, 760 F.2d at 516 ("[i]n an unregulated market 'cutthroat' competition for the more profitable fluid milk sales can lead to an overall decline in prices. . . .  The regulatory scheme authorized by the Act is designed to prevent such strife . . . .").

The Act and Rule directly conflict with this Congressional purpose for all Arkansas dairy farmers.  As illustrated by the outcome set forth in Table 2 above, no Arkansas dairy farmer would want its milk to go to any processor other than an Arkansas Class I processor because, if the milk were shipped elsewhere, the Arkansas farmer would miss out on the Over-Market Premium mandated by the Rule.  This invites the very "strife" that the federal regulatory scheme was trying to avoid, even as between Arkansas dairy farmers.  Indeed, when the Attorney General of Arkansas reviewed the 2007 attempt by the Arkansas legislature to mandate a different payment scheme for Arkansas dairy farmers, he noted that the prior legislation appeared to "ensure[] a uniform price to be received by all producers, a fact seemingly consistent with the federal regime."  AG Op., at *17.  The fact that the current legislation creates unequal pricing therefore must be, by the State's own constitutional analysis, inconsistent with the federal regime.

More broadly, the Act and Rule require farmers within a single FMMO to receive non-uniform prices.  See Table 2.  This result will spread the conflict from Arkansas to the region supplying raw milk to Arkansas plants.  Non-Arkansas dairy farmers will want Arkansas raw milk to be shipped to non-Arkansas plants so as to avoid their bearing the burden of paying Arkansas

farmer-owners more than they receive for supplying the same plants, while Arkansas farmers will want to supply only Arkansas Class I plants. The Act and Rule directly conflict with the federal regulation intended to avoid these conflicts and maintain orderly marketing conditions.

As a corollary to the conflict with the federal government's uniform pricing policy created by the Arkansas scheme, the Act and Rule fail to account for diversions, which as explained above are another important feature of federal regulation. Because the demand for beverage milk significantly fluctuates, with demand for beverage milk being higher in the fall (when milk production is lower) and lower in the spring (when milk production is higher), the supply of Class I processing plants requires the availability of more milk than might be shipped on any given day. *See* SUMF at ¶ 37; *see also Zuber,* 396 U.S. at 172-73 (noting fluctuating demand). By definition, a diversion is a shipment of raw milk to a non-Class I plant but that is considered as part of the overall pool because that milk is associated with the supply to a Class I plant. Diversions allow dairy farmers to participate in the FMMO pool without worrying about whether their milk is actually going to a Class I plant on any given day. Yet with the Rule, and as explained above, no Arkansas dairy farmer would want its milk to be diverted to a non-Class I plant; non-Arkansas dairy farmers will want Arkansas milk to be diverted to avoid the burden that they bear in paying the Arkansas dairy farmer's Over-Market Premium.

By failing to account for diversions, the Act and Rule directly conflict with the federal regulatory system that is designed to treat diversions as equivalent to the supply of the plant because the farmers are meant to receive a uniform price for the supply to any regulated plant. The Act and Rule also distort the cooperative's operations intended to keep marketing costs as low as possible; decisions on diversions are typically based on keeping the costs of such shipments as low as possible. The Act and Rule pit farmers <u>in the same cooperative</u> (and potentially in the same

state) against each other to supply a particular regulated plant under contract to the cooperative; the federal regulatory system is designed specifically to avoid this competition. *Cf. Smyser*, 760 F.2d at 516 ("cutthroat competition" among farmers can lead to lower prices).

The conflict between the Act and Rule and federal law is not limited to Arkansas's attempt to undermine the rules and policies of the Federal Order system. As explained above, DFA has entered into contracts with its farmer-owners that govern the distribution of proceeds from the sale of raw milk and the payment of expenses associated therewith. By establishing a payment calculation that is inconsistent with DFA's longstanding and lawful contracts with its farmer-owners, the Act and Rule directly conflict with the provision of the AMAA that permits qualified cooperatives, such as DFA, to distribute the proceeds from the sale of the raw milk of its farmer-owners consistent with its contracts with those farmer-owners. 7 U.S.C. § 608c(5)(F).[16] In enacting this section, Congress expressed an intent to preserve and protect from federal price regulation a cooperative's contracts with its farmer-owners. Congress surely did not intend to turn around and have states interfere with the very contracts that Congress sought to protect from federal interference at the same time it was regulating the price of raw milk. Accordingly, the Act and Rule should be stricken down as conflicting with federal law and regulation.

---

[16] That provision provides: "Nothing contained in this subsection (5) is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions of the Act of Congress of February 18, 1922, as amended, known as the "Capper-Volstead Act" [7 USCS §§ 291, 292], engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers: Provided, That it shall not sell milk or its products to any handler for use or consumption in any market at prices less than the prices fixed pursuant to paragraph (A) of this subsection (5) for such milk." Indeed, the Arkansas statute contains a comparable provision which the Rule contradicts. *See* page 13, *supra*.

The myriad of cases involving milk regulation and the Supremacy Clause are not to the contrary.  In each of these cases, the critical inquiry has been an examination of the intent of Congress as revealed by the AMAA and its implementation by USDA and the ways in which state regulation may interfere with the federal programs.  *See* AG Op. at *15-*16 (collecting cases), *supra; see also, e.g., Grant's Dairy-Maine,* 232 F.3d 8 (finding that Maine pricing regulation did not contravene federal regulation).  That examination in this context demonstrates the Act's and Rule's substantial interference with USDA's programs under the AMAA.

### C.  The Act and Rule are Unconstitutional under the Dormant Commerce Clause

Just this past Term, the United States Supreme Court reaffirmed the notion that the Commerce Clause of the United States Constitution (Art. I, Sec. 8, Cl. 3) contains a "negative command," "forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1145 (2023) (citations omitted).  That case involved a challenge under the so-called "dormant Commerce Clause" to a California proposition that barred the sale of pork from producers that did not adhere to certain standards in the treatment of the pigs.  Two agricultural industry trade associations challenged the proposition on the ground that it excessively regulated interstate commerce.  The Supreme Court upheld the lower court's dismissal of the case, clarifying and overruling prior cases invalidating laws that either controlled commerce outside the State or had "clearly excessive" effects on interstate commerce because of the vagueness of that standard. *Id*. at 1155-59.

The Supreme Court made clear that the essence of a dormant Commerce Clause claim is discrimination:  For a state law or regulation to contravene the dormant Commerce Clause, there must be "purposeful discrimination," where a state "seek[s] to 'build up . . . domestic commerce'

through 'burdens upon the industry and business of other States.'" *Id.* at 1152-54 (citations omitted).

As discussed above (see pp. 17-20), this is precisely the intent and effect of the Act and Rule. Arkansas's pricing scheme acts as a tax on non-Arkansas raw milk to increase payments to Arkansas dairy farmers, in an area where the federal government regulates the minimum prices paid to those farmers. *See W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186 (1994) (striking down Maine regulation that imposed a tax on all milk suppliers to Maine, which proceeds were distributed as subsidies to Maine dairy farmers). The State may defend the Rule as being complementary to federal regulation – because the FMMO program only sets a minimum price that a processor must pay for raw milk, Arkansas can require a higher minimum price without offending the federal regulation. *Cf. Pierce v. Freeman,* 238 F. Supp. 947, 950 (E.D. La. 1965) (state raw milk pricing regulation in effect before the regulation being challenged did not cause difficulty with compliance because both the federal order and the state regulation were setting minimum prices). But the Arkansas scheme requires more – it requires that the cooperative make such a payment only to its Arkansas farmer-owners at the expense of its out-of-state farmer-owners.

Perhaps based on the erroneous assumption that either the processor or DFA on behalf of its farmer-owners can simply pay more to some dairy farmers without reducing payments to others, Arkansas has established a scheme whereby Arkansas dairy farmers supplying Arkansas fluid milk processing plants will be paid more than they would be entitled to receive under federal order rules. And such payments must be made even though non-Arkansas dairy farmers supply those same processing plants. *See* SUMF at ¶ 32. But the funds to pay Arkansas dairy farmers more must come from somewhere – and in this case, the legislature and Milk Board have not chosen to fund

the payments by requiring a higher price for processors or charging a premium at retail, as other states have done. Instead, for Arkansas dairy farmers in cooperatives, those additional payments will be funded by their fellow farmer-owners from outside Arkansas. *See* SUMF at ¶ 57. This is illustrated by Table 2. Table 2 represents how the pooling and distribution of revenues among cooperative farmer-owners work – the funds are collected from the sale of raw milk and then those funds are divided up and distributed to the farmer-owners in proportion to the amount of raw milk that the farmer produced. Under any realistic scenario, the payments pursuant to the Act and Rule will force DFA to pay other non-Arkansas dairy farmers less, discriminating against out-of-state farmer-owners in favor of Arkansas farmer-owners. Such a burden cannot stand.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant DFA's motion for summary judgment.

Dated: August 2, 2023                              Respectfully submitted,


                                                   */s/ Kathy McCarroll*
                                                   Kevin A. Crass (AR Bar #84029)
                                                   Kathy McCarroll (AR Bar #2014191)
                                                   Friday, Eldredge & Clark, LLP
                                                   400 W. Capitol Ave., Ste. 2000
                                                   Little Rock, Ark. 72201
                                                   501.376.2011
                                                   crass@fridayfirm.com
                                                   mmccarroll@fridayfirm.com

                                                   *Counsel for Plaintiff Dairy Farmers of America, Inc.*