IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DAIRY FARMERS OF AMERICA, INC.                                              PLAINTIFF

VS.                                    CASE NO. 4:22-cv-501-JM-JTR

WES WARD, in his Official Capacity as
Secretary of the Department of Agriculture,
AND FREDERIC SIMON, in his Official
Capacity as Chairman of the Arkansas Milk
Stabilization Board                                                        DEFENDANTS


**<u>DAIRY FARMERS OF AMERICA, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................................. 1

II.    BACKGROUND ............................................................................................................. 3

III.   ARGUMENT ................................................................................................................ 5

       A.    The State's Own Statements of Fact Show that It Is Not Entitled to Summary
             Judgment under the Contracts Clause .................................................................... 5

             1.    The Act and Rule Substantially Impair the Payment Term of DFA's
                   Membership and Marketing Agreements with its Farmer-Owners ............ 5

             2.    The State Lacks a Legitimate Public Purpose to Justify its Substantial
                   Impairment of DFA's Membership and Marketing Agreements with
                   its Farmer-Owners ...................................................................................... 9

       B.    The State's Own Statements Demonstrate that the Act and Rule Conflict with
             Federal Law and Are Unconstitutional under the Supremacy Clause ................. 10

       C.    The Act and Rule Are Unconstitutional under the Dormant Commerce Clause .. 14

       D.    The Act and Rule Are Not a Valid Exercise of the State of Arkansas's Police
             Powers ................................................................................................................. 16

IV.    CONCLUSION ............................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978) ................................................................................................... 9, 10

*Ass'n of Equip. Mfrs. v. Burgum*,
    932 F.3d 727 (8th Cir. 2019) ..................................................................................... 9, 17

*Beaumont v. Faubus*,
    239 Ark. 801, 394 S.W.2d 478 (1965) .......................................................................... 17

*Bohannon v. Johnson Food Equip., Inc.*,
    No. 5:07CV00123 JMM, 2008 U.S. Dist. LEXIS 45273 (E.D. Ark. June 9, 2008) ......... 17

*Equip. Mfrs. Inst. v. Janklow*,
    300 F.3d 842 (8th Cir. 2002) ........................................................................................ 10

*Flight Concepts Ltd. P'ship v. Boeing Co.*,
    819 F. Supp. 1535 (D. Kan. 1993), aff'd, 38 F.3d 1152 (10th Cir. 1994) ........................ 7

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992) ........................................................................................................ 11

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) ............................................................................. 5, 6, 7, 8

*Mahurin v. Oaklawn Jockey Club*,
    299 Ark. 13, 771 S.W.2d 19 (1989) .............................................................................. 17

*Nat'l Pork Producers Council v. Ross*,
    143 S. Ct. 1142 (2023) .................................................................................................. 14

*Oak Tree Farm Dairy, Inc. v. Butz*,
    390 F. Supp. 852 (E.D.N.Y. 1975) ................................................................................. 4

*Osage Creek Cultivation, LLC v. Ark. Dep't of Fin. & Admin.*,
    2023 Ark. 47, 6, 660 S.W.3d 843, 847 (2023) ............................................................... 17

*Palade v. Bd. of Trs. of the Univ. of Ark. Sys.*,
    2022 Ark. 119, 645 S.W.3d 1 (2022) ............................................................................ 17

*Red River Serv. Corp. v. Minot*,
    146 F.3d 583 (8th Cir. 1998) ........................................................................................ 16

*S.D. Farm Bureau, Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ........................................................... 15

*Smyser v. Block*,
    760 F.2d 514 (3d Cir. 1985) ............................................................11

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ..................................................................... 5

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) ....................................................................... 15

*White Eagle Coop. Ass'n v. Conner*,
    553 F.3d 467 (7th Cir. 2009) ........................................................... 4

*Zuber v. Allen*,
    396 U.S. 168 (1969) ................................................................4, 11, 12

## Statutes and Rules

7 U.S.C. § 608c(5)(F) .......................................................................... 13

Arkansas Act 521 of 2021 (the "Act") ................................................ *passim*

Act 691 of 2023, § 1 ............................................................................ 1

Capper-Volstead Act, 7 U.S.C. §§ 291, 292 ........................................ 13

Commerce Clause, U.S. Const. art. I, § 8, Cl. 3 ................................. 2, 14

Contracts Clause, U.S. Const. art. I, §10, cl. 1 ................................... 1, 5

Supremacy Clause, U.S. Const. art. VI, cl. 2 ..................................... 2, 10

Milk Stabilization Rule, 238-00-22 Ark. Code R. § 3 (the "Rule") ..................................... *passim*

Federal Rule of Civil Procedure 25(d) ................................................ 1

## Other Authorities

Op. Ark. Att'y Gen. No. 36 (2007), 2007 Ark. AG LEXIS 36 ................................. 4, 14

# I. INTRODUCTION

Plaintiff Dairy Farmers of America, Inc. ("DFA") and Defendants Wes Ward and Frederic Simon, in their official capacities (the "State"), both filed motions for summary judgment with regard to the constitutionality of Arkansas Act 521 of 2021 (the "Act") and the Milk Stabilization Rule, 238-00-22 Ark. Code R. § 3 (the "Rule"), which require that Arkansas dairy farmers who ship their milk to a processing plant that manufactures beverage milk be paid a special "Over Market Premium."  The State's Motion for Summary Judgment ("Motion") should be denied because, among other reasons, statements made in the State's own brief (ECF No. 18, "State's Brief") establish that the State is not entitled to summary judgment and conversely, that summary judgment should be granted to DFA.[1]  Specifically, the State's Brief establishes that the Act and Rule violate the United States Constitution's Contracts Clause because:  (1) the Rule is directed at DFA; (2) the Rule's intent and effect is to modify the payment obligations under DFA's contracts with its farmer-owners; (3) the Rule's intent and effect is to have DFA redistribute the funds it receives in order to direct more money to Arkansas farmers; (4) the State has no evidence that the Rule results in benefits to the public; and (5) the purpose of the Rule was to aid a very narrow class of Arkansas citizens (which the State alleges is 25 Arkansas dairy farms).  As such, the Act and

---

[1] The State contends that because the Milk Stabilization Board has been abolished and Frederic Simon is no longer its Chairman, he should be dismissed as a party.  *See* State's Brief at 22-23.  This argument ignores Federal Rule of Civil Procedure 25(d).  Per that rule, when a public officer ceases to hold office while an action is pending, the action does not abate and his "successor is automatically substituted as a party."  Thus, the Chairman of the Livestock and Poultry Board, Marcus Creasy, is automatically substituted as a defendant in the place of Frederic Simon.  *See* Act 691 of 2023, § 1 (abolishing the Arkansas Milk Stabilization Board and transferring its authority, duties, and functions to the Arkansas Livestock and Poultry Commission).

Rule substantially interfere with DFA's pre-existing Membership and Marketing Agreements with its Arkansas farmer-owners (and with the pre-existing Membership and Marketing Agreements of DFA's other farmer-owners) without a cognizable public policy justification, and therefore the State is not entitled to summary judgment under the United States Constitution's Contracts Clause.

The State further declares that the Act and Rule are consistent with the federal regulatory program under the Agricultural Marketing Agreement Act of 1937 ("AMAA"). Yet it makes this declaration ignoring the AMAA's purpose of ensuring that dairy farmers shipping to a regulated plant receive (or have their cooperative receive) a uniform price without regard to the type of dairy product(s) that the plant manufactures. The State fails to consider the discriminatory impact of the Act and Rule on non-Arkansas suppliers and the resulting discriminatory environment that this impact creates, which undermines governmental encouragement of agricultural cooperatives. In fact, the Act and Rule produce a disruption to the intended outcome of the federal regulatory program: the orderly marketing of raw milk. Thus, because the State fails to demonstrate that the Act and Rule are consistent with federal regulation, the State is not entitled to summary judgment under the Supremacy Clause.

The State's Brief asserts that the Act and Rule are designed to assist, at most, the 25 dairy farmers that are reported to be in Arkansas. The State omits that, for farmer-owners of DFA, such assistance must necessarily be subsidized by DFA's other out-of-state farmer-owners. The State's omission of how DFA's Arkansas farmer-owners would be assisted appears intended to mask the reality that the Act and Rule discriminate against and tax out-of-state suppliers of raw milk to benefit in-state interests without substantial justification. As such, the State's Motion should be denied under the dormant Commerce Clause.

The State alleges that its actions are proper uses of its police powers under the Arkansas Constitution which entitles it to sovereign immunity against DFA's claims thereunder and that, in any case, such matters should be heard by an Arkansas state court.  The State ignores that its police powers are constrained by the United States Constitution and that its own Constitution has been interpreted as being co-extensive, in relevant part, to the United States Constitution.  The State's sole case cited as requiring state courts to hear DFA's claims under the Arkansas Constitution is inapposite and federal courts have routinely decided matters under state constitutions.  The State's Motion with regard to the Arkansas Constitution should be denied.

## II. <u>BACKGROUND</u>

The background on DFA and the dairy industry more generally is set forth in the Brief in Support of DFA's Motion for Summary Judgment.  *See* ECF No. 23 ("DFA's Brief") at 1-13.  For purposes of this Opposition, a few concepts bear repeating.

- DFA is an agricultural cooperative, formed under Kansas's cooperative marketing law, and is 100% owned and governed by its farmer-owners.  What this means is (a) DFA's farmer-owner board of directors and management team try to make decisions that are in the best interests of the farmer-owners as a whole (not just farmers based in one particular state) and (b) any moneys that DFA receives or expenses that DFA incurs are shared among DFA's farmer-owners.

- Beverage milk processors are also known as "Class I processors."  This is because the raw milk used for beverage purposes is classified as "Class I," while raw milk used for fresh and cultured dairy products such as ice cream, yogurt, and sour cream is Class II, milk used for cheese is generally Class III, and milk used for powdered milk and butter is Class IV.

- A key purpose of the AMAA is uniform pricing. *See Zuber v. Allen,* 396 U.S. 168, 179 (1969) ("[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area"). With uniform pricing, the federal government has sought to eliminate competition that could result in farmers receiving reduced prices for their milk by having farmers share, on a market-wide basis, in the classified pricing system for raw milk, where raw milk used for beverage purposes generally draws the highest price and raw milk used for powdered milk or for butter receives the lowest price. *See White Eagle Coop. Ass'n v. Conner*, 553 F.3d 467, 471 (7th Cir. 2009) (explaining classified pricing and uniform blend price); *see also* Op. Ark. Att'y Gen. No. 36 (2007), 2007 Ark. AG LEXIS 36, at *12-13, *16-17. "[U]niform minimum pricing is intended to reduce the incentive that producers otherwise would have to divert all fluid milk to Class I handlers and, literally, to flood that market. *White Eagle Coop. Ass'n*, 553 F.3d at 471; *see also Oak Tree Farm Dairy, Inc. v. Butz*, 390 F. Supp. 852, 854 (E.D.N.Y. 1975) (AMAA was intended to "prevent cutthroat competition among farmers for the Class I market, and to counter the effects upon the consumer of seasonal fluctuations in supply"). Thus, as the State acknowledges in its Statement of Undisputed Material Facts (ECF No. 19, "State's SUMF", at ¶¶ 7-9), the minimum amount that a regulated processor (of any dairy product) pays to a dairy farmer or, where the farmer is a member of a cooperative, to the cooperative, is the "uniform price," which is the weighted average of the prices for each class of milk.

## III. <u>ARGUMENT</u>

### A. The State's Own Statements of Fact Show that It Is Not Entitled to Summary Judgment under the Contracts Clause

The United States Supreme Court applies a two-part test[2] to determine if a state law violates the Contracts Clause. Simply put, the Contracts Clause test is (a) does the law create a "substantial impairment" of an existing contract and, if so, (b) is there a strong enough public policy reason to overcome and justify that impairment? *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022) (internal quotation marks omitted); *see also Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018).

> 1. The Act and Rule Substantially Impair the Payment Term of DFA's Membership and Marketing Agreements with its Farmer-Owners

The State's own statements establish that the Act and Rule "substantially impair" DFA's existing contractual relationships with its farmer-owners. The State's Brief begins with an attempt to question whether DFA even has a contractual relationship with its farmer-owners.[3] It is indisputable that DFA has a Membership and Marketing Agreement with every one of its farmer-owners. *See* DFA's Statement of Undisputed Material Facts, ECF No. 22 ("DFA SUMF"), at ¶¶ 8–9; Bachelor Decl., ¶ 16, Ex. 1. Indeed, the State has submitted a declaration from Bill Haak declaring that he is an Arkansas dairy farmer and has a Membership and Marketing Agreement

---

[2] The State cites a 2008 Eighth Circuit Court of Appeals case and a three-part test to determine if a state law violates the Contracts Clause. *See* State's Brief at 6. The United States Supreme Court and the Eighth Circuit Court of Appeals more recently have articulated a two-prong test, as DFA sets out here, and in DFA's Brief at 15-16. The State's misstatement of the law is of no moment because even under the State's outdated test, the State's analysis demonstrates that the Act and Rule interfere with DFA's contracts with its farmer-owners in violation of the Contracts Clause, and that the State's Motion should therefore be denied.

[3] DFA attached the form contract that is currently in use to its Complaint (ECF No. 1). Each DFA farmer-owner, including those in Arkansas, has entered into a Membership and Marketing Agreement with DFA. *See* Bachelor Decl., ¶ 16. The State does not cite to any facts to the contrary. *See* State's SUMF.

with DFA. State's Brief, Ex. 7, ¶¶ 1, 5. Thus, it is beyond dispute that there are contracts that are impacted by the Act and Rule, and the State does not claim otherwise in its Statement of Undisputed Material Facts. *See* State's SUMF.

The real issue before the Court as it relates to the first part of the Contracts Clause test is whether the Rule "substantially impairs" or "undermines the contractual bargain" between DFA and its farmer-owners. The Eighth Circuit has recently made clear that "[a] state's interference with a **_minor contractual provision_** is not a substantial impairment under the Contract Clause. In contrast, interference with a **_crucial contractual right_** may constitute a substantial impairment." *Heights Apts.,* 30 F.4th at 728, *citing Sveen*, 138 S. Ct. at 1821-22 (emphasis added). The inquiry focuses on whether the regulation substantially interferes with any single "crucial contractual right." *Heights Apts.,* 30 F.4th at 728.

Here, the Rule interferes with a "crucial contractual right," as it focuses on the consideration to be paid by DFA for the product being sold by the farmer-owner. In this regard, DFA's Membership and Marketing Agreement states that DFA is permitted to blend the proceeds received from the sale of one farmer-owner's raw milk with the proceeds received from the sale of other farmer-owners' milk:

> DFA agrees to purchase all Milk from Member, and thereafter market or utilize such Milk in a form and manner as DFA deems best for the advantage and benefit of all Members. DFA is authorized to adopt or enter into any marketing plan or plans for pooling of Milk or dairy products, or proceeds from the sale of Milk or dairy products. DFA is authorized to blend the proceeds of Milk with the proceeds derived from raw grade "A" milk sold by other Members.

DFA SUMF at ¶ 10; Bachelor Decl., Ex. 1, at ¶ 2.A.

The Membership and Marketing Agreement then sets forth the provision that explains how the farmer-owner will be paid out of those gross receipts:

> In order to determine the proceeds to be paid to Member for Milk, DFA will first pay, or make provisions for the payment of (i) all ordinary and necessary expenses

incurred in the marketing or utilization of Milk or dairy products including, but not limited to, the cost of manufacturing, processing, preparing for market, handling, hauling, associated research, advertising and distribution, service of debt and payment to third-party creditors, and (ii) any other deductions or offsets authorized by law, its rules, regulations, policies, Bylaws or other agreements between DFA and Member.

DFA SUMF at ¶ 13; Bachelor Decl., Ex. 1, at 3.A.

This is all consistent with cooperative principles: there is a general sharing of the risks and rewards (or receipts and expenses) associated with the marketing of the farmer-owners' agricultural products. And there is no term more material and significant to a contract than the consideration. *See Flight Concepts Ltd. P'ship v. Boeing Co.*, 819 F. Supp. 1535, 1553 (D. Kan. 1993) ("[c]onsideration is essential to a valid contract"), aff'd, 38 F.3d 1152 (10th Cir. 1994). But the Rule seeks to modify how DFA pays its Arkansas farmer-owners under its Membership and Marketing Agreements, which, due to the nature of cooperatives, necessarily modifies how DFA pays its non-Arkansas farmer-owners under their Membership and Marketing Agreements, completely undermining the bargain that DFA has made with its farmer-owners. This is exactly the type of interference with a crucial contractual right that the Eighth Circuit has labeled a "substantial impairment." *Heights Apts.*, 30 F.4th at 728.

The State attempts to show that it does not interfere with the payment terms of DFA's Membership and Marketing Agreement by concocting a provision that does not exist: the payment terms establish a "minimum" payment to DFA's farmer-owners. *See* State's Brief at 7. Using this interpretation of DFA's Membership and Marketing Agreement, the State takes the position that forcing DFA to pay a select group of farmer-owners more than they would have otherwise been paid is not a substantial impairment. The State's reading is simply incorrect, and the State has no legal authority to support its suggested reading. Rather, as is apparent from the plain text of the provisions relating to payment in the Membership and Marketing Agreement (which does not use

the word "minimum"), the provision describes how DFA distributes <u>all</u> the net proceeds that DFA receives from the sale of its farmer-owners' raw milk.

The State next argues that, if there is an impairment, it would not be substantial because "there are 25 dairy farms in Arkansas. That is it. Only 25." State's Brief at 8.[4]  Eighth Circuit precedent refers to interference with "a… contractual right" (*Heights Apts.*, 30 F.4th at 728), easily dispatching the State's suggestion that the relevant inquiry is whether the number of contracts with which a regulation interferes is substantial (*see* State's Brief at 8).  Moreover, there is nothing in the Supreme Court's Contracts Clause test that permits the State to impair a limited number of contracts.  And the State cites no support for its notion.  But in attempting to shift the focus to the (relatively small) number of dairy farms in Arkansas, the State also ignores the nature of a cooperative.  To pay Arkansas farmer-owners more, which the State concedes is the purpose of the Rule, DFA must pay its other farmer-owners less.  Stated differently, once DFA receives funds from the sale of its farmer-owners' raw milk, and after it has deducted expenses, it distributes all those remaining funds to its farmer-owners subject to permitted deductions.  If DFA is required by law or regulation to make an additional payment to certain farmer-owners, it necessarily has less money available to pay the remaining farmer-owners.  *See* DFA SUMF at ¶ 57; Bachelor Dec., ¶ 29.  This impairment therefore impacts the contracts of all DFA farmer-owners in the Southeast.[5]

---

[4] The State also cites that DFA has a total of 6,000 farmer-owners and had 2022 net sales totaling $24.5 billion and compares this too an alleged $11 million in sales generated by Arkansas dairy farmers.  But just as the State cannot claim the absence of substantial impairment because it has rewritten only a limited number of contracts, the dollar value of the contracts substantially impaired when compared to the rest of DFA's business is irrelevant to the analysis.  In any case, as DFA explains immediately below, because it is a farmer-owned cooperative, changing the terms of even one contract interferes with many others.

[5] The State asserts that DFA's Arkansas farmer-owners supply only 5% of the raw milk to the Arkansas Class I milk processing plants.  But notwithstanding the implicit admission that the Arkansas plants are obtaining raw milk from non-Arkansas dairy farms, nowhere in the State's

The State does not address other aspects of the Contracts Clause analysis that confirm that there is a substantial impairment.  For example, Arkansas has no history of regulating prices paid to dairy producers and cooperatives. *See* DFA's Brief at 21-22.  This lack of historical regulation undermines the State's current efforts.  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978) (state regulation violated contracts clause where, *inter alia*, it "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken").

>    2.    The State Lacks a Legitimate Public Purpose to Justify its Substantial Impairment of DFA's Membership and Marketing Agreements with its Farmer-Owners

The State attempts to justify its impairment by describing the importance of milk to consumers and the precipitous decline of the number of dairy farms in Arkansas, but this is insufficient to meet the State's burden of proving a "significant and legitimate public purpose" for the regulation.  *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 733 (8th Cir. 2019).  The State has no evidence that the Rule would impact the availability of milk for Arkansas consumers[6] or that the federal regulatory system is causing harm to Arkansas's citizens.  And given its other statements, it would be surprising if it could:  there are only 25 dairy farmers apparently producing only enough milk to supply 5% of the Arkansas processing plants.  *See* note 5, *supra*.

---

consideration of the Act and Rule does the State consider the impact of the Act and Rule on DFA's other farmer-owners, including especially the other farmer-owners in the Southeast Area.

[6] The State claims that "Arkansas parents not having enough milk to provide their family with, or a school district not having enough milk to provide for their students every day are the concerns of every Arkansan" (State's Brief at 10), but provides no evidence that raw milk prices paid to Arkansas dairy farmers have had any impact whatsoever on the availability of beverage milk for families or school children.  *Cf.* State's SUMF (setting forth no evidence regarding the impact of the declining number of Arkansas farms on beverage milk availability).  As the State acknowledges, three beverage milk processing plants currently operate in Arkansas (State's Brief at 18), and there is no evidence that those plants are not able to obtain raw milk at a competitive price.  State's Brief at 18, State's SUMF (no evidence on lack of supply of milk).

The State blames the decrease in dairy farms in Arkansas on lower prices following federal deregulation (State's Brief at 2), but the State's own evidence demonstrates that the number of dairy farms was precipitously declining well before Federal Milk Marketing Order reforms took effect in 2000. *See* August 2, 2023 Declaration of Jason Boyd, ECF No. 17-1, at 3 (number of Arkansas dairy farms decreased from 849 in 1990 to 394 in 2000). The same evidence shows that the number of Arkansas dairy farms decreased even in years in which raw milk prices were significantly higher than usual. *See* DFA's Response to State's SUMF Statement 15. In short, the evidence the State attempts to use to justify special interest legislation demonstrates that higher prices paid to dairy farmers for their raw milk would not impact the decline in Arkansas dairy farms.

The State has all but admitted that the Act and Rule were designed to benefit a very small class of Arkansas citizens, but the Eighth Circuit has declared such a justification insufficient because the Act and Rule were enacted to protect a "narrow class" rather than "to protect a broad societal interest." *Allied Structural Steel Co.*, 438 U.S. at 248-59. Additionally, where, as here, the regulation is intended to "directly adjust[] the rights and responsibilities of the contracting parties," the regulation does not pass muster. *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th Cir. 2002).

Because the undisputed evidence shows that (a) the Act and Rule interfere with a crucial provision of DFA's Membership and Marketing Agreements, and (b) the State lacks sufficient justification for the Act and Rule, the State's Motion under the Contracts Clause should be denied.

### B. The State's Own Statements Demonstrate that the Act and Rule Conflict with Federal Law and Are Unconstitutional under the Supremacy Clause

The parties agree that this Court is faced with a question of whether the Act and Rule are implicitly preempted by the AMAA, and the critical question is whether "'compliance with both

federal and state regulations is a physical impossibility,' . . . or . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . .'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citations omitted)). The State cites a number of the AMAA's purposes, specifically acknowledging that two of the purposes are "to achieve 'parity for producers'" and "ensure the 'orderly supply of agricultural products.'" State's Brief at 13.

To the State, "parity for producers" means one thing: higher prices for Arkansas dairy farmers only. The State makes a conclusory statement that forcing DFA to take money from its out-of-state farmer-owners promotes "price equality for Arkansas dairy farmers without in any way damaging the federal milk market's orderliness." State's Brief at 14. But as DFA explained in its own brief (*see* DFA's Brief at 7-8), the intent and effect of the Act and Rule are the opposite of the federal regulatory program. They undermine the notion of uniformity of pricing, regardless of the use to which the raw milk will be put. *See id.*; *Zuber*, 396 U.S. at 179 ("[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area"). The Act and Rule insert the very competition among farmers to supply a particular type of processing plant in order to achieve higher prices that the federal government, for the benefit of dairy farmers, sought to eliminate. *See, e.g.*, *Smyser v. Block*, 760 F.2d 514, 516 (3d Cir. 1985) ("[i]n an unregulated market 'cutthroat' competition for the more profitable fluid milk sales can lead to an overall decline in prices. . . . The regulatory scheme authorized by the Act is designed to prevent such strife . . . .").

The State has proffered evidence from an Arkansas DFA farmer-owner who states that his hauling costs have increased (and hence his net proceeds from the sale of his raw milk have decreased) since the Rule was enacted because Hiland Dairy, the Class I processor in Arkansas,

stopped taking raw milk from Arkansas dairy farms.  State's Brief, Ex. 7, ¶¶ 6-15.  Specifically, he claims that he alone must now pay to have his raw milk shipped to Springfield, Missouri, and that this is true for other Arkansas dairy farmers.  That assertion requires further clarification.  The extra hauling expenses for sending Mr. Haak's milk to Springfield, Missouri (or elsewhere) are shared among all DFA's Southeast farmer-owners, including those farmer-owners in Arkansas. *See* Aug. 18, 2023 Supplement Declaration of Alex Bachelor,  filed concurrently herewith, ("Supp. Bachelor Decl."), ¶¶ 5-6.  But more importantly, the fact that a dairy processor decided that it did not want to incur the regulatory burden (and risk) associated with the Act and Rule demonstrates the conflict with the federal regulatory system.  That processor's decision illustrates the very truth that makes the Act and Rule unconstitutional: they interfere with the orderly marketing of raw milk to the detriment of dairy farmers.  Even if Hiland Dairy had not directed DFA, as its supplier, to avoid supplying it with Arkansas raw milk, DFA's out-of-state farmer-owners may have urged that same result so that they could avoid paying a subsidy to Arkansas farmer-owners.

Moreover, even if Hiland were accepting Arkansas raw milk, this same conflict between DFA's Arkansas farmer-owners and out-of-state farmer-owners could also result from another aspect of the federal regulatory program that the State does not even mention:  diversions.  *See* DFA's Brief at 7, 27-28.  A diversion is a shipment of raw milk to a non-beverage milk plant that is considered under the federal regulatory system to be equivalent to the shipment to a beverage milk plant.  Such diversions are a necessary part of the milk supply to a beverage milk plant because the demand for beverage milk significantly fluctuates, both on a seasonal and weekly basis.  *See* DFA SUMF at ¶ 37; *see also Zuber*, 396 U.S. at 172-73 (noting fluctuating demand).

The State further fails to address that the Act and Rule conflict with the AMAA's express sanctioning of the distribution of the net proceeds from the sale of raw milk by qualified

cooperatives, such as DFA, consistent with its contracts with its farmer-owners. 7 U.S.C. § 608c(5)(F).[7]  While Congress protected a cooperative's methods for distributing the net proceeds of the sale of raw milk to the cooperative's farmer-owners, the Act and Rule were designed to interfere with those methods to benefit, at most, 25 Arkansas dairy farmers.

A substantial portion of the State's Brief is devoted to explaining how the federal regulation system sets only a minimum price to be paid for raw milk.  *See* State's Brief at 1-2, 14-16.  DFA does not disagree but notes that it is not relevant to this analysis, for the reasons stated above.  But there are additional reasons that the State's argument is not relevant.  Regardless of the federal minimum price for raw milk that is based on usage, the Act and Rule do not simply attempt to raise prices to the 25 Arkansas dairy farmers; they undermine the federal regulatory system that seeks to have farmers be indifferent to the type of processing plant to which their raw milk is shipped and to get credit for providing what is in effect the reserve supply to a Class I processing plant.  More importantly, the federal minimum price regulation applies to the purchaser of the raw milk – it does not apply to the supplying farmer's cooperative.  As explained in DFA's Brief, federal regulation specifically permits cooperatives to make their own determinations about how best to distribute the net proceeds from the sale of their farmer-owners' raw milk in accordance with their membership agreements.  DFA's Brief at 28.

The "phalanx" of cases related to state price regulations for raw milk cited by the State (State's Brief at 15) are inapposite where, as here, the state regulation takes the unprecedented step

---

[7]  "Nothing contained in this subsection [5] is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions of the [Act of Congress of February 18, 1922, as amended, known as the 'Capper-Volstead Act' 7 U.S.C.S. §§ 291, 292], engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers."

of dictating how a cooperative must distribute any additional premium paid above the federally regulated minimum. In each of the cases cited by the State, there was a finding that the state's *method* of ensuring higher prices to dairy farmers did not otherwise run afoul of the United States Constitution. In 2007, the Arkansas Attorney General offered an opinion regarding a similar proposed law, now conveniently ignored by the State, and considered those same cases. *See* DFA's Brief at 9-10, 25-26. The Attorney General stated: "It is true that a number of other states set state minimum prices that are over the federal order price. In setting these so-called 'over-order' minimums, however, it appears that the states have continued to utilize some form of blending pricing and something akin to a producer settlement fund." 2007 Ark. AG LEXIS 36, at *19. The Attorney General therefore concluded that the proposed act, which, like the Act and Rule challenged here, did not include blended pricing, was "in all likelihood unconstitutional under the Supremacy Clause." *Id.* at *20.

The State has failed to demonstrate that the undisputed material facts require a finding that the Act and Rule are consistent with the Supremacy Clause – instead, the undisputed facts demonstrate precisely the opposite – and the State's Motion with respect to the Supremacy Clause should be denied.

### C.  The Act and Rule Are Unconstitutional under the Dormant Commerce Clause

The United States Supreme Court recently reaffirmed the notion that the Commerce Clause of the United States Constitution (Art. I, Sec. 8, Cl. 3) contains a "negative command," "forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1145 (2023) (citations omitted). A violation of this so-called "dormant Commerce Clause" requires a showing of "purposeful discrimination," where a state "seek[s] to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *Id.* (citations omitted). The State

pretends that the Act and Rule operate in a vacuum: according to the State's reasoning, the Rule requires Arkansas dairy farmers to be paid more, and the collective farmer-owners of DFA can conjure up money to pay DFA's Arkansas farmer-owners more without impacting any other farmer-owners. *But see* DFA SUMF at ¶ 57 (payments pursuant to the Act and Rule will force DFA to pay other non-Arkansas dairy farmers less, discriminating against out-of-state farmer-owners in favor of Arkansas farmer-owners). The State's argument ignores the obvious: the Act and Rule are specifically designed to tax non-Arkansas raw milk to increase payments to Arkansas dairy farmers. *See W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186 (1994) (striking down Maine regulation that imposed a tax on all milk suppliers to Maine, which proceeds were distributed as subsidies to Maine dairy farmers). This discrimination against out-of-state interests to benefit (at most) 25 Arkansas dairy farmers violates the dormant Commerce Clause.

The State concedes that where a regulation "is motivated by a discriminatory purpose, is facially discriminatory against out-of-staters, and/or has a discriminatory effect" the regulation will be subject to the "strictest scrutiny." State's Brief at 17, quoting *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 596-97 (8th Cir. 2003). As the case relied upon by the State explains, even if the State has a legitimate interest motivating the regulation, under strict scrutiny a regulation will be struck down "unless the [State] can demonstrate that they have no other method by which to advance their legitimate local interests." After acknowledging that the State bears this heavy burden, the State fails to even attempt to meet it – the State provides no argument, much less undisputed facts, demonstrating a lack of alternatives for meeting the State's goals. *See* State's Brief at 18. Nor could it do so, given that the State could implement a number of initiatives, including providing tax breaks, low-cost loans, grants (as it did before), and other financial measures to further the Arkansas dairy farming industry. The federal government has

implemented a number of initiatives to assist dairy farmers, including the Dairy Margin Coverage Program,[8] Dairy Revenue Protection,[9] and loans at competitive rates.[10]  Given that there are other programs to assist farmers (including loan or assistance programs administered by other states), the State's unsupported declaration that it had no alternative to the Act and Rule rings hollow.

The State also argues that it is a market participant and therefore entitled to freely operate in the market.  Of course, the State cites no facts in support of this notion (as it is required to do on a summary judgment motion), nor could it.  The State, through the Act and Rule, is acting as a regulator and not a market participant, and the case on which it relies (*Red River Serv. Corp. v. Minot*, 146 F.3d 583, 588 (8th Cir. 1998)) is distinguishable because in that case, the City of Minot operated a municipal landfill, which the court found was an activity engaged in as a participant in the market for waste.  Here, the State has no trading partner with which it seeks to establish the terms of trade.  *Cf. id.*

Because the State's proffered undisputed facts demonstrate the unconstitutionality of the Act and Rule under the dormant Commerce Clause, the State's Motion regarding the dormant Commerce Clause should be denied.

### D.  The Act and Rule Are Not a Valid Exercise of the State of Arkansas's Police Powers

The State argues that it has not violated the Arkansas Constitution by exceeding its "police powers," but those powers are constrained by the United States Constitution under that Constitution's Supremacy Clause as well as other aspects of the Arkansas Constitution.  For instance, whether the State has validly exercised its "police powers" is encompassed by the second

---

[8] https://www.fsa.usda.gov/programs-and-services/dairy-margin-coverage-program/index
[9] https://www.rma.usda.gov/en/Fact-Sheets/National-Fact-Sheets/Dairy-Revenue-Protection
[10] https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/index

prong of the test to determine whether there has been a violation of the Contracts Clause, i.e., whether the regulation was motivated by "a significant and legitimate public purpose." *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d at 733.  Because the Arkansas Constitution's Contracts Clause has been construed as being coextensive with the United States Constitution's Contracts Clause[11], a violation of the latter necessarily exceeds the State's police powers under the former.

The State briefly suggests that any challenge to the Act and Rule under the Arkansas Constitution must be brought in an Arkansas state court and that any such challenge is barred by sovereign immunity.  State's Brief at 11-12.  The only case cited for this proposition, *Palade v. Bd. of Trs. of the Univ. of Ark. Sys.*, 2022 Ark. 119, 12, 645 S.W.3d 1, 8 (2022), does not contain any holding relevant to that assertion – instead it is a case in which dismissal was affirmed because the case did not include a justiciable controversy.  Given the State's failure to cite any relevant authority, the State's argument should not be considered.

If the Court does consider the State's cursory argument, it should be rejected.  Federal courts regularly consider cases in which violations of the Arkansas Constitution are alleged.  *See, e.g., Bohannon v. Johnson Food Equip., Inc.*, No. 5:07CV00123 JMM, 2008 U.S. Dist. LEXIS 45273 (E.D. Ark. June 9, 2008).  Moreover, in Arkansas, sovereign immunity is not a defense to actions challenging the constitutionality of acts or regulations and seeking only declaratory and injunctive relief.  *See Osage Creek Cultivation, LLC v. Ark. Dep't of Fin. & Admin.*, 2023 Ark. 47, 6, 660 S.W.3d 843, 847 (2023) (explaining that while "lawsuits seeking financial damages from the State are barred by sovereign immunity. . . . lawsuits seeking declaratory or injunctive relief

---

[11] *See Mahurin v. Oaklawn Jockey Club*, 299 Ark. 13, 16, 771 S.W.2d 19, 21 (1989) (looking to U.S. Supreme Court precedent on U.S. Constitution's contracts clause in construing Ark. Const. art. 2, § 17); *Beaumont v. Faubus*, 239 Ark. 801, 804-05, 394 S.W.2d 478, 481 (1965) (same).

against state officials committing ultra vires, unconstitutional, or illegal acts can go forward")

(internal citations omitted).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the State's Motion.

Dated: August 18, 2023                          Respectfully submitted,


                                                */s/ Kathy McCarroll*
                                                Kevin A. Crass (AR Bar #84029)
                                                Kathy McCarroll (AR Bar #2014191)
                                                Friday, Eldredge & Clark, LLP
                                                400 W. Capitol Ave., Ste. 2000
                                                Little Rock, Ark. 72201
                                                501.376.2011
                                                crass@fridayfirm.com
                                                mmccarroll@fridayfirm.com

                                                *Counsel for Plaintiff Dairy Farmers of
                                                America, Inc.*

### CERTIFICATE OF SERVICE

I, Kathy McCarroll, hereby certify that on August 18, 2023, I electronically filed the foregoing Dairy Farmers of America, Inc.'s Brief in Opposition to Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will automatically send notice to all participants and parties.

                                                By: */s/ Kathy McCarroll*
                                                Kathy McCarroll (AR Bar #2014191)

18