**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**DAIRY FARMERS OF AMERICA, INC.**                                        **PLAINTIFF**

**v.**              **CASE NO. 4:22-cv-501-JM-JTR**

**WES WARD, IN HIS OFFICIAL**                                        **DEFENDANTS**
**CAPACITY AS SECRETARY OF THE**
**DEPARTMENT OF AGRICULTURE;**
**AND  FREDERIC SIMON, IN HIS**
**OFFICIAL CAPACITY AS CHAIRMAN**
**OF THE ARKANSAS MILK**
**STABILIZATION BOARD**

## DEFENDANTS' RESPONSIVE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Since 1990, Arkansas has seen a 97.05% loss of Grade A dairy-producing farms.  In 1990, we had 849 dairy farms.  As of August 1, 2023, we are down to only 25.  Dairy farms are losing money as we speak.  Dairy Farmers of America, Inc. ("Plaintiff" or "DFA") is a Kansas cooperative marketing association, whose principal place of business is in Kansas City, Kansas.  It is reportedly owned by more than 6,000[1] family farms ("Member-Farmers") across the United States.  A cooperative or "co-op" is a collection of dairy farmers who work together to market their milk and other dairy products.  The operative phrase in the description of a "co-op" is "they work together."  This is not how DFA operates.  DFA enters into one-sided DFA-drafted Membership and Marketing Agreements ("MMAs") with local dairy farmers, agrees to purchase the milk from the local farmer, and then pays the farmer an amount of money that is left over after DFA pays "all ordinary and necessary expenses" allegedly incurred in the marketing or utilization of milk or

---

[1] It is believed this number may actually be closer to 8,000, based upon various dairy reports.

other dairy products. (DE 1, p. 30, ¶ 3.A.)  These "ordinary and necessary expenses" include manufacturing, processing, preparing for market, handling, hauling, "associated research," advertising, distribution, service of debt and payments to third party creditors, proceeds received from the sale of milk or dairy products produced by a farmer-member (as equity capital), and any other deductions they see fit, which includes enormous salaries for their corporate executives — amounts unknown even to its members, though requested by them.  (DE 1, p. 30, ¶ 3.A. – C.)

What has DFA done to aid Arkansas's 25 remaining dairy farmers? On May 31, 2022, it used its minority ownership interest in Hiland Dairy (Arkansas's only milk processor) to direct Hiland to stop accepting milk from Arkansas dairy farmers. In turn, the already-struggling dairy farmers are now forced to pay additional expenses for milk haulers to transport their milk out of state, often driving right by one of Hiland Dairy's three processing plants.

This is just one example of what Arkansas dairy farmers have historically been up against. In an effort to assure the continued viability of dairy farming in Arkansas, while not infringing on the rights of out-of-state dairy farmers, Arkansas House Bill ("HB") 1729 was filed on March 15, 2021. On March 18, 2021, the Arkansas House overwhelmingly voted to support the bill with a vote of 89 "yeas," 0 "nays," 10 "non-voting" and 1 "present."  Less than two-weeks later, the Arkansas Senate voted and recorded 29 "yeas," 4 "nays," and 2 "present."  HB 1729 became Act 521 ("Act 521") on April 1, 2021.

Upon the passage of Act 521, the Arkansas Milk Stabilization Board[2] ("the Board") was then tasked with the duty of drafting a set of rules ("Milk Stabilization Rules") to implement Act 521 in order to ensure Arkansas milk producers received Class 1 prices for their milk that was to be utilized or sold as fluid milk in Arkansas. (DE 1, p. 24) After numerous board meetings, which

---

[2] The Board was abolished as of July 1, 2023, pursuant to Act 691of 2023.

allowed public comments, a set of Milk Stabilization Rules was finalized in March 2022. These Milk Stabilization Rules were filed with the Arkansas Secretary of State's Office in May 2022. Within ten days of the Milk Stabilization Rules being filed, DFA decided that, instead of following the Rules and paying Arkansas farmer-members Class 1 prices for their milk that was to be utilized or sold as fluid milk, it would circumvent them entirely. This is when DFA went against the best interests of its Arkansas member-farmers. DFA seeks an order from this Court that would allow it to continue its deceptive actions, and further harm Arkansas dairy farmers, and in turn, citizens of the State.

In its motion for summary judgment, DFA alleges: (a) both Act 521 and the Milk Stabilization Rules directly interfere with their preexisting contractual rights, (b) seek to place the Arkansas law and regulation above federal law and regulations in violation of the Supremacy Clause of the United States Constitution, and (c) discriminate against out-of-state suppliers of raw milk in order to benefit in-state interests. (DE 23) The evidence and legal arguments presented in the Defendants motion for summary judgement, as well as those asserted in this response, clearly establish that neither Act 521 nor the Milk Stabilization Rules violate any of DFA's constitutional rights. As a result, DFA is not entitled to summary judgement on any of its claims.

## II. ARGUMENT

A.    **Neither Act 521 nor the Milk Stabilization Rules Interfere with its Existing Member-Farmer Contracts and thus Do Not Violate the "Contract Clauses" of the United States or Arkansas Constitutions.**

One of the United States' "express limitations on state power" is that "[n]o State shall pass any Law impairing the Obligation of Contracts." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 14 (1977); U.S. CONST. art. 1, § 10, cl. 1 (cleaned up). Simply put, this Federal "Contract Clause" ensures that state governments—such as the Arkansas General Assembly—cannot

interfere with existing contracts absent a compelling justification. *American Fed'n of State, Cnty. & Mun. Emps. v. Benton*, 513 F.3d 874, 879 (8th Cir. 2008).

Although Defendants believe the proper standard when considering whether a state law impermissibly interferes with a contract is the three-prong analysis utilized in their motion for summary judgment and incorporate by reference that analysis, for purposes of this Response, they will address DFA's two-prong test as cited in *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022). Under the first prong, the question to answer is "whether the state law ***substantially impairs*** a contractual relationship," which takes into consideration "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S.Ct. 1815, 1821-22 (2010) (emphasis added). If the first prong is met, a court must then determine whether the second prong can be met, which is "whether the state law is drawn in an '**appropriate**' and '**reasonable**' way to advance 'a significant and legitimate public purpose.'" *Ass'n of Equip. Mfrs. V. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quoting *Sveen,* 138 S.Ct. at 1822) (internal quotation marks omitted) (emphasis added). Each prong will be addressed separately.

1.    Neither Act 521 Nor the Milk Stabilization Rules Substantially Impair the Contractual Relationship between DFA and its Member-Farmers.

DFA's argument is essentially that it puts its member-farmers on notice, by the various documents, MMAs, regulations, bylaws, rules, etc. (all drafted by DFA and completely one-sided) that it is going to calculate an amount DFA deems should be paid to the farmers, after combining all of the proceeds and then deducting the numerous expenses (some specified, some not) from the payments. Under this logic, it's easy to understand why farmers are frustrated with this arrangement.

DFA further states that in order to pay Arkansas member-farmers what Act 521 and the Milk Stabilization Rules entitle them to receive, it would have to ignore the agreement it has reached with all farmer-members. This is untrue. It is undisputed that the MMAs set forth a *minimum* amount that the member-farmers are to receive, not a maximum. Think of an employer who hires an employee at a pay rate of the Arkansas minimum wage rate of $11.00, but, once hired and the employment contract is signed, the employer then decides to pay the employee $13.00 an hour. Is that a violation of their contractual relationship? No, of course not.

DFA says that "for us, it all starts at the farm, which is why we support and invest so much into preserving our farmers' legacies and ensuring their futures." https://www.dfamilk.com. This could not be further from the truth, according to Arkansas dairy farmers, and according to the voluminous amount of litigation against DFA across the United States, it appears that many dairy farmers agree.

On its website, DFA describes itself as "a purpose-driven cooperative, working to enrich communities and consumers' lives through all the possibilities of dairy." It professes to understand that these possibilities go beyond the traditional dairy case and understands the importance of providing opportunities for rural communities to thrive, sharing nourishment to those in need, and preserving natural resources for future generations. www.dfamilk.com. The DFA may talk a big game, but it doesn't walk the walk.

As of August 1, 2023, Arkansas has only 25 Grade A dairy farms. That is it. DFA, on the other hand, has a reported membership of at least 6,000 dairy farms. Assuming all Arkansas dairy farms are members of DFA (which they are not), Arkansas dairy farms would account for 0.46% of a gross membership in excess of a purported 6,000 dairy farms.

In 2020, DFA's net income, excluding non-recurring items, was $170.6 million.  In 2021, DFA's net  income, excluding significant non-recurring items, was $199 million.  And for 2022, it had a reported net income of $107.9 million, with net sales totaling **$24.5 billion.**  Now **c**ompare DFA's **$24.5 billion** in sales to the mere $11 million in Arkansas milk sales that dairy farms generate annually.  It is incredulous to say that any alleged payment to an Arkansas member could be a substantial financial burden on DFA.

Unfortunately, the substantial burden has fallen upon the shoulders of the Arkansas dairy farmer who is trying to stay in business while producing as much milk as they can for their families and communities.

For the reasons stated, DFA has failed to establish it has or will incur a "substantial impairment" when Act 521 is deemed constitutional.

2.    The State Can Meet its Burden of Demonstrating Act 521 and the Milk Stabilization Rules Advance a Significant and Legitimate Public Purpose.

Once the threshold of determining if a substantial impairment actually exists, which it does not in this case, the Court must turn to determine whether "that impairment violated the Contract Clause." *U.S. Trust Co.*, 431 U.S. at 17.  The United States Supreme Court notes in *El Paso v. Simmons*, that "it is not every modification of a contractual promise that impairs the obligation of contract under federal law."  379 U.S. 497, 506-07 (1965).  Meaning, that while some might see this constitutional provision as "unambiguously absolute," it simply is not "the Draconian provision that its word seems to imply."  *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934) (further proving that the Contract Clause "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.").

Therefore, we must see if such an impairment of the Contract Clause is an "essential attribute[] of sovereign power." *U.S. Trust Co.*, 431 U.S. at 21. Arkansas has a "sovereign right to protect the general welfare of [its] people" and that the Court *must respect* a state legislature's "wide discretion on their part in determining what is and what is not necessary." *El Paso*, 379 U.S. at 508-09 (cleaned up). While it has been long established that the Contract Clause "limits the power of the State . . . to regulate [contracts] between private parties[,]" it does not outright prohibit the State from "repealing or amending statutes generally, or from enacting legislation with retroactive [contractual] effects." *U.S. Trust Co.*, 431 U.S. at 17.

Such a literalism "would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *Spannaus*, 438 U.S. at 240. Such an exercise of police power by the State is "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort, and general welfare of the people," and most importantly "is paramount to *any rights* under contracts between" parties. *Id.* at 241. Stated more simply, Act 521 and the Rules "must serve a legitimate public purpose." *U.S. Trust Co.*, 431 U.S. at 22 (quoting *Home Bldg. & Loan Ass'n v. Blaisedell*, 290 U.S. 398, 444-45 (1934)). Furthermore, legislation such as Act 521 and its resultant Milk Stabilization Rules, which will adjust the rights and responsibility of DFA, must be upon "reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.*

DFA provided a copy of its boilerplate, template MMA attached to its Complaint. (DE 1, p. 29) For all intents and purposes, Defendants understand that this Agreement constitutes a written tool that DFA may use to bind itself and its member-farmers in a contractual relationship. Defendants have never seen copies of such agreements, although copies were requested in discovery.

7

A reading of the draft MMA attached to the Complaint illustrates that DFA agrees to: (a) purchase all milk from the member (i.e., the dairy farmer); (b) pick up or arrange for the milk to be picked up from the member's farm; (c) distribute proceeds to the member after DFA pays for the ordinary and necessary expenses incurred, such as manufacturing, processing, handling, hauling, advertising, etc. and any other deductions or offsets authorized by law. (DE 1) The draft MMA sets a *minimum* for what is to be paid to the member, not a maximum.

The Milk Stabilization Rules promulgated by the Board state that milk class prices are to be calculated using the regulations set forth in the Federal Milk Marketing Order ("FMMO") No. 7. If the dealer's (i.e., Hiland Dairy's) percentage of utilization of milk that was produced in and sold as fluid milk within Arkansas exceeds the percentage of utilization of milk as Class 1 milk in the FMMO No. 7, the producer (dairy farmer) shall be paid an Over-Market Premium. S1, p. 25) When an Over-Market Premium is owed to a producer, the premium is to be paid to the producer, or to the producer's cooperative, by the dealer pursuant to the rules for payments to producers. There is nothing in the Agreement that suggests a higher amount cannot, will not, or should not be paid. The language of the Agreement and the Milk Stabilization Rules do not conflict with one another. As such, neither Act 521 nor the Milk Stabilization Rules impair DFA's contractual relationships with its Member-Farmers.

In support of its argument, DFA cites to a statement allegedly made by Frederic Simon, the former Milk Stabilization Board Chairman, at an undated Board meeting, in which Mr. Simon allegedly discussed where the increase in money for Arkansas dairy farmers was to come from. DFA claims this to be "evidence" that the State would be treating out-of-state dairy farmers unfairly. Such a discussion, assuming for purposes of this argument that it did occur, is not evidence of any intentional attempts to obtain more money for Arkansas farmers. It would be part

of a discussion. Nothing more. Neither the Milk Stabilization Board, the former Board Chairman, nor the State can dictate how other states are to be paid, and neither Act 521 nor the Milk Stabilization Rules seek to do that.

DFA also offers pages from a slide presentation as evidence that the State knew what it would be doing was establishing unfair treatment of member-farmers. The presentation "State Regulation of Dairy Pricing) (DE 23-1, pp. 5-13) is dated August 19, 2021 (approximately 8 months prior to the adoption of the Milk Stabilization Rules). It is presumed that DFA is referring to pp. 12-13 of the presentation, which list "practical issues" regarding the dormant Commerce Clause and the Supremacy Clause. These slides are not evidence of wrongdoing. If they are evidence of anything, it is of a discussion that took place 8 months before the Milk Stabilization Rules were adopted, and after multiple Board meetings were held.

DFA goes on to allege that the State cannot present credible evidence regarding the State's burden to show that the law "protects a broad societal interest rather than a narrow class," citing *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002). If the milk produced by the 25 Arkansas dairy farmers was to be utilized only by the Arkansas dairy farmer families, DFA could be right in their assertion; however, that is not the case at all.

Arkansas is a milk deficit state, meaning it does not produce enough milk to supply its own population. In 1990, Arkansas had 849 Grade A dairy-producing farms across the state. As of today, only 25 remain. This is an overall decrease of 97.05% in Arkansas Grade A dairy-producing farms — in 33 years. Dairy farmers have faced a variety of challenges that have led to a decline in dairy operations in Arkansas. Arkansas parents not having enough milk to provide their family with, or a school district not having enough milk to provide for their students every day are the concerns of every Arkansan, including Arkansas dairy farmers. Their job is to provide all the milk

they can to Arkansas citizens.  It is undisputed that a lack of milk in Arkansas is and could continue to be a sizeable economic concern.

According to DFA's website, it acknowledges that developing a well-balanced diet for young children is a complex science. https://dfamilk.com.  Its research shows that most children fall short on key nutrients. *Id*. In fact, DFA estimates that 75% of kids younger than the age of nine don't get enough vitamin D and potassium, two nutrients critical for development. *Id*. The good news, it points out, is that kids can get 13 essential nutrients from milk including the all-important nutrient protein, which is essential for growth and development. Further, DFA stresses the importance of adding at least one glass of milk to every mealtime. *Id.*

The Arkansas Department of Education estimates that the number of students enrolled in grades K-12 during the 2022-2023 school year was just slightly under 500,000. https://adedata.arkansas.gov. That means, according to DFA's own research and public announcements, that 1.5 million glasses of milk should be consumed by school-aged children in Arkansas every day.

The estimated population of Arkansas in 2023 is 3.011 million.  https://www.census.gov. Again, using DFA's assertions, even if we were to allow every citizen of the state to have one glass of milk each day, that would be more than 3 million glasses of milk every day.

For years, DFA has entered contracts with its reported 6,000+ Member-Farmers to provide services for hauling and processing milk.  According to the Complaint, some of those member-farmers are, or have been, Arkansas dairy farmers.  Initiating Milk Stabilization Rules that provide for Arkansas farmers to receive an amount above the minimum contract price makes perfect sense in this state.  The evidence available establishes that neither Act 521 nor the Milk Stabilization Rules interfere with any of DFA's contractual relationships.

On March 15, 2021, Arkansas HB 1729 was filed.  HB 1729 sought to amend the Arkansas Milk Stabilization Board Act; to amend the powers and duties of the Arkansas Milk Stabilization Board; and to set the price to be paid for milk produced and sold in Arkansas.  This need was based on the dramatically dwindling number of Arkansas Grade A dairy farmers, and the public interested of supporting local growth in milk production for the families of Arkansas.  The need for the legislation could not be seen as anything other than reasonable and appropriate, given the dramatically falling number of Grade A dairy farms.

DFA makes a passing comment in their motion about Arkansas House Bill 1419 that failed in the Arkansas Legislature, as well as a 2007 Opinion from then Attorney General Dustin McDaniel as further support of the state's violation of the federal Contracts Clause.  (Ex. A & B) This argument will be addressed more fully in the next section; however, Defendants affirmatively assert that DFA's argument on this point fails, along with its other arguments.

For the reasons stated above, as we all those asserted in Defendants' motion for summary judgment, DFA is not entitled to summary judgment on its Contracts Clause claim.  Defendants respectfully request judgment be entered in their favor.

**B.     Neither Act 521 nor the Milk Stabilization Rules Contradict the Legislative Purpose of the MMAs, thus They Do Not Violate the United States Constitution's "Supremacy Clause."**

Federal laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.  Furthermore, "Congressional intent is the touchstone of preemption analysis."  *Grant's Dairy— Me. LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 14 (1st Cir. 2000) (quoting *Cippolone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)); *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Moreover, while conducting such analyses, courts must "start

with the assumption that the historic police powers of the states [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.* at 14-15 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

To begin this analysis, the Court must recognize that preemption is split between two distinct camps. "Express preemption" occurs when the face of a federal statute expressly states that Federal law is *exclusive* in a field (i.e., preempting state law, defining the extent of said preemption, and leaving no room for contradictory or supplementary state or local laws). *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); 496 U.S.at 78-79. In the present action, the facts present no reason for an express-preemption analysis.

In the second camp, we have "implied preemption." Implied preemption occurs when a federal statute does *not* expressly state that Federal law is exclusive in a field, but federal preemption of state or local law is nonetheless implied from congressional intent. *Hillsborough*, 471 U.S. at 713. Implied preemption can occur in three unique, but similar, ways. None of those three apply here.

As stated above, three types of implied preemption exist. First, courts routinely recognize "conflicts preemption," which is where Federal and state law are mutually exclusive, meaning that compliance with both Federal and state regulations is a physical impossibility. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Second, courts recognize "field preemption," which is where a scheme of Federal law is "so pervasive as to make reasonable the inference that Congress has left no room for the States to supplement it." *Id.* Lastly, courts recognize "frustration preemption," which pseudo-arises out of conflicts preemption, but is distinct enough to analyze as a separate type of implied preemption. *Id.* Frustration preemption exists when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the

United States Congress. *Id.* Simply put, frustration preemption exists where state law impedes the overall goals of Federal law.

To begin an analysis of implied preemption regarding the MMA, Defendants find it prudent to follow the model argument provided in *Grant's Dairy*. In *Grant's Dairy*, the First Circuit considered the innate objectives of federal milk price regulation. *Grant's Dairy*, 232 F.3d at 15. Chief among those objectives was achieving "parity for producers" and ensuring the "orderly supply of agricultural commodities." *Id.* Further, the First Circuit opined that the AMAA[3] routinely "insured a sufficient quantity of pure and wholesome milk," assured "a level of farm income adequate to maintain productive capacity to meet future needs," and reflected current economic factors. *Id.*

Ultimately, the First Circuit's analysis mirrored that of the D.C. Circuit's logical and sound reasoning. *Id.* That the "objectives of federal milk price regulation, generally, are 'to guarantee producers parity prices, to protect the health and purses of consumers, to establish and safeguard orderly marketing conditions, and to assure to each area of the country a sufficient quantity of pure and wholesome milk.'" *Id.* (quoting *Schepps Dairy, Inc. v. Bergland*, 628 F.2d 11, 19 (D.C. Cir. 1979)).

Here, Defendants align with the opinion of the First Circuit in *Grant's Dairy*. In that case, the First Circuit held that "Maine's pricing scheme conflicts with neither the AMAA's overarching purposes . . . nor the goals of federal milk price regulation." *Grant's Dairy*, 232 F.3d at 16. Like the Maine law in *Grant's Dairy*, Act 521 and the Milk Stabilization Rules in Arkansas achieve the same purpose. Act 521 and the Milk Stabilization Rules promote price equality for Arkansas dairy farmers without damaging the federal milk market's orderliness. *Id.* Most importantly, Act 521

---

[3] Agricultural Marketing Agreement Act of 1937, now codified, as amended, at 7 U.S.C. §§ 601-626, authorized the Secretary of Agriculture to set minimum prices for milk.

and the Milk Stabilization Rules contribute "to the promotion of an adequate supply of milk by assuring [Arkansas dairy farmers] a steady, predictable income stream[,]" which will in turn encourage production and bolster dairy farming in the Natural State. *Id.*

To further bolster the Defendants' reasoning, it is prudent to rely upon the United States Supreme Court's decision in *West Lynn Creamery, Inc. v. Healy*. 512 U.S. 186 (1994). The Court in *West Lynn* plainly states that "[t]he federal order *does not* prohibit the payment of prices higher than the established minima." *Id.* at 190, n.1 (emphasis added). Moreover, that the AMAA has only authorized the "Secretary of Agriculture to *regulate the minimum prices* paid to producers" for their raw milk. *Id.* at 189 (emphasis added). Therefore, just like the First Circuit's reasoning in *Grant's Dairy* and the Supreme Court's reasoning in *West Lynn*, these cases provide an avenue for this Court to recognize that "prices higher than the federal minima are *not fundamentally incompatible with the objectives of the federal regulatory scheme*." *Grant's Dairy*, 232 F.3d at 17 (emphasis added).

Lastly, there exists a great "phalanx" of cases which arise out of the United States District Courts of Louisiana, Maine, Oregon, and Pennsylvania—two of which were affirmed by the United States Supreme Court—that support the Defendant's claim that Arkansas's regulation of milk prices *higher than the federal minima* is not preempted by the AMAA. *Grant's Dairy*, 232 F.3d at 18; *Crane v. Comm'r of Dep't of Agric., Food & Rural Res.*, 602 F.Supp. 280, 292 (D. Me. 1985) (holding that the AMAA does not exist to set a ceiling on the price a dealer may pay a farmer nor does the AMAA authorize the setting of maximum prices at all, and that farmers are free to bargain for prices higher than the federal minima); *Schwegmann Bros. Giant Super Mkts. v. Louisiana Milk Comm'n*, 365 F.Supp. 1144, 1156-58 (M.D. La. 1973), *aff'd*, 416 U.S. 922 (1974) (holding that Congress has not preempted "either the field of price competition in interstate

commerce . . . , nor the field of milk marketing" through the AMAA); *United Dairy Farmers Coop. Ass'n v. Milk Control Comm'n*, 335 F.Supp 1008, 1014-15 (M.D. Pa. 1971), *aff'd*, 404 U.S. 930 (1971) (holding that the minimum prices set by Pennsylvania's Milk Marketing Board are higher than the minimum set by the federal order; therefore, there is "no impossibility of compliance" with both the federal order and the Pennsylvania minimum and that each may operate without conflict. Further, that there is zero "indication that Congress has intended to preempt this field . . . ."); *Medo-Bel Creamery, Inc. v. Oregon*, 673 P.2d 537, 544 (1983) (holding that nothing in the AMAA bars states from "setting minimum prices that are higher than those set under the federal statute[,]" and that there is "no impossibility of dual compliance with [both] the federal and state regulatory bodies.").

In support of its argument, DFA cites to a 2007 bill, House Bill ("HB") 1419, which it describes as similar to the 2021 Act as well as a prior Attorney General's Opinion, 2007-036, which addressed HB 1419. (Ex. A & B) A review of both illustrates the flaws in DFA's argument.

On February 7, 2007, Arkansas Representative Johnny Hoyt introduced HB 1419, entitled "An Act to Create the Arkansas Milk Stabilization Act; to Protect the Arkansas Dairy Industry; and for Other Purposes." (Ex. A) HB1419 proposed to establish equitable dairy pricing in several ways. First, it sought to exercise the state's right under the FMMO to institute a state-regulated milk pricing plan for milk produced in Arkansas. Second, for any dairy cooperative that transports milk from a farm to a processor and distributes milk-sales dollars back to the dairy farmer, the dairy farmer would be entitled to Class 1 milk prices under Grade A regulations. Third, it sought to place a cap on handler costs ($0.35 per hundredweight) excluding transportation costs. And lastly, transportation costs paid by an Arkansas dairy farmer would be limited to only the "usual and customary costs" of transporting Arkansas milk to processors in this state. (Ex. A)

In addition to the submission of HB 1419, Representative Hoyt submitted a request for an Attorney General Opinion regarding the constitutionality of HB 1419. (Ex. B) On March 22, 2007, Attorney General Dustin McDaniel issued Opinion 2007-036, in which he opined that HB 1419 would likely be unconstitutional under the Supremacy Clause.  Specifically, the Opinion stated as follows:

> "House Bill 1419 requires all milk produced under Grade A regulations and that meets the processor's requirements for Class 1 Milk to be priced in the 'Class 1 Value.' This provision ensures a uniform price to be received by all producers, a fact seemingly consistent with the federal regime, which also requires a uniform price ultimately paid to producers. See 7 U.S.C. §608c(B).  Unlike the federal regime, however, the bill does not 'classify milk in accordance with the form in which or the purpose for which it is used, and fix[] . . . minimum prices for each such use classification which all handlers shall pay . . .' See 7 U.S.C. 608c.  Instead, it fixes one price to be paid by handlers for Grade A Class 1 acceptable milk notwithstanding the use to which the milk will be put.  In essence, HB 1419 is contrary to the federal scheme because it does not utilize any type of "blending price" mechanism."  The provisions of HB 1419 were "conflict preempted" by the relevant federal scheme. Under HB 1419, compliance with the extant federal order is impossible and the objectives of the federal scheme would be undermined.
> (Ex. B)

HB 1419 died in the House Committee on May 1, 2007. (Ex. C) Act 521 is remarkably different and distinguishable from HB 1419. Most importantly, Act 521 accounts for "price blending" which HB 1419 did not. *See* Ark. Code Ann. § 2-10-104(d)(1)(B)(i). HB 1419 sought to establish a set price for handler costs.  Act 521 does not. HB 1419 sought to limit the transportation costs paid by an Arkansas dairy farmer to the "usual and customary costs" of transporting milk to processors in this state.  Act 521 does not. Lastly, Act 521 provides an option for the Board to "Revise the payment of Class 1 prices required under subdivision (d)(1)(B)(i) of this section if Arkansas is no longer considered a milk deficit state."  A.C.A. § 2-10-104(d)(2)(A) A reading of HB 1419, AG Opinion 2007-036, and Act 521 establish that no violation of the Supremacy Clause.

For the reasons stated above, as we all those asserted in Defendants' motion for summary judgment, DFA is not entitled to summary judgment on its Supremacy Clause claim.  Defendants respectfully request judgment be entered in their favor.

**C.    Neither Act 521 nor the Milk Stabilization Rules Interfere with Interstate Commerce and thus Are Not *Per Se* Invalid under the United States Congress's Dormant Commerce Power.**

The United States Constitution grants Congress the power "[t]o regulate Commerce . . . among the several states." U.S. CONST. art. 1, § 8. cl. 3.  This power has an adverse aspect, which is commonly referred to as the Dormant Commerce Clause, which implies that "states may not enact laws that discriminate against or unduly burden interstate commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003).  For an Arkansas law—such as Act 521 at issue in this case—that is challenged for violating the Dormant Commerce Clause, we look "to a two-tiered analysis." *Id.* at 593.

First, we must determine if discrimination exists. *Id.*  Discrimination in this respect "refers to 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.*  Therefore, if the Act is indeed discriminatory, it would then be considered *per se* invalid.  However, the Defendants can proffer "under rigorous scrutiny, that [they have] no other means to advance a legitimate local interest." *Id.*  This showing a legitimate local interest then forces us to the second tier of the analytical framework. *Hazeltine*, 340 F.3d at 593.  This second analytical framework provides "that the law will be struck down only if the burden it imposes on interstate commerce 'is clearly *excessive* in relation to its putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

1.      **Tier 1 of the D.C.C. Analytical Framework.**

The Supreme Court has recognized three indicators of discrimination against out-of-state interests. *Id.* These indicators include a "discriminatory purpose[,]" whether a law could "facially discriminate against out-of-state interests[,]" and if a law has a "discriminatory effect." *Id.* (quoting *Bacchus Imports, Ltd. V. Dias*, 468 U.S. 263, 270 (1984); *Chem. Waste Mgmt. v. Hunt*, 504 U.S. 334, 342 (1992); *Maine v. Taylor*, 477 U.S. 131, 148 n.19 (1986)).

DFA is burdened with the task of "proving [the Defendant's] discriminatory purposes." *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).  In their present action, DFA has asserted allegations of a discriminatory effect, "both facially and in practical effect." *Doc. 1, p. 20*.  However, it has proffered no "direct evidence that the drafters of [Act 521] . . . intended to discriminate against out-of-state business." *Hazeltine*, 340 F.3d at 593. Further, "the bare fact that milk is federally regulated is simply not enough to render concurrent state regulation of some of its milk unconstitutional." *Grant's Dairy*, 232 F.3d at 19-20.   However, even if this Court determines that Act 521 contains discriminatory purpose, facially discriminates against out-of-staters, and/or has a discriminatory effect, the Defendants have proffered a legitimate local interest to supplant the burden of Tier 1's outcome.

2.      **Tier 2 of the D.C.C. Analytical Framework.**

If this Court concludes that Act 521 was motivated by a discriminatory purpose is facially discriminatory against out-of-staters, and/or has a discriminatory effect, the Court must utilize the strict scrutiny balancing test. *Hazeltine*, 340 F.3d at 596-97 (stating that the United States Supreme Court held this as one their tests with the "strictest scrutiny.").  In *MSM Farms, Inc. v. Spire*, the Eighth Circuit found that promoting local, family farms is a legitimate state interest.  927 F.2d 330, 333 (8th Cir. 1991).  Paired with the strength of this legitimate local interest, however, we

must shift the Court's focus to the real crux of this analysis:  whether reasonable non-discriminatory alternatives exist to advance said interests.  *Hazeltine*, 340 F.3d at 597.  The Defendants bear this burden of demonstrating that no such alternative(s) exists.  *Id.* (quoting *Oregon Waste Sys.*, 511 U.S. 93, 100-01 (1994).

For the last 33 years, Grade A dairy farming has decreased in Arkansas by 97.05%.  Those Grade A farmers that are left are working their farms, caring for their dairy cows, and are trying to ensure Arkansas receives all the milk it can.  The dairy farmers are contracting with who they can, and as any businessperson would, they are seeking the highest price for their fluid milk.

There are three milk processing plants in Arkansas:  Hiland Dairy in Fort Smith, Hiland Dairy in Fayetteville, and Hiland Dairy in Little Rock.  As of June 2, 2022, Hiland Dairy, at the direction of DFA, announced it would no longer accept milk from Arkansas farmers.  As a result, Arkansas dairy farmers are now forced to arrange for their milk to be driven across state lines to be processed.  Oftentimes, the tanker trucks carrying Arkansas milk must pass by the Hiland Dairy processing plants on their way to unload their milk in neighboring states.

As previously stated, Arkansas dairy farmers are doing everything they can to care of the needs of Arkansans.  It is undisputed that the need for milk in this state is legitimate, real, and ever present.

3.    **The "Market Participant" Exception to the D.C.C. Analytical Framework.**

Even when a state law violates the Dormant Commerce Clause and its two-tier analysis, courts routinely uphold laws as a "'market participant' rather than a market regulator, however, its conduct is outside the reach of the Commerce Clause."  *Red River Serv. Corp. v. Minot*, 146 F.3d 583, 586 (8th Cir. 1998) (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809-10 (1976)).  Furthermore, if the state government is a "market participant in a business, it may pursue

its own economic interest free from the constraints imposed by the [Dormant] Commerce Clause within the market in which it is a participant." *Id.* at 586-87.  In short, the Dormant Commerce Clause is not intended to "limit the liability of the States themselves to operate freely in the free market." *Id.* at 587.

The State of Arkansas is a market participant in the federal milk market.  It cannot set regulations for the entire field of milk marketing and compensation.

For the reasons stated above, as we all those asserted in Defendants' motion for summary judgment, DFA is not entitled to summary judgment on its dormant Commerce Clause claim. Defendants respectfully request judgment be entered in their favor.

### III.    CONCLUSION

Plaintiff has failed to establish a *prima facie* case establishing that:  **(A)** the Defendants violated the United States Constitution and Arkansas Constitution by unlawfully interfering with DFA's contracts and thus have violated both "Contract Clauses"; **(B)** Act 521 and the Milk Stabilization Rules contradict the Agricultural Marketing Agreement Act (codified at 7 U.S.C. § 601 *et seq.*), and thus have violated the "Supremacy Clause"; and **(C)** Act 521 and the Milk Stabilization Rules are *per se* invalid under the United States Congress's "Dormant Commerce Clause.  Because DFA has failed to establish a prima facie case of any constitutional violations, it is not entitled to summary judgment on any of its claims.  For these reasons, DFA"s Complaint must be dismissed, with prejudice.

For the reasons state above, Defendants are entitled to the dismissal of all claims against them and judgment in their favor.  Defendants respectfully request this Court grant their motion and dismiss the Complaint with prejudice.

Respectfully submitted,
**TIM GRIFFIN**
*Attorney General*,
State of Arkansas

**By:**   */s/      Christine A. Cryer*
Christine A. Cryer
Ark Bar No.:  2001082
*Senior Assistant Attorney General*,
State of Arkansas
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 683-0958
Fax:  (501) 682-2591
Email:  Christine.cryer@arkansasag.gov

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I, Christine A. Cryer, hereby certify that on August 18, 2023, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will automatically send notice to all participants and parties.

**By:**   */s/      Christine A. Cryer*
Christine A. Cryer
*Senior Assistant Attorney General*,
State of Arkansas