IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DAIRY FARMERS OF AMERICA, INC.                          PLAINTIFF

v.                              No. 4:22-cv-501-JM

WES WARD, in his official capacity as
Secretary of the Department of Agriculture,
and FREDERIC SIMON, in his official
capacity as Chairman of the Arkansas
Milk Stabilization Board[1]                              DEFENDANTS

## ORDER

        Plaintiff Dairy Farmers of America (DFA) filed suit to challenge the constitutionality of

Arkansas Act 521 of 2021 that amended the Arkansas Milk Stabilization Act, Ark. Code Ann. §

2-10-101, *et seq*. Plaintiff challenges Act 521's requirement that Arkansas milk producers

receive a certain price classification for fluid milk sold in Arkansas. Specifically, DFA alleges

that Act 521 violates three constitutional provisions: the Contract Clause, the Supremacy Clause,

and the dormant Commerce Clause. The parties filed simultaneous motions for summary

judgment. (Doc. Nos. 17, 20). In advance of issuing its written opinion, the Court advised the

parties that it intended to grant the State's motion for summary judgment on two of Plaintiff's

claims—the Supremacy Clause and dormant Commerce Clause claims—and deny both parties'

motion for summary judgment as to the Contract Clause claim, which it intended to set for trial.

In the course of writing the opinion, for which the Court apologizes for its delay, the Court has

reconsidered the Contracts Clause claim and is granting Plaintiff's motion for summary

judgment on this claim.

---

[1] The Arkansas Milk Stabilization Board was abolished, and its authority was transferred to the
Arkansas Livestock and Poultry Commission effective July 1, 2023. AR LEGIS 691 (2023),
2023 Arkansas Laws Act 691 (S.B. 403).

I. BACKGROUND

As the Supreme Court has explained, "two distinctive and essential phenomena of the milk industry" create the potential for market disequilibrium. *Zuber v. Allen,* 396 U.S. 168, 172, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). The first is that the price of raw milk depends on its end use. The second is that production yield varies seasonally, resulting in oversupply in summer months. Absent regulation or coordination, therefore, the milk market is vulnerable to destabilizing competition among producers to sell for the highest-price use, on the one hand, and inequitable bargaining power favoring buyers, on the other.

*Minnesota Milk Producers Ass'n v. Glickman*, 153 F.3d 632, 637 (8th Cir. 1998).

Dairy farming in Arkansas is regulated at the federal and state level. Federal Milk Marketing Orders (FMMOs) are regulations issued by the U.S. Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937 ("AMAA"). Their purpose is to stabilize the dairy market for a geographic region. These regulations establish the  minimum price that dairy processors must pay for raw milk in a region. Under FMMOs, payment for milk is required to be pooled and paid to individual farmers or cooperative associations based on a uniform or average price.  Arkansas is one of the southeastern states regulated by FMMO No. 7.

In 2007, the Arkansas legislature added a layer of state regulations with the passage of the Arkansas Milk Stabilization Act. It was passed in response to what the legislature found were "recent, dramatic price fluctuations, with a pronounced downward trend" that "threaten the viability and stability of the dairy industry" in Arkansas. Ark. Code Ann. § 2-10-102 (a)(7). In 2021, the legislature passed Act 521, codified at Ark. Code Ann. § 2-10-104, amending the Milk Stabilization Act to require that Arkansas milk producers "receive Class I prices for milk utilized or sold as fluid milk in this state."[2] Class I price, which is usually higher than the price for other

---

[2] The classes of milk include and fluid milk (Class I); dairy products like ice cream and sour cream (Class II); cheeses (Class III); and butter and milk powder (Class IV).

classes of milk,[3] is defined as the price set by FMMO No. 7. Ark. Code Ann. §2-10-104(b).

To implement Act 521, the Milk Stabilization Board enacted Rule 238-00-22 Ark. Code R. §3 (the "Rule"). This Rule recites the following understanding of the Milk Stabilization Board: "Prices for milk produced and sold in Arkansas are currently only regulated at the Federal level, pursuant to the state of Arkansas's inclusion in Federal Milk Marketing Order Number 7; .......Traditionally, the utilization of milk produced and sold in the state of Arkansas as fluid milk is much higher than the average utilization of milk as fluid milk in the Federal Milk Marketing Order Number 7; As a result, Arkansas milk producers are often underpaid for the milk they produce, making it necessary for the state to require a premium to fairly compensate milk producers; The overwhelming majority of milk producers in Arkansas are members of cooperative associations; Due to various economic reasons, the cooperative associations often negotiate with milk dealers to reach agreements for price premiums that exceed the Federal Marketing Order's established monthly minimum milk price;  However, milk producers remain underpaid for the milk they produce as the premiums paid to cooperatives are not sufficiently passed on to producers; It is therefore necessary to establish clear circumstances that cause Arkansas milk producers to be underpaid for milk, and to require that premium payments are fairly passed through to producers in those circumstances." Code Ark. R. 209.01.17-I

Plaintiff DFA is a Kansas cooperative marketing association. It is a nationwide dairy cooperative owned and governed by over 6,000 family dairy farms. A dairy farmer must execute

---

[3] In response to Plaintiff's statement of this fact, the State responded that it did not find the website link cited by Plaintiff to support this fact and therefore denied this statement. This does not make the fact disputed. See *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008) ("A fact is "disputed" in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice.") (citations omitted).

a Membership and Marketing Agreement ("MMA") and be approved to become a member of DFA. Under the MMAs, DFA agrees to purchase all the raw milk a member produces and in return the member gives DFA the authority to collectively market all its members' milk, combine the revenues received, deduct expenses, and then distribute the net proceeds to its members. DFA's Arkansas members are part of the DFA Southeast Area along with six surrounding states.

Summary judgment is appropriate only when the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and that the movant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). For the reasons stated below, the Court grants DFA's motion for summary judgment on the Contract Clause claim and grants the State's motion for summary judgment on the Supremacy Clause and the dormant Commerce Clause claims.

## II. ANALYSIS

### A. The Contract Clause

The Contract Clause "restricts the power of the state to disrupt contractual arrangements." *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 818 (2018). It states that "[n]o state shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. In determining whether a state law violates the Contract Clause, "[t]he threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship" and if so,

"whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quoting *Sveen* at 819) (internal quotations omitted).

As to the threshold issue, the undisputed facts establish that the MMAs create a contractual relationship between DFA and its member farmers. It is also undisputed that the passage of Act 521 impairs DFA's contract with its member farmers by requiring that Arkansas farmers get paid more than their non-Arkansas coop members. The question then is whether the impairment is substantial. DFA argues that by requiring DFA to pay Arkansas members the higher Class I price for all liquid milk sold, the overall pool of net proceeds will be smaller, resulting in non-Arkansas members who are subject to the same MMA receiving a lesser share of the pooled proceeds. The current MMA obligates DFA to purchase all milk from a member and therefore market or utilize it as DFA deems best "for the advantage and benefit of all members." (Doc. No. 21-1, ¶ 2.A.). The MMA further authorizes DFA to blend the proceeds of a member's milk with the proceeds derived from the milk sold by other members. (Doc. No. 21-1, ¶ 2.A.) Further, the MMAs incorporate DFA's articles of incorporation and bylaws. Article III of the articles of incorporation state a purpose of the association is to "distribute on a uniform basis the marketing proceeds after paying the expenses and matured liabilities of the association." (Doc. No. 21-2, p. 5). This is reflected in the bylaws as well. (Doc. No. 21-2, ¶2.8).

The State suggest that DFA could find other ways to pay Arkansas farmers the higher prices without impacting the non-Arkansas members, referring to the expenses that are deducted from the pooled proceeds. The State also argue that if the Act and the Rule do have an impact on the MMAs, it is not significant given the relatively small number of Arkansas DFA members. The State's arguments do not address the fact that, regardless of where the money comes from to

pay the premium price to Arkansas members, the non-Arkansas members would receive less. Additionally, the Court is not persuaded by the State's argument that the impairment cannot be significant because of the small number of Arkansas DFA members. Act 521 and the Rule affect all members of DFA's Southeast Area in a contract right crucial to its members.

The Eighth Circuit, "distilling the jurisprudence on substantial impairment, has concluded that the governing rule is akin to a question of reasonable foreseeability: 'if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed.'" *Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quoting *Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383, 385 (8th Cir. 1994)). The record establishes that prior to the enactment of Act 521, milk prices were governed only on a federal level, leaving it undisputed that DFA and its members could not reasonably have seen the impositions of Act 521 coming. (Code Ark. R. 209.01.17-I; Doc. 23 at 21-22). For these reasons, the Court finds that Act 521 constitutes a substantial impairment on DFA's contracts with its member farmers.

With this finding of substantial impairment, the burden shifts to the State. "The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act." *Burgum*, 932 F.3d at 730 (quoting *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002)). DFA has established through citations to the legislative history that the purpose of the Act and implementing regulations is to adjust the rights of the contracting parties, specifically naming DFA, to ensure that a higher price is paid to Arkansas dairy farmers than other members of DFA. Code Ark. R. 209.01.17-I ("Arkansas milk producers are often underpaid for the milk they produce, making it necessary for the state to require a premium to fairly compensate milk producers."). The State counters that Arkansas has a sovereign right to

protect the general welfare of its citizens, emphasizing that the Court "*must respect*" the state legislature's discretion in doing so.[4] In support of its argument, the State points to the decrease of Grade A dairy farms in Arkansas since 1990 (from 849 farms to 25), which it attributes to "a variety of challenges." (Doc. No. 18 at 10). From this decrease, the State foreshadows "a lack of milk in Arkansas" leading to Arkansas parents not having enough milk to provide their families or a school district not having enough milk for its students. *Id*. This concern for milk scarcity in Arkansas, however, is not supported by the record. Nor does the State provide evidence that its legislation would reverse the decline in Arkansas Grade A dairy farms. The Court finds that the State has failed to carry its burden to establish that Act 521 advanced a significant and legitimate public purpose. Instead, the evidence submitted by DFA establishes that the Act was passed with the impermissible purpose of benefitting the narrow class of Arkansas dairy farmers out of the premiums negotiated by the cooperatives. *See Equip. Mfrs. Inst. v. Janklow,* 300 F.3d 842, 859, 861 (8th Cir. 2002). Therefore, DFA is entitled to summary judgment on its claim that Act 521 violates the Contract Clause. The same analysis applies to the Contract Clause of the Arkansas Constitution. *Mahurin v. Oaklawn Jockey Club*, 771 S.W.2d 19, 21 (Ark. 1989).

   B. The Supremacy Clause

   "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (citing *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). At the same time, the United States Supreme Court has held that a consideration of the Supremacy Clause "'starts with the assumption that the historic police powers of the States are not to be superseded by ...

---

[4] Citing *City of El Paso v. Simmons*, 379 U.S. 497, 508 (1965) and adding the emphasis.

Federal Act unless that is the clear and manifest purpose of Congress.'" *Id.* DFA bears the

burden of establishing preemption. *See R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th

1170, 1178 (8th Cir. 2023).

DFA argues that the AMAA preempts Act 521 and the Rule by implication, rather than

by express preemption, in that it "'stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress.'" *R. J. Reynolds Tobacco Co. v. City of Edina*, 60

F.4th 1170, 1178 (8th Cir. 2023) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287

(1995)). Whether this so-called conflict preemption applies "is a matter of judgment, to be

informed by examining the federal statute as a whole and identifying its purpose and intended

effects." *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

The AMMA "was intended 'to raise producer prices' and 'to ensure that the benefits and

burdens of the milk market are fairly and proportionately shared by all dairy farmers.'"

*Minnesota Milk Producers Ass'n v. Glickman*, 153 F.3d 632, 637 (8th Cir. 1998) (quoting *Block

v. Community Nutrition Inst.,* 467 U.S. 340, 342 (1984)). It represented "an effort to insulate

farmers from competitive market forces that [Congress] believed caused "unreasonable

fluctuations in supplies and prices" and was a declaration of "a national policy of stabilizing

prices for agricultural commodities." *Horne v. Dep't of Agric.*, 569 U.S. 513, 516 (2013).

The AMAA requires that the FMMOs contain provisions which "(1) classify milk in

accordance with the purpose for which it is used, (2) set minimum prices for each such use that

handlers must pay, (3) require that said prices be uniform except that adjustments can be made

for production differentials, grade or quality of the milk, and locations of delivery, and (4)

provide for the use of "blended" prices such that all producers of milk subject to a particular

FMMO receive a uniform price for the milk delivered to handlers regardless of the ultimate use

of the milk. *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 859–60 (9th Cir. 2013); 7 U.S.C. §
608c(5).

As argued by the State, "the AMAA mandates a minimum price, it does not mandate a
maximum price" that dairy farmers must be paid. *Farmers Union Milk Mktg. Coop. v. Yeutter*,
930 F.2d 466, 468 (6th Cir.1991) (further stating that "market forces are allowed to intrude on
this regime on occasion, though only in one direction." *Id.* at 469). Therefore, the Court finds
that the passage of Act 521 does not frustrate Congress's purpose in enacting the AMMA. In so
finding, the Court follows "the great weight of authority holds that state regulation of milk prices
is not preempted by the extant federal regime." *Grant's Dairy--Maine, LLC v. Comm'r of Maine
Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 18 (1st Cir. 2000).[5]

C. The Dormant Commerce Clause

In its most recent discussion of the dormant Commerce Clause, *National Pork Producers
Council v. Ross*, 598 U.S. 356 (2023), the Supreme Court "synthesized decades of dormant
Commerce Clause jurisprudence into a few key principles." *New Jersey Staffing All. v. Fais*, 110
F.4th 201, 205 (3d Cir. 2024). Primary among them is that the dormant Commerce Clause
"prohibits the enforcement of state laws driven by ... economic protectionism—that is, regulatory
measures designed to benefit in-state economic interests by burdening out-of-state competitors."
*Id.* (cleaned up). "This antidiscrimination principle lies at the very core of our dormant
Commerce Clause jurisprudence. *Nat'l Pork Producers* at 369 (internal quotation omitted).

---

[5] Citing "*E.g., Crane v. Commissioner of Dep't of Agric., Food & Rural Res.,* 602 F.Supp. 280,
293 (D.Me.1985); *Schwegmann Bros. Giant Super Mkts. v. Louisiana Milk Comm'n,* 365 F.Supp.
1144, 1156–57 (M.D.La.1973), *aff'd,* 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279 (1974);
*United Dairy Farmers Coop. Ass'n v. Milk Control Comm'n,* 335 F.Supp. 1008, 1014–15
(M.D.Pa.1971), *aff'd,* 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971); *Medo–Bel Creamery,
Inc. v. Oregon,* 65 Or.App. 614, 673 P.2d 537, 544 (1983)."

The Eighth Circuit will find that "[a] state statute violates the dormant Commerce Clause if it: (1) clearly discriminates against interstate commerce in favor of in-state commerce, (2) imposes a burden on interstate commerce that outweighs any benefits received,[6] or (3) has the practical effect of extraterritorial control on interstate commerce." *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (cleaned up). "The burden to show discrimination rests on the party challenging the validity of the statute[.]" *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). If discrimination is established, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Id.* "Extreme caution is warranted before a court deploys [the dormant Commerce Clause's] implied authority" and "something courts should do only where the infraction is clear." *Nat'l Pork Producers* at 390 (cleaned up).

In the present case, Act 521 requires that Arkansas milk producers "receive Class I prices for milk utilized or sold as fluid milk in this state." In its brief, DFA argues that "the intent and effect" of Act 521 is purposeful discrimination to build up Arkansas dairy farmers through burdens on the industry and the business of other states. (Doc. No. 23 at 30). In an effort to bring the Act within tariffs recognized as "patently unconstitutional" under the Commerce Clause,[7] DFA likens the Act's requirement that Arkansas dairy farmers receive Class 1 prices to a tax on non-Arkansas raw milk, citing *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994). However,

---

[6] This factor incorporates the Pike balancing test: if a law is found not to be discriminatory, "[it] will be struck down only if the burden it imposes on interstate commerce 'is clearly excessive in relation to its putative local benefits.'" *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)).

[7] "In fact, tariffs against the products of other States are so patently unconstitutional that our cases reveal not a single attempt by any State to enact one." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193, 114 S. Ct. 2205, 2211, 129 L. Ed. 2d 157 (1994)

in *Healy,* Massachusetts imposed a tax on *all* milk sold to in-state retailers *regardless* of where it was produced, then redistributed the tax solely to Massachusetts producers. The result was a tax that only applied to out of state producers "and had the effect of allowing Massachusetts producers, despite their higher initial costs, to sell at prices below those charged by out-of-state producers." *Grant's Dairy*, 232 F.3d 21 (quoting *Healy* at 194–95). This Massachusetts tax on milk was held to be an unconstitutional under the Commerce Clause.

The Supreme Court discussed three cases in *National Pork Producer* in which it had found a state's protectionist price-control laws violated the dormant Commerce Clause. In *Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511 (1935)*, New York passed laws that "barred out-of-state dairy farmers from selling their milk in the State 'unless the price paid to' them matched the minimum price New York law guaranteed in-state producers." *Nat'l Pork Producers*, 598 U.S. at 371–72 (quoting *Baldwin*, at 519). These laws "violated the dormant Commerce Clause because they 'deliberately robbed out-of-state dairy farmers' of the ability to leverage any competitive advantages over New York milk sellers stemming from 'lower cost structures [or] more productive farming practices.'" *New Jersey Staffing*, 110 F.4th at 206 (quoting *Nat'l Pork Producers* at 372). The next two cases, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986), and *Healy v. Beer Inst.*, 491 U.S. 324 (1989), involved state laws that required liquor distillers and beer merchants, respectively, to affirm that their in-state prices were no higher than their out-of-state prices. *Nat'l Pork Producers* at 372. The Supreme Court "reasoned that these laws violated the dormant Commerce Clause because the States were trying to 'hoard commerce for the benefit of in-state merchants and discourage consumers from crossing state lines to make their purchases from nearby out-of-state vendors.'" *New Jersey Staffing* at 206 (quoting *Nat'l Pork Producers* at 372–73 (cleaned up)).

Act 521 does not impose a tax. It does not place a burden on milk coming into the state or regulate who can sell milk in Arkansas. Compare the Arkansas statute to Maine's statute that was upheld as constitutional in *Grant's Dairy*. Maine set a minimum price that in-state handlers must pay to in-state producers with respect to milk produced, processed, and sold in Maine. This closely mirrors what is required by Act 521, with one distinction. The Arkansas statute does not specify who must pay Arkansas producers, just that they must "receive" Class 1 prices for their milk that is sold in Arkansas. As the legislative history makes clear, the statute is directed at encouraging dairy cooperatives, as the ones who negotiate premiums from handlers, to pass the premiums on to the Arkansas producers. While DFA is a Kansas cooperative association, Act 521 does not treat in-state cooperatives differently from out-of-state cooperatives. The Court finds that DFA has failed to meet its burden of proof to show that Act 521 and its regulations are discriminatory. Therefore, the Court denies DFA's motion for summary judgment on the dormant Commerce Clause and grants the State's motion.

### III. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff's motion for summary judgment (Doc. No. 20) is GRANTED in part and DENIED in part. As to its claim that Act 521 and the enacting regulations violate the Contract Clause, the motion is GRANTED; otherwise, the motion is DENIED.

The Court further finds that Defendant's motion for summary judgment (Doc. No. 17) is likewise GRANTED in part and DENIED in part. As to its claims that Act 521 and the implementing regulations pass constitutional muster with respect to the Supremacy Clause and the dormant Commerce Clause, the motion is GRANTED; otherwise, it is DENIED.

IT IS SO ORDERED this 30th day of October, 2024.

_____
UNITED STATES DISTRICT JUDGE